# No. 25-5694

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

---

**FEDEX CORPORATION, and Subsidiaries**

**Plaintiff-Appellee**

**v.**

**UNITED STATES OF AMERICA**

**Defendant-Appellant**

---

**ON APPEAL FROM THE JUDGMENT OF**
**THE WESTERN DISTRICT OF TENNESSEE**

---

**OPENING BRIEF FOR THE APPELLANT**

---

BRETT A. SHUMATE
  *Assistant Attorney General*
JOSHUA WU
  *Deputy Assistant Attorney General*

CLINT A. CARPENTER          **(202) 514-4346**
NORAH E. BRINGER            **(202) 307-6224**
  *Attorneys, Tax Litigation Branch*
  *Civil Division, U.S. Department of Justice*
  *Post Office Box 502, Washington, D.C. 20044*

# TABLE OF CONTENTS

**Page**

Table of contents.................................................................................i

Table of authorities ..........................................................................v

Statement regarding oral argument......................................................x

Glossary ...........................................................................................xi

Introduction .....................................................................................1

Jurisdictional statement .....................................................................3

     A.    District Court jurisdiction .............................................3

     B.    Appellate jurisdiction ...................................................4

Statement of the issues ......................................................................4

Statement of the case .......................................................................5

     A.    Legal introduction.........................................................5

          1.    U.S. taxation of worldwide income leads to the foreign tax credit ("FTC").............................6

               a.    Congress creates FTCs to ease double taxation .......................................................7

               b.    Congress limits FTCs to preserve U.S. tax on U.S. income........................................8

          2.    Congress enacts "subpart F" to impose U.S. income tax on a few categories of undistributed foreign income .............................10

               a.    Section 951(a): Subpart F inclusions in gross income................................................11

               b.    Section 959(a): Exclusion of distributions of previously included subpart F income........................................12

               c.    Section 960(a): Subpart F and FTCs .........13

(1) Section 960(a)(1): Allowance of FTCs for subpart F income ............... 13

(2) Section 960(a)(2): Disallowance of FTCs for distributions of previously taxed subpart F income ............................................... 14

(3) Section 960(a)(3): The exception to disallowance on which FedEx rests its claim for FTCs ..................... 15

3. Congress enacts the "transition tax" to prevent windfalls in the move to the TCJA's new system for taxing foreign income ................ 17

a. Section 965(a)-(b)(3): The transition tax and its exemption of Offset Earnings ........ 17

b. Section 965(b)(4)(A): Exempting distributions of Offset Earnings from U.S. income tax ........................................... 20

c. Section 965(g): Coordinating the transition tax's reduced tax rates with reduced FTCs ............................................ 22

d. Section 965(o): Congress gives Treasury regulatory authority "to prevent the avoidance" of section 965's "purposes" ...... 24

4. Treasury promulgates a rule disallowing FTCs for foreign taxes paid with respect to Offset Earnings .................................................. 24

B. Procedural history ........................................................ 25

1. FedEx's original and amended tax returns ........ 25

2. District Court proceedings ................................ 26

Summary of argument ......................................................... 31

Argument ........................................................................ 34

      The disallowance rule is valid under the best reading of
      section 965 and, in any event, does not conflict with the
      best reading of section 960(a)(3) ............................................ 34

      Standard of review ............................................................ 34

      A.    Section 965's best reading is that it delegates
            discretionary authority to Treasury to disallow
            FTCs for Offset Earnings Foreign Taxes ..................... 35

            1.    Section 965(o) delegates discretionary
                  authority to Treasury to "prevent the
                  avoidance" of section 965's "purposes" ................ 36

            2.    The disallowance rule is a valid exercise of
                  Treasury's delegated authority because it
                  prevents avoidance of section 965(g)'s
                  purpose of limiting FTCs to instances of
                  double taxation ................................................. 40

      B.    In any event, the best reading of the integrated
            statutory scheme is that section 960(a)(3) does not
            allow FTCs related to distributions of Offset
            Earnings ...................................................................... 48

            1.    The District Court's primary rationale,
                  though incorrect, forecloses FTCs for Offset
                  Earnings Foreign Taxes ..................................... 49

            2.    Section 960(a)(3) does not allow FTCs related
                  to distributions of Offset Earnings because
                  section 965(b)(4)(A) treats those earnings as
                  if they were previously included in the
                  distributee's income ........................................... 52

a.  Section 965(b)(4)(A)'s fictional treatment of Offset Earnings applies to all of section 960(a)(3)—not just the part that helps FedEx—which is fatal to the claim for FTCs ................................ 53

b.  Section 959(a) applies to a whole chapter of the Internal Revenue Code, including section 960 ................................ 56

c.  The District Court's concern, raised *sua sponte*, about the "prior taxable year" language was both misplaced and beyond its authority to consider ............... 58

d.  Statutory context confirms that FTCs are not available for Offset Earnings Foreign Taxes ............................................. 61

3.  Any doubt that the Code bars FTCs for Offset Earnings Foreign Taxes must be resolved in the Government's favor ...................................... 65

Conclusion ................................................................................. 67
Certificate of compliance ....................................................... 68
Addendum ................................................................................. 69
Statutory addendum ............................................................... 70

# TABLE OF AUTHORITIES

**Cases:**                                                     **Page(s)**

*Associated Tel. & Tel. Co. v. United States,*
306 F.2d 824 (2d Cir. 1962) ........................................62-64

*Audio Technica U.S., Inc. v. United States,*
963 F.3d 569 (6th Cir. 2020) ........................................ 65

*Burnet v. Chi. Portrait Co.,*
285 U.S. 1 (1932) .............................. 1, 7, 35, 62

*Burns v. United States,*
501 U.S. 129 (1991) ........................................ 45

*Burroughs Adding Mach. Co. v. Terwilliger,*
135 F.2d 608 (6th Cir. 1943) ........................................65-66

*Cboe Global Markets, Inc. v. SEC,*
155 F.4th 704 (D.C. Cir. 2025) ........................................ 37

*Charter Co. v. United States,*
971 F.2d 1576 (11th Cir. 1992) ........................................ 60

*Chevron, U.S.A. Inc. v. NRDC, Inc.,*
467 U.S. 837 (1984) ....................2, 27, 29, 33-34, 36, 39

*Chrysler Corp. v. Commissioner,*
436 F.3d 644 (6th Cir. 2006) ........................... 1, 35, 66

*Estate of Bird,*
534 F.2d 1214 (6th Cir. 1976) ........................................ 60

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ........................................61-62

*Fowler Hosiery Co. v. Commissioner,*
301 F.2d 394 (7th Cir. 1962) ........................................ 64

*Garlock Inc v. Commissioner,*
489 F.2d 197 (2d Cir. 1973) ........................................11-12

*Gentsch v. Goodyear Tire & Rubber Co.,*
151 F.2d 997 (6th Cir. 1945) ........................................ 9, 66

*Gulomjonov v. Bondi,*
131 F.4th 601 (7th Cir. 2025) ........................................ 38

*INDOPCO, Inc. v. Commissioner,*
503 U.S. 79 (1992) ........................................ 65

*Lesko v. United States,*
___ F.4th ___, 2025 WL 3562218 (Fed. Cir. 2025) .................41-44

**Cases (cont'd):**                                                      **Page(s)**

*Liberty Global, Inc. v. Commissioner,*
    153 F.4th 966 (10th Cir. 2025)............................................6, 9-10
*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024) ................................2, 5, 27, 32-34, 36-41, 61
*Mallette Bros. Const. Co. v. United States,*
    695 F.2d 145 (5th Cir. 1983) ........................................................60
*Marsman v. Commissioner,*
    205 F.2d 335, 342 (4th Cir. 1953) ..............................................63
*Mayfield v. U.S. Dep't of Labor,*
    117 F.4th 611 (5th Cir. 2024)......................................................41
*McGowan v. United States,*
    143 F.4th 686 (6th Cir. 2025)............................................... 34, 66
*Moore v. United States,*
    36 F.4th 930 (9th Cir. 2022) .......................................10-11, 17-18
*Moore v. United States,*
    602 U.S. 572 (2024) ..............................................10-11, 17-18, 22
*Muskat v. United States,*
    554 F.3d 183 (1st Cir. 2009).......................................................60
*Nat'l Cash Register Co. v. United States,*
    400 F.2d 820 (6th Cir. 1968) .............................................8, 63, 66
*New Colonial Ice Co. v. Helvering,*
    292 U.S. 435 (1934) ...................................................................65
*NextEra Energy Res., LLC v. FERC,*
    118 F.4th 361 (D.C. Cir. 2024) ..................................................46
*Ohio Telecom Assoc. v. FCC,*
    150 F.4th 694 (6th Cir. 2025).....................................................41
*Pickens v. Hamilton-Ryker IT Solutions, Inc.,*
    133 F.4th 575 (6th Cir. 2025)..........................................37-39, 41
*Pulsifer v. United States,*
    601 U.S. 124 (2024) ...................................................................45
*R.H. Donnelley Corp. v. United States,*
    641 F.3d 70 (4th Cir. 2011) ...............................................9, 62-63
*Rodgers v. United States,*
    843 F.3d 181 (5th Cir. 2016) ......................................................60
*Salyersville Nat'l Bank v. United States,*
    613 F.2d 650 (6th Cir. 1980) ......................................................60

**Cases (cont'd):** **Page(s)**

*Schiff v. United States,*
942 F.2d 348 (6th Cir. 1991) .......................................... 65

*Staub v. Proctor Hosp.,*
562 U.S. 411 (2011) ........................................................ 46

*United States v. Goodyear Tire and Rubber Co.,*
493 U.S. 132 (1989) ................................................... 7, 35

*United States v. Hansen,*
599 U.S. 762 (2023) ........................................................ 62

*United States v. Tate,*
999 F.3d 374 (6th Cir. 2021) .......................................... 62

*Whirlpool Fin. Corp. v. Commissioner,*
19 F.4th 944 (6th Cir. 2021) ........................................... 11

*Whitman v. Am. Trucking Assocs.,*
531 U.S. 457 (2001) ........................................................ 64

**United States Constitution:**

U.S. Const. amend. XVI ..................................................... 6

**Statutes:**

Internal Revenue Code (26 U.S.C.):

§ 11(b) ............................................................................ 22
§ 61(a) .............................................................................. 6
§ 245A ............................................................................ 17
§ 901 (2016) ................................................ 7-8, 13-14, 23, 55
§ 902 (2016) ........................ 7-8, 13-16, 23, 25, 35, 40, 44, 54, 63
§ 904 ........................................................................... 9-10
§ 951 (2016) ............................................................... *passim*
§ 957(a) ........................................................................... 11
§ 959 (2016) ............................................................... *passim*
§ 960 (2016) ............................................................... *passim*
§ 965 ......................................................................... *passim*
§ 6532(a)(1) ................................................................. 4, 26

**Statutes (cont'd):**                                    **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):

§ 7422(a) ....................................................................... 4, 60
§ 7805 ...................................................................25, 40, 44

28 U.S.C.:

§ 1291 ............................................................................... 4
§ 1346(a)(1) ...................................................................... 4
§ 2107(b) .......................................................................... 4

Revenue Act of 1913,
    Pub. L. No. 63-16, 38 Stat. 114 ..................................... 6
Revenue Act of 1918,
    Pub. L. No. 65-254, 40 Stat. 1057 ............................... 5, 7
Revenue Act of 1921,
    Pub. L. No. 67-98, 42 Stat. 227 ....................................8-9
Tax Cuts and Jobs Act of 2017
    Pub. L. No. 115-97, 131 Stat. 2054 ........................ *passim*

**Rules and regulations:**

Fed. R. App. P. 4(a)(1)(B) ................................................. 4

Treasury Regulations (26 C.F.R.):

§ 1.960-2(a) (2017) ......................................................... 59
§ 1.965-5(c)(1)(i) ............................................................ 30
§ 1.965-5(c)(1)(ii) .....................................2, 4, 24-25, 40
§ 301.6402-2(b)(1) .......................................................... 60

Regulations Regarding the Transition Tax Under
    Section 965 and Related Provisions,
    84 Fed. Reg. 1838 (Feb. 5, 2019) ........................24-25, 40

**Legislative history:**                                          **Page(s)**

    H.R. Rep. No. 86-1358 (1960) ...........................................................9
    H.R. Rep. No. 87-1447 (1962) ...............................................11, 14-15
    H.R. Rep. No. 115-409 (2017) .................................................17-18
    H.R. Rep. No. 115-466 (2017) (Conf. Rep.)...................................23-24
    S. Rep. No. 67-275 (1921).................................................................9
    S. Rep. No. 86-1393 (1960)..............................................................9
    S. Rep. No. 99-313 (1985)...............................................................10

    *Internal Revenue: Hearings Before the Committee on*
        *Finance of the United States Senate on H.R. 8245,*
        67th Cong. 3 1st Sess. (1921) ..........................................9

**Other authorities:**

    Antonin Scalia & Bryan A. Garner, *Reading Law* (2012).................46
    Joel D. Kuntz & Robert J. Peroni, *U.S. International*
        *Taxation* (Sept. 2025) ............................................6, 11, 13-14, 16
    *Mertens Law of Federal Income Taxation*.........................................60

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument should be heard in this complex tax case because the case concerns questions of first impression about the validity of a federal Treasury regulation and the proper interpretation of an extremely complicated statutory scheme governing U.S. taxation of foreign income.

# GLOSSARY

| | |
|---|---|
| CFC | Controlled foreign corporation |
| FTC | Foreign tax credit |
| I.R.C. | Internal Revenue Code (26 U.S.C.) |
| IRS | Internal Revenue Service |
| Offset Earnings | A type of foreign income that Congress effectively exempted from U.S. taxation under I.R.C. § 965(b) |
| Offset Earnings Foreign Taxes | Foreign taxes paid with respect to Offset Earnings |
| TCJA | Tax Cuts and Jobs Act of 2017 |
| Treas. Reg. | Treasury Regulation (26 C.F.R.) |

## INTRODUCTION

The United States historically has taxed the worldwide income of U.S. taxpayers. For more than a century, federal statutes have allowed U.S. taxpayers a foreign tax credit ("FTC") for taxes paid to foreign countries on income that *also* is taxed by the United States. The "primary design" of this credit is "to mitigate the evil of double taxation." *Burnet v. Chi. Portrait Co.*, 285 U.S. 1, 7 (1932). Indeed, this Court has recognized that mitigating double taxation is "the underlying purpose of the statutory scheme governing foreign tax credits." *Chrysler Corp. v. Commissioner*, 436 F.3d 644, 654 (6th Cir. 2006).

This case concerns whether FedEx is entitled to $233 million in FTCs—and, for tax year 2019, an $89 million tax refund—for foreign taxes paid by its foreign subsidiaries on so-called "Offset Earnings," a type of foreign income that Congress has *exempted* from U.S. taxation. Because of that exemption, allowing FedEx to claim FTCs with respect to its Offset Earnings would not mitigate double taxation but rather would reduce FedEx's U.S. taxes on its U.S. income—at the expense of every U.S. taxpayer who does not happen to have Offset Earnings.

Recognizing that Offset Earnings are not at risk of double taxation, the Treasury Department promulgated a regulation, the "disallowance rule," that bars FTCs for foreign taxes paid with respect to Offset Earnings ("Offset Earnings Foreign Taxes"). 26 C.F.R. ("Treas. Reg.") § 1.965-5(c)(1)(ii). This rule is valid under the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), because it "prevent[s] the avoidance of the purposes of [26 U.S.C. ("I.R.C.") § 965]" and is therefore within the boundaries of the discretionary authority that Congress granted to Treasury in I.R.C. § 965(o). *See Loper Bright*, 603 U.S. at 395. The rule is also valid because the interlocking statutes governing FTCs, when properly construed, do not allow FTCs for Offset Earnings Foreign Taxes.

FedEx argues that there is a statutory loophole through which Congress—*sub silentio* and contrary to the settled purpose of FTCs— allowed FTCs for Offset Earnings Foreign Taxes *notwithstanding* that Offset Earnings are exempt from U.S. taxation and therefore *not* at risk of double taxation. Applying the now-overruled framework in *Chevron, U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), the District Court adopted FedEx's "simpler" analysis and held that the disallowance rule

was invalid. (Order, RE 49, Page ID # 985-986.) But the court did not consider the discretionary authority that Congress delegated to Treasury in section 965(o), misinterpreted statutory text, and failed to give proper weight to the complex and interlocking statutory provisions through which Congress has both allowed and limited FTCs.

Far from mitigating double taxation, the District Court's erroneous interpretation results in double *nontaxation* of Offset Earnings by requiring the Treasury to reimburse (in the form of FTCs) the foreign taxes paid on earnings that are already exempt from U.S. taxes. This Court should reverse the District Court's ruling that the disallowance rule is invalid, vacate the judgment, and remand to the District Court for further proceedings.

## JURISDICTIONAL STATEMENT

### A. District Court jurisdiction

On FedEx's original corporate income tax returns for tax years ending May 31, 2018 (the 2018 tax year), and May 31, 2019 (the 2019 tax year), according to allegations in the complaint, FedEx treated the disallowance rule as valid and did *not* claim FTCs for Offset Earnings Foreign Taxes. (*See* Complaint, RE 1, Page ID # 7, 19.) In amended

returns filed for both years on April 17, 2020, FedEx changed its position, treated the disallowance rule as invalid, and claimed the FTCs and tax refunds at issue in this litigation. (*See id.* at Page ID # 17, 19.)

On November 2, 2020, after six months had elapsed without the IRS acting on its claims, FedEx timely filed this refund suit in the Western District of Tennessee. (*Id.* at Page ID # 1-32.) *See* I.R.C. § 6532(a)(1). The District Court had jurisdiction under I.R.C. § 7422(a) and 28 U.S.C. § 1346(a)(1).

## B. Appellate jurisdiction

On June 4, 2025, the District Court (Judge Samuel H. Mays, Jr.) entered final judgment, resolving all parties' claims. (Judgment, RE 75, Page ID # 1173-1174.) The Government filed a timely notice of appeal on August 1, 2025. (Notice of Appeal, RE 76, Page ID # 1175-1176.) *See* 28 U.S.C. § 2107(b); Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the disallowance rule in Treas. Reg. § 1.965-5(c)(1)(ii), which bars FTCs for Offset Earnings Foreign Taxes, is a valid

exercise of the discretionary authority that Congress delegated to Treasury in I.R.C. § 965(o).

2. Alternatively, whether the integrated statutory scheme governing FTCs does not allow FTCs for Offset Earnings Foreign Taxes.

## STATEMENT OF THE CASE

### A. Legal introduction

The provisions of the Internal Revenue Code governing FTCs operate through interlocking statutes that Congress enacted over the span of a century, from the Revenue Act of 1918 to the Tax Cuts and Jobs Act of 2017 ("TCJA"). Congress engrafted each permutation on previously enacted frameworks, so these statutes "can be sensibly understood only by reviewing text in context." *See Loper Bright*, 603 U.S. at 392 n.4 (internal quotations omitted). To determine whether FedEx should be allowed to claim $233 million in FTCs for its Offset Earnings Foreign Taxes, and a related $89 million tax refund for 2019, it is critical to understand the history of the relevant statutes and how they interact today.[1]

---

[1] The Code's international tax provisions are complex. Of necessity, we provide a general overview of these intricate statutes and,

(continued…)

### 1. U.S. taxation of worldwide income leads to the foreign tax credit ("FTC")

Starting from the first modern federal income tax, enacted after the ratification of the Sixteenth Amendment in 1913,[2] the United States historically has imposed the federal income tax on worldwide income of U.S. taxpayers, including corporations. *See* I.R.C. § 61(a) (defining "gross income" as "all income from whatever source derived"); Revenue Act of 1913, Pub. L. No. 63-16, § II.A-B, G, 38 Stat. 114, 166-72; Joel D. Kuntz & Robert J. Peroni, *U.S. International Taxation* § B1.03 (Sept. 2025) ("Kuntz-Peroni"). "When a U.S. corporation does business overseas, its activity is usually taxed both by the United States and the country in which it does business." *Liberty Global, Inc. v. Commissioner*, 153 F.4th 966, 967 (10th Cir. 2025). Alleviating such double taxation has been a consistent fixture of federal income tax law.

---

at times, describe them in simplified terms. We also omit details and nuances that are not directly relevant to the issues on appeal.

[2] The Sixteenth Amendment granted Congress "power to lay and collect taxes on incomes, from whatever source derived . . . ." U.S. Const. amend. XVI.

### a. Congress creates FTCs to ease double taxation

With a "primary design" "to mitigate the evil of double taxation," Congress enacted the first FTC in the Revenue Act of 1918. *Burnet*, 285 U.S. at 7; Revenue Act of 1918, Pub. L. No. 65-254, § 238, 40 Stat. 1057, 1080. Congress provided the credit for foreign taxes paid *directly* by a domestic corporation for, *e.g.*, income earned through unincorporated foreign branches. *See* Revenue Act of 1918, § 238(a), 40 Stat. at 1080 (enacting the "direct" FTC now codified at I.R.C. § 901).

For domestic corporations that operated through separately incorporated foreign subsidiaries, Congress also allowed a "deemed-paid" or "indirect" FTC. *See* Revenue Act of 1918, § 240(c), 40 Stat. at 1082; *United States v. Goodyear Tire and Rubber Co.*, 493 U.S. 132, 139-41 (1989) (discussing the indirect credit previously codified at I.R.C. § 902). When a domestic parent corporation received, from a foreign subsidiary, a dividend subject to U.S. tax, the parent was "deemed to have paid" a portion of the related foreign taxes that its foreign subsidiary actually paid. Revenue Act of 1918, § 240(c), 40 Stat. at 1082. And the domestic parent corporation could claim FTCs based on that statutorily created fiction. *See id.*

For the tax years at issue here, the deemed-paid credit was codified at I.R.C. § 902(a), with I.R.C. § 901(a) allowing FTCs for "the taxes deemed to have been paid" under section 902.[3] *See Nat'l Cash Register Co. v. United States*, 400 F.2d 820, 823-24 (6th Cir. 1968).

### b. Congress limits FTCs to preserve U.S. tax on U.S. income

Only three years after creating the credit, Congress enacted limits to ensure that FTCs would reduce U.S. tax on *foreign income*—thereby addressing double taxation—but could not go further to reduce U.S. tax on *U.S. income.* *See* Revenue Act of 1921, Pub. L. No. 67-98, § 238(a), (e), 42 Stat. 227, 258-59. T.S. Adams, the FTC's architect and an advisor to Treasury, explained that the unlimited FTC was "subject to this one rather grave abuse: If the foreign taxes are higher than our rate of taxes, that credit may wipe out taxes which fairly belong to this

---

[3] The TCJA repealed section 902 and altered other statutes cited herein, including I.R.C. §§ 901, 951, 959, and 960. *See, e.g.*, 131 Stat. 2054, 2221-22, § 14301 (repealing section 902 and amending section 960). But the *pre-TJCA* versions of those statutes apply here because FedEx's 2018 tax year is the source of the disputed FTCs, and that tax year began before the effective date of the relevant TCJA amendments. *See, e.g.*, *id.* at § 14301(d), 131 Stat. at 2225. (*See also* Order, RE 49, Page ID # 972 n.8.) As such, unless otherwise noted, we cite to the pre-TCJA (2016) versions of I.R.C. §§ 901, 902, 951, 959, and 960, the pertinent parts of which are reproduced in an addendum to this brief.

country." *Internal Revenue: Hearings Before the Committee on Finance of the United States Senate on H.R. 8245*, 67th Cong. 3, 73, 1st Sess. (1921), *available at* https://www.finance.senate.gov/download/internal-revenue-part-1-september-1_-october-1-1921.  "To prevent this abuse," S. Rep. No. 67-275, at 17 (1921), the Revenue Act of 1921 "included limitations designed to protect the domestic tax on domestic income," *Gentsch v. Goodyear Tire & Rubber Co.*, 151 F.2d 997, 999 (6th Cir. 1945).

Modern analogous limitations are codified at I.R.C. § 904(a), which "is meant to restrict the [FTC] to what the U.S. tax would have been on the taxpayer's foreign-source income."  *R.H. Donnelley Corp. v. United States*, 641 F.3d 70, 75 (4th Cir. 2011) (citing H.R. Rep. No. 86-1358 (1960); S. Rep. No. 86-1393 (1960)); *see also Liberty Global*, 153 F.4th at 967 ("Section 904 is one of many provisions designed to prevent the [foreign] tax credit from reducing or eliminating the United States tax on income from sources within the United States." (internal quotations omitted)).[4]  As a 1985 congressional report explained,

---

[4] Section 904 achieves its intended effect by limiting the credits available to the taxpayer's U.S. tax liability (before credit) multiplied by

(continued…)

"[p]ermitting the foreign tax credit to reduce U.S. tax on U.S. income would in effect cede to foreign countries the primary right to tax income earned in the United States." S. Rep. 99-313, at 295 (1985).

### 2. Congress enacts "subpart F" to impose U.S. income tax on a few categories of undistributed foreign income

"For legal and practical reasons, Congress generally does not directly tax foreign corporations, including American-controlled foreign corporations, on the income that they earn outside of the United States." *Moore v. United States*, 602 U.S. 572, 579 (2024) ("*Moore II*"), *aff'g*, 36 F.4th 930 (9th Cir. 2022) ("*Moore I*"). "Traditionally, U.S. taxpayers generally did not pay U.S. taxes on foreign earnings until those earnings were distributed to them," *Moore I*, 36 F.4th at 933, which sometimes is called "repatriating" or "onshoring" of the foreign earnings. That dynamic "encouraged American companies to structure their operations so as to shift their income to foreign subsidiaries" and

---

the ratio of the taxpayer's foreign-source income to its worldwide taxable income. *Liberty Global*, 153 F.4th at 967-68; I.R.C. § 904(a). This limitation is applied separately to separate categories of income. I.R.C. § 904(d). Consequently, it does not necessarily prevent foreign tax imposed on a particular item of income from offsetting U.S. tax on another item of income, so long as those items are within the same section 904(d) category.

"thereby defer indefinitely" U.S. tax of such income. *Whirlpool Fin. Corp. v. Commissioner*, 19 F.4th 944, 945-46 (6th Cir. 2021).

Attempting to combat that "tax avoidance device," in 1962, Congress enacted "subpart F" of the Internal Revenue Code (named after its place in the Code, I.R.C. §§ 951-965). *Garlock Inc v. Commissioner*, 489 F.2d 197, 201 (2d Cir. 1973); *see also* H.R. Rep. No. 87-1447, at 57 (1962) (describing "'tax deferral'" through foreign subsidiaries). "Subpart F targets for current U.S. taxation certain types of income and activities that Congress considers tax haven devices." Kuntz-Peroni ¶ B3.01. Until the TCJA was enacted in 2017, subpart F was "the primary method used to tax a [controlled foreign corporation's] U.S. shareholders on foreign earnings held offshore." *Moore I*, 36 F.4th at 933.

### a. <u>Section 951(a)</u>: Subpart F inclusions in gross income

Subpart F applies to "United States shareholders" of a "controlled foreign corporation" ("CFC"). *See* I.R.C. §§ 951(b), 957(a). Subpart F taxes U.S. shareholders currently on certain CFC foreign income (referred to as "subpart F income"), even though the income is not *actually* distributed to the U.S. shareholders. *See Moore II*, 602 U.S. at

579, 587. Specifically, under I.R.C. § 951(a), a U.S. shareholder of a CFC must "include in his gross income," *inter alia*, "his pro rata share . . . of the corporation's subpart F income." Subpart F income is subject to U.S. tax "whether or not that income has been distributed to the shareholder." *Garlock*, 489 F.2d at 198.

### b. Section 959(a): Exclusion of distributions of previously included subpart F income

If a U.S. shareholder later receives a distribution of earnings already taxed under subpart F, I.R.C. § 959(a) ensures that it is not taxed again. Section 959(a) provides that when "the earnings and profits of a foreign corporation" that are "attributable to amounts which *are, or have been included* in the gross income of a United States shareholder under section 951(a)"—*i.e.*, already have been subject to U.S. tax under subpart F—are *distributed* to that shareholder, such amounts "*shall not*" "*be again included*" in the shareholder's gross income (emphasis added). Section 959(a) broadly applies "[f]or purposes of this chapter" of the Internal Revenue Code, *i.e.*, Chapter 1 (Normal Taxes and Surtaxes) of Subtitle A (Income Taxes).

### c. Section 960(a): Subpart F and FTCs

Congress also allowed a deemed-paid FTC when a U.S. shareholder included subpart F income in its gross income. Once again, Congress coordinated U.S. taxation of foreign income with the availability of FTCs. *See* Kuntz-Peroni ¶ B4.10[4] (discussing the pre-TCJA version of section 960, which applies here).

#### (1) Section 960(a)(1): Allowance of FTCs for subpart F income

Where subpart F income "is included under section 951(a) in the gross income of a domestic corporation," and other requirements are met, "section 902 [the deemed-paid FTC provision] shall be applied *as if* the amount so included were a dividend paid by [the] foreign corporation." I.R.C. § 960(a)(1) (emphasis added). Section 960 "creates a deemed-paid tax that feeds into the basic [FTC] section, Section 901." Kuntz-Peroni ¶ B4.10[1]. In less technical terms, section 960(a)(1) allows FTCs to mitigate the U.S. tax imposed via the subpart F income inclusion by (1) pretending that subpart F income was a "dividend" paid by a foreign corporation to a domestic corporation, which (2) triggers the fiction in section 902 "deem[ing]" that the domestic corporation paid

some of the foreign corporation's foreign taxes, which (3) allows the domestic corporation to claim an FTC under section 901.

**(2)**     **Section 960(a)(2): Disallowance of FTCs for distributions of previously taxed subpart F income**

Just as Congress ensured (through section 959(a)) that subpart F income is generally *taxed* only once by the United States, it also allowed a *deemed-paid FTC* only once for foreign taxes paid on subpart F income. I.R.C. § 960(a)(2); *see* H.R. Rep. No. 87-1447 at 66; Kuntz-Peroni ¶ B4.09[3][c][iii]. The rule in section 960(a)(2) that generally prevents a subsequent FTC is first triggered by exclusion from income under section 959. Recall that section 959(a) excludes distributions of foreign earnings from a U.S. corporation's income when such earnings previously were included as subpart F income—and therefore were previously taxed (via section 951(a)) and previously resulted in a deemed-paid FTC (via sections 960(a)(1) and 902) for foreign taxes paid on the earnings. *See supra* at 12-14. Accordingly, "[i]f a domestic corporation receives a distribution from a foreign corporation, any portion of which is excluded from gross income under section 959," the foreign taxes "shall *not* be taken into account for purposes of section 902

[the deemed-paid FTC provision], to the extent such taxes *were deemed paid* by a domestic corporation under [section 960(a)(1)] for any prior taxable year." I.R.C. § 960(a)(2) (emphasis added); *see also* I.R.C. § 959(d) (effecting the same prohibition). In this way, the statutes coordinate FTC availability with U.S. taxation:

| subpart F inclusion | Subject to U.S. tax (section 951(a)) | Deemed-paid FTC available (section 960(a)(1)) |
| Distribution of earnings and profits previously included as subpart F income | No additional U.S. tax (section 959(a)) | No additional FTC (section 960(a)(2)) |

**(3)** **Section 960(a)(3): The exception to disallowance on which FedEx rests its claim for FTCs**

Congress was concerned that a narrow slice of foreign taxes could slip through this framework, "[w]here the foreign country imposes a tax directly on dividend distributions" *after* the subpart F inclusion (under section 951(a)(1)) *and* the deemed-paid FTC (under sections 960(a)(1) and 902)). H.R. Rep. 87-1447, at 66. To solve that problem, Congress enacted the exception in I.R.C. § 960(a)(3), *see id.*, on which FedEx

relies to claim FTCs for Offset Earnings Foreign Taxes.

Section 960(a)(3) states:

> Any portion of a distribution from a foreign corporation received by a domestic corporation *which is excluded from gross income under section 959(a)* shall be treated by the domestic corporation as a dividend, solely for purposes of taking into account under section 902 [certain foreign taxes related to the distribution], *which were not deemed paid* by the domestic corporation under [section 960(a)(1)] for any prior taxable year.

I.R.C. § 960(a)(3) (emphasis added).  By treating the described distribution as a "dividend," section 960(a)(3) triggers the deemed-paid credit under section 902.  *See* Kuntz-Peroni ¶ B4.10[4][a].

Section 960(a)(3) thus provides an exception to section 960(a)(2)'s general bar on subsequent FTCs by allowing a U.S. corporation to claim FTCs—upon receiving a distribution "which is excluded from gross income under section 959(a)"—for foreign income taxes "which were *not* deemed paid by the domestic corporation under [section 960(a)(1)] for any prior taxable year."  FedEx relies on the section 960(a)(3) exception to claim $233 million in FTCs for foreign taxes on Offset Earnings that have never, and will never, be subject to U.S. tax.

**3. Congress enacts the "transition tax" to prevent windfalls in the move to the TCJA's new system for taxing foreign income**

Despite Congress's efforts, subpart F subjected only a "small portion" of CFCs' income to U.S. taxation. *Moore II*, 602 U.S. at 579. By 2015, CFCs had stockpiled an estimated $2.6 trillion in offshore earnings that had not been subject to U.S. tax. *Moore I*, 36 F.4th at 933. The way that the United States taxes the foreign operations of U.S. corporations was fundamentally changed through the TCJA, Pub. L. No. 115-97, 131 Stat. 2054 (2017). The historical "worldwide system of taxation with deferral provide[d] perverse incentives to keep funds offshore." H.R. Rep. No. 115-409, at 370 (2017). Broadly speaking, the TCJA transitioned the United States "toward a territorial system, where corporations are generally taxed only on their domestic source profits," and repatriated foreign earnings "are generally not taxed." *Moore I*, 36 F.4th at 933; *see* I.R.C. §§ 245A, 965(b)(4).

**a. <u>Section 965(a)-(b)(3)</u>: The transition tax and its exemption of Offset Earnings**

"As part of the complicated transition," the TCJA imposed the transition tax, which is "a one-time, backward-looking tax" on the income accumulated abroad under the prior system, which "went almost

entirely untaxed by the United States." *Moore II*, 602 U.S. at 579-80.[5]

The transition tax fills a significant gap between the old and new systems and was enacted "[t]o avoid a potential windfall" for entities that deferred U.S. tax through owning foreign corporations and, post-TCJA, can receive tax-free distributions of the accumulated foreign income. H.R. Rep. No. 115-409, at 375; *see also Moore I*, 36 F.4th at 938. Without the transition tax, CFC shareholders would have "never" paid U.S. tax on accumulated offshore earnings. *Moore I*, 36 F.4th at 938.

Subpart F was the "mechanism" for the transition tax. H.R. Rep. No. 115-409, at 376. The transition tax "modified subpart F by classifying CFC earnings after 1986 as income taxable in 2017." *Moore I*, 36 F.4th at 933. The transition tax "attributed the long-accumulated and undistributed income of American-controlled foreign corporations to American shareholders" and then used the subpart F mechanism to tax those shareholders on their pro rata shares, at reduced tax rates of 15.5% or 8%. *Moore II*, 602 U.S. at 580; *see Moore I*, 36 F.4th at 933.

---

[5] The *Moore* opinions refer to the transition tax as the "mandatory repatriation tax" or "MRT."

The transition tax is codified at I.R.C. § 965. As relevant here, a CFC with "accumulated post-1986 deferred foreign income"—in the statute's parlance, a "deferred foreign income corporation"—must include that accumulated foreign income as subpart F income for its "last taxable year" beginning before 2018. I.R.C. § 965(a), (d).

Section 965(b), however, effectively exempted a subset of accumulated foreign income, Offset Earnings, from the transition tax. This exemption recognizes that historically unprofitable CFCs would not have "accumulated post-1986 deferred foreign *income*," but instead would "ha[ve] a *deficit* in post-1986 earnings and profits," making such a CFC an "E&P [earnings and profits] *deficit* foreign corporation" under the transition tax provisions. *See* I.R.C. § 965(a), (b)(3)(B) (emphasis added). Section 965(b)(1) effectively allows taxpayers to offset (*i.e.*, reduce) the accumulated foreign *income* of their successful CFCs with the accumulated foreign *deficits* of their unsuccessful CFCs, in determining the net income subject to the transition tax under section 965(a). The foreign income that is thus offset by foreign deficits is what the parties and the District Court described as "Offset Earnings." That foreign income is not subject to the transition tax, and as explained

below, it will *never* be subject to U.S. tax because distributions of Offset Earnings are also U.S.-tax-free.

Section 965(b)(1)-(3) thus effectively limits the transition tax to a corporation's combined, net-positive accumulated earnings from its foreign subsidiaries. For example, assume a U.S. shareholder owns two foreign subsidiaries, a deferred foreign *income* corporation (Company A) and an E&P (earnings and profits) *deficit* foreign corporation (Company B). Company A has $100 in accumulated earnings that have not been subject to U.S. tax, and Company B has a "specified E&P deficit" of $30. Under section 965(a) and (b)(1)-(3), the U.S. shareholder's subpart F inclusion, which is subject to the transition tax, is only $70 ("non-Offset Earnings"). The $30 delta—*i.e.*, the foreign income of Company A that becomes free of the transition tax upon being netted against the foreign deficit of Company B—is Offset Earnings.

**b.** **Section 965(b)(4)(A): Exempting distributions of Offset Earnings from U.S. income tax**

Section 965(b)(1)-(3) effectively exempts Offset Earnings from the transition tax, and section 965(b)(4)(A) effectively exempts *distributions* of Offset Earnings from U.S. tax—making Offset Earnings forever free

from U.S. tax. Recall that subpart F income is subject to U.S. tax only once, when included in gross income under section 951(a), and section 959(a) ensures that the same income is not taxed again when distributed to the U.S. shareholder. *See supra* at 11-12. Operating through subpart F's mechanism, deferred foreign income that *is* subject to the transition tax is included in subpart F income under section 951(a), the normal subpart F income inclusion provision. *See* I.R.C. § 965(a). For income subject to the transition tax, section 959(a) operates in its usual way to ensure that a second tax is not imposed when that income is distributed to a U.S. shareholder.

Congress created yet another legal fiction to extend that distribution exemption to Offset Earnings. And that ensures that Offset Earnings are *never* taxed in the U.S.—neither via inclusion as subpart F income (through the transition tax) nor upon distribution. To that end, section 965(b)(4)(A) provides that "[f]or purposes of applying section 959," Offset Earnings (*i.e.*, "an amount equal to such shareholder's reduction under [section 965(b)(1)]") "shall be *treated* as an amount *which was included* in the gross income of such United States shareholder under section 951(a)," even though it was not. I.R.C.

§ 965(b)(4)(A) (emphasis added).  Section 965(b)(4)(A) treats Offset

Earnings as though they previously were included in subpart F income

(under section 951(a)), which exempts distributions of Offset Earnings

from U.S. tax (under section 959).

In the Government's view, under the interlocking subpart F

provisions described above, treating Offset Earnings as though they

*previously were* included in subpart F income also means that the Offset

Earnings Foreign Taxes are treated as though they *previously were*

deemed paid under section 960(a)(1) and, therefore, as though deemed-

paid FTCs *previously were* allowed.  In that case, no FTCs are again

available for those same foreign taxes under section 960(a)(3) when the

Offset Earnings are distributed to a domestic parent corporation like

FedEx because section 960(a)(3) requires that the foreign taxes "were

*not* deemed paid" under section 960(a)(1).  *See also* I.R.C. § 960(a)(2).

   c. **Section 965(g): Coordinating the transition tax's reduced tax rates with reduced FTCs**

Through deductions, the TCJA effectively reduces the rates for the

transition tax to 8% and 15.5%, versus the pre-TCJA top corporate tax

rate of 35% or the post-TCJA 21% rate.  *See* I.R.C. § 965(c); I.R.C.

§ 11(b) (2016 & 2018); *Moore II*, 602 U.S. at 580.  And continuing the

general pattern that Congress has followed since it first limited the FTC in 1921, the TCJA also harmonizes the transition tax's low tax rates with reduced FTCs in section 965(g), which "limit[s] the credit to the taxable portion of the included income." H.R. Rep. No. 115-466, at 606 (House bill), 613 (Senate amendment) (2017) (Conf. Rep.); *see id.* at 620.

Working through the existing FTC framework in sections 901 and 902, section 960(a) generally allows FTCs for foreign taxes paid on earnings that *are* subject to the transition tax (*i.e.*, non-Offset Earnings). But consistent with the transition tax's lower tax rates, section 965(g) disallows FTCs (*i.e.*, the "credit" "under section 901") for a specified "applicable percentage of any [foreign] taxes paid or accrued (or treated as paid or accrued)," which effectively limits the allowed FTCs to only the amount necessary to prevent double taxation in light of the transition tax's reduced rates. Thus, in the TCJA, Congress once again calibrated the allowance of FTCs to mitigate double taxation but not reduce U.S. tax on unrelated income.

### d. Section 965(o): Congress gives Treasury regulatory authority "to prevent the avoidance" of section 965's "purposes"

In the TCJA, Congress required the Secretary of the Treasury to "prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of [section 965], including . . . regulations or other guidance to prevent the avoidance of the purposes of this section . . . ." I.R.C. § 965(o). Congress wanted Treasury to "prescribe rules or guidance in order to deter tax avoidance" through various strategies. H.R. Rep. 115-466, at 618.

### 4. Treasury promulgates a rule disallowing FTCs for foreign taxes paid with respect to Offset Earnings

After notice and comment, Treasury promulgated the disallowance rule barring FTCs for Offset Earnings Foreign Taxes. Treas. Reg. § 1.965-5(c)(1)(ii); Regulations Regarding the Transition Tax Under Section 965 and Related Provisions, 84 Fed. Reg. 1838, 1901 (Feb. 5, 2019). As relevant here, the disallowance rule states:

> No credit is allowed under section 960(a)(3) or any other section for foreign income taxes that would have been deemed paid under section 960(a)(1) with respect to [Offset Earnings, *i.e.*,] the portion of a section 965(a) earnings

amount that is reduced under [regulations implementing section 965(b)].

Treas. Reg. § 1.965-5(c)(1)(ii). As its authority for this rule, Treasury cited the discretionary authority that Congress delegated in section 965(o) and the independent grants of regulatory authority in I.R.C. §§ 902(c)(8) and 7805. 84 Fed. Reg. at 1874.

Responding to comments that made essentially the same arguments that FedEx has made here, Treasury explained that because the TCJA effectively exempts Offset Earnings from U.S. tax, allowing FTCs for Offset Earnings Foreign Taxes "would confer a windfall double benefit for taxpayers with [Offset Earnings]." *Id.* at 1857 (referring to Offset Earnings as "section 965(b) previously taxed earnings and profits"). Treasury further explained that the interlocking statutory provisions governing the issue do not allow FTCs for Offset Earnings Foreign Taxes. *See id.*

### B. Procedural history

#### 1. FedEx's original and amended tax returns

According to FedEx, during its 2018 tax year, it received distributions of Offset Earnings totaling $263 million, on which its CFCs had paid $233 million in foreign taxes. (Complaint, RE 1, Page

ID # 16.)  FedEx filed original corporate income tax returns for tax year 2018 in March 2019, and for tax year 2019 in March 2020.  (*Id.* at Page ID # 17-19.)  On both original returns, FedEx treated the disallowance rule as valid and did not claim any FTCs for Offset Earnings Foreign Taxes.  (*Id.*)

But in amended returns for both years, filed in April 2020, FedEx changed course and asserted that the disallowance rule is invalid.  On its amended 2018 return, FedEx claimed $233 million in FTCs for Offset Earnings Foreign Taxes, but it was not able to use those credits for 2018 and sought a modest tax refund for reasons not relevant to this appeal.  (*Id.*)  On its amended 2019 return, FedEx carried forward the unused FTCs for Offset Earnings Foreign Taxes, claimed $146 million in such credits for 2019, and sought an $89 million refund.[6]  (*Id.*)

### 2.    District Court proceedings

The IRS did not respond to FedEx's refund claims within six months, and FedEx filed this suit in November 2020.  *See* I.R.C. § 6532(a)(1).  FedEx sought refunds of $146,000 for 2018 and $89

---

[6] On its amended returns, FedEx made other adjustments that are irrelevant on appeal.

million for 2019.  (Complaint, RE 1, Page ID # 31.)  And FedEx based its

2019 refund claim on its asserted entitlement to $233 million in FTCs

for Offset Earnings Foreign Taxes, citing its theory that the

disallowance rule is invalid.  (*Id.* at Page ID #2-3.)

Paving the way for partial summary judgment proceedings on that

legal issue, the parties agreed that FedEx would not be entitled to any

tax refund for 2019 if the District Court agreed with the Government

that the disallowance rule "validly disallows, or otherwise applicable

statutory provisions do not allow," FTCs for Offset Earnings Foreign

Taxes.  (*See* Joint Statement, RE 42-1, Page ID # 277.)  And if the court

agreed with FedEx, further proceedings would be necessary to

determine the tax consequences.  (*Id.*)

The parties filed cross motions for partial summary judgment.

The parties and the District Court addressed the validity of the

disallowance rule under *Chevron*, 467 U.S. 837 (*see* Order, RE 49, Page

ID # 970-971, 990), which was overruled later during the District Court

proceedings in *Loper Bright*, 603 U.S. at 412.  The District Court

concluded that "the government's regulation is contradicted by the plain

terms of the tax code."  (Order, RE 49, Page ID # 963.)  The court

observed that, pre-TCJA, the three parts of I.R.C. § 960(a) "worked together harmoniously to create an integrated tax credit scheme." (*Id.* at Page ID # 977.) Subsection (a)(1) provided an FTC when subpart F income was included under section 951; subsection (a)(2) "denied a second, redundant credit" when such funds were distributed; and subsection (a)(3) "granted a credit for any additional foreign taxes that had been imposed after the section 951 inclusion and for which no credit had previously been granted." (*Id.*)

The court then turned to the TCJA provision at the center of the dispute, I.R.C. § 965(b)(4)(A). The court rejected the Government's argument that the statutorily created fiction in section 965(b)(4)(A) triggered a series of interrelated steps that ended with no FTCs for Offset Earnings Foreign Taxes. (*See id.* at Page ID # 978-980.) The District Court agreed with FedEx's argument that "Offset Earnings are treated as previously included in income under section 959" but "not treated as included in income when applying section 960, which controls the grant of tax credits." (*Id.* at Page ID # 980.) In the court's view, the phrase "[f]or purposes of applying section 959" in section 965(b)(4)(A) means that "the statute applies to section 959, but not to other

sections"—and specifically not to section 960. (*Id.* at Page ID # 980-982.) The court ultimately found FedEx's approach to be "simpler and more convincing" than the Government's. (*Id.* at Page ID # 985-986.)

The District Court, *sua sponte*, stated that there was "another problem" with the Government's position. (*Id.* at Page ID # 986.) The court thought that there would be a "subset of cases" where "a corporation distributes its Offset Earnings in the *same* taxable year that they would have been included in income" and that "the government's interpretation of the statute breaks down" because "the foreign taxes associated with Offset Earnings" distributed with such timing "could not have been deemed paid 'for any *prior* taxable year' as required by [section 960(a)(3)] to deny a credit." (*Id.* at Page ID # 986-987 (quoting I.R.C. § 960(a)(3); emphasis added).)

The District Court recognized that there was "considerable weight" to the Government's argument that allowing FTCs for Offset Earnings Foreign Taxes "'is not the mitigation of double tax; it is the elimination of any tax.'" (*Id.* at Page ID # 987 (quoting Government's brief).) But the court concluded that, at *Chevron* step one, it could not consider such issues, which "would not change the Court's evaluation of

the unambiguous text." (*Id.* at Page ID # 987-988.) The court also thought that it was "not implausible" that Congress "might have intended" to allow FTCs for Offset Earnings Foreign Taxes, "given a policy of encouraging repatriation of foreign funds." (*Id.* at Page ID # 989.) The court ultimately found that the Government's interpretation of section 960(a)(3) "and its related provisions" was "not reasonable" and held that FedEx was entitled to FTCs for its Offset Earnings Foreign Taxes. (*Id.* at Page ID # 989-990.) Accordingly, the District Court "set aside" the "government's regulation," "to the extent that it contradicts the statute."[7] (*Id.* at Page ID # 990.)

The parties agreed that, under the District Court's rulings, FedEx would be entitled to tax refunds of $87,058 for 2018 and $84,524,409 for 2019. (Order, RE 74, Page ID # 1171-1172.) The District Court entered judgment accordingly. (Judgment, RE 75, Page ID # 1173-1174.)

---

[7] Later in the District Court proceedings, the court held that another rule, described as the "regulatory haircut rule," Treas. Reg. § 1.965-5(c)(1)(i), is invalid to the extent that it applies to Offset Earnings Foreign Taxes. (Order, RE 70, Page ID # 1156.) The Government disagrees with that ruling and may, in other cases, continue to apply, and contest any challenges to, the regulatory haircut rule. But the Government is not challenging that ruling in this appeal.

## SUMMARY OF ARGUMENT

FedEx seeks $233 million in foreign tax credits (FTCs) and an $89 million tax refund for 2019 based on its Offset Earnings that will never be taxed by the United States. For more than a century, Congress has allowed FTCs to mitigate double taxation—*i.e.*, where income is taxed by *both* the United States and a foreign country. Congress also has consistently limited U.S. taxpayers' ability to use FTCs to reduce U.S. tax on *unrelated U.S. income.* Allowing FTCs beyond the mitigation of double taxation would amount to double *nontaxation* and effectively subsidize foreign countries by using the U.S. Treasury to reimburse taxpayers for foreign taxes not duplicated by U.S. taxes. The disallowance rule prevents that bizarre outcome with respect to Offset Earnings, and the District Court erroneously concluded that the rule is invalid.

1. Consistent with the long-settled purpose of FTCs, when Congress imposed the transition tax at reduced tax rates, it also limited the related FTCs to the amounts necessary to prevent double taxation. Congress did this in section 965(g), which reduces the allowable amount of such FTCs to account for the reduced rates of the transition tax. In

that way, Congress carefully calibrated such FTCs to do no more than mitigate the double taxation resulting from the imposition of the transition tax on foreign income also taxed abroad.

At the same time, Congress also delegated to Treasury discretionary authority to issue "regulations or other guidance to prevent the avoidance of the purposes of" section 965. I.R.C. § 965(o). To prevent the avoidance of section 965's purposes regarding FTCs— specifically, section 965(g)'s purpose of allowing FTCs only to the extent necessary to mitigate double taxation—Treasury promulgated the disallowance rule, which bars FTCs for Offset Earnings Foreign Taxes. Offset Earnings are *not* subject to the transition tax or any U.S. tax. Thus, allowing FTCs for Offset Earnings Foreign Taxes would avoid the purposes of section 965, as evidenced by Congress's limitations in section 965(g) on FTCs for foreign taxes paid on deferred foreign income that *is* subject to the transition tax.

Indeed, there is no conceivable purpose for section 965(g)'s limitations that would *not* be avoided by allowing FTCs for Offset Earnings Foreign Taxes. The disallowance rule is thus within "the boundaries of [Treasury's] delegated authority" in section 965(o). *See*

*Loper Bright*, 603 U.S. at 371. And the rule is therefore valid under the standards prescribed in *Loper Bright*.

2.      The District Court, in erroneously holding that the disallowance rule was invalid (under the now-overruled *Chevron* framework), not only ignored the Congressional delegation of authority in I.R.C. § 965(o), but also misinterpreted the text of section 960(a)(3) and the other statutes on which FedEx bases its claim. Over the course of a century, Congress engrafted each relevant enactment on what came before, from the FTC provisions enacted in 1918, through subpart F enacted in 1962, to the TCJA in 2017, which used subpart F's mechanism for the transition tax and its limited FTCs. These statutes must be considered as an integrated whole.

Although their interactions are complex, the best reading of these statutes compels the conclusion that section 960(a)(3) does not allow FTCs for Offset Earnings Foreign Taxes. If there is any doubt on that front, moreover, the doubt must be resolved in the Government's favor under the long-settled rule of strict construction for statutes granting tax credits.

## ARGUMENT

**The disallowance rule is valid under the best reading of section 965 and, in any event, does not conflict with the best reading of section 960(a)(3)**

### Standard of review

This Court reviews *de novo* the District Court's grant of partial summary judgment to FedEx regarding the validity of the disallowance rule. *See McGowan v. United States*, 143 F.4th 686, 695 (6th Cir. 2025). The District Court held that the disallowance rule was invalid under the now-overruled framework in *Chevron*, 467 U.S. 837 (*see* Order, RE 49, Page ID # 990).

Such judicial review now is governed by *Loper Bright*, which held that, "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency," a reviewing court fulfills its role "by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decision making within those boundaries." 603 U.S. at 395 (alterations, quotation marks, and citations omitted).

**A.      Section 965's best reading is that it delegates discretionary authority to Treasury to disallow FTCs for Offset Earnings Foreign Taxes**

For more than a century, Congress has allowed FTCs to mitigate double taxation when the United States taxes foreign income that a foreign country also taxes.  As the Supreme Court concluded in 1932, "the purpose of the statute" allowing FTCs "is clear," and "the primary design of the provision was to mitigate the evil of double taxation." *Burnet*, 285 U.S. at 7.  Ever since, that has remained the overarching purpose of FTCs.  The Supreme Court explained in 1989 that allowing deemed-paid FTCs under I.R.C. § 902 "protects domestic corporations that operate through foreign subsidiaries from double taxation of the same income."  *Goodyear Tire*, 493 U.S. at 135.  More recently, this court explained that mitigating double taxation is "the underlying purpose of the statutory scheme governing foreign tax credits." *Chrysler Corp. v. Commissioner*, 436 F.3d 644, 654 (6th Cir. 2006).

There is no evidence, nor any sound reason to believe, that the TCJA departed from that long-settled purpose and allowed FTCs for Offset Earnings Foreign Taxes, given that Offset Earnings are free from U.S. taxation—nor that Congress intended to use FTCs related to the

transition tax to subsidize foreign governments at the expense of the U.S. Treasury. But those are precisely the effects of allowing FTCs with respect to distributions of Offset Earnings.

Under the District Court's ruling, U.S. corporations that happen to have Offset Earnings would not only *pay no U.S. tax* on those earnings (which Congress clearly intended), but also *be reimbursed* by the U.S. Treasury (through FTCs) for foreign taxes their subsidiaries paid. Far from mitigating double taxation, this amounts to double *nontaxation* of Offset Earnings—paid for by every U.S. taxpayer that happens not to have Offset Earnings. The disallowance rule prevents this bizarre result and is squarely within the boundaries of the discretionary authority delegated to Treasury in I.R.C. § 965(o).

1. **Section 965(o) delegates discretionary authority to Treasury to "prevent the avoidance" of section 965's "purposes"**

*Loper Bright* overruled *Chevron* and held that courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous." 603 U.S. at 413. But "[i]n a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion," and "Congress has often enacted such

statutes." *Id*. at 394. "In doing away with deference," this Court explained earlier this year, "*Loper Bright* did not do away with discretion." *Pickens v. Hamilton-Ryker IT Solutions, Inc.*, 133 F.4th 575, 587 (6th Cir. 2025).

*Loper Bright* explained that some statutes "empower an agency to prescribe rules to fill up the details of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as 'appropriate' or 'reasonable.'" 603 U.S. at 395 (internal quotations and citations omitted). As an example of the latter, the Court cited a statute "directing EPA to regulate power plants 'if the Administrator finds such regulation is appropriate and necessary.'" *Id*. at n.6 (quoting 42 U.S.C. § 7412(n)(1)(A)). And the D.C. Circuit recently upheld the SEC's capping of certain fees under discretionary authority that Congress delegated, *inter alia*, "'to make such rules and regulations as may be necessary or appropriate to implement'" the relevant statute's provisions. *Cboe Global Markets, Inc. v. SEC*, 155 F.4th 704, 713-15 (D.C. Cir. 2025) (quoting 15 U.S.C. § 78w(a)(1)).

Here, Congress used similar language to grant arguably even greater discretionary authority to Treasury in I.R.C. § 965(o), which

states that "[t]he Secretary shall prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of [section 965], including . . . regulations or other guidance to prevent the avoidance of the purposes of [section 965] . . . ."  Section 965(o) is thus "an express delegation of power" to Treasury that "unambiguously convey[s] discretion" to promulgate regulations that Treasury deemed "necessary or appropriate" to prevent the avoidance of section 965's purposes.  *See Pickens*, 133 F.4th at 587.

Where Congress conveys such discretion, courts play a limited role.  "[C]ourts must respect the delegation, while ensuring that the agency acts within it."  *Loper Bright*, 603 U.S. at 413.  The Seventh Circuit, upholding an immigration regulation under *Loper Bright*, observed that the Supreme Court "made a point of emphasizing" this dynamic.  *Gulomjonov v. Bondi*, 131 F.4th 601, 609 (7th Cir. 2025).  Because the "best reading" of section 965(o) "is that it delegates discretionary authority to [Treasury]," the judiciary's role "is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits."  *Loper Bright*, 603 U.S. at 395.  "[T]o stay out of discretionary policymaking left to the political

branches, judges need only . . . independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Id.* at 404; *see also Pickens*, 133 F.4th at 588.

Because the District Court addressed the disallowance rule before the Supreme Court decided *Loper Bright*, the court applied the now-overruled *Chevron* framework to find the rule invalid. (Order, RE 49, Page ID # 989-990.) When invalidating the disallowance rule, the District Court did not cite or discuss the delegation of regulatory authority in section 965(o). (*See id.* at Page ID # 962-990.) Since the District Court's and the parties' *Chevron* analyses focused on statutory ambiguity, the court's disregard of section 965(o) perhaps was understandable.

But *Loper Bright* requires a different analysis that focuses on "the best reading of a statute" and recognizes that the best reading "may well be" that the statute "delegates discretionary authority to an agency." 603 U.S. at 394-95. The District Court correctly observed that "there is considerable weight to" the Government's "forceful[ ]" contention that allowing FTCs for Offset Earnings "'is not the

mitigation of double tax; it is the elimination of any tax.'" (*Id.* at Page ID # 987 (quoting Government's brief).) But the court mistakenly viewed that as an "extra-textual" "policy" consideration. (*Id.*) To the contrary, the Government's argument is directly relevant to the text of section 965(o) because the disallowance rule barring FTCs for Offset Earnings Foreign Taxes "prevent[s] the avoidance of the purposes of" section 965—and thus is within the boundaries of section 965(o)'s delegated authority, as explained below.

> **2. The disallowance rule is a valid exercise of Treasury's delegated authority because it prevents avoidance of section 965(g)'s purpose of limiting FTCs to instances of double taxation**

Through I.R.C. § 965(o), Congress delegated discretionary authority to Treasury to promulgate regulations that "may be necessary or appropriate" to, *inter alia*, "prevent the avoidance of the purposes of [section 965]." Treasury exercised that discretionary authority, in conjunction with its independent authority under I.R.C. §§ 902(c)(8) and 7805, to promulgate the disallowance rule in Treas. Reg. § 1.965-5(c)(1)(ii). *See* Regulations Regarding the Transition Tax, 84 Fed. Reg. at 1874, 1901. "[B]ecause [section 965(o)] is an uncontroverted, explicit delegation of authority, the question is whether the [disallowance rule]

is within the outer boundaries of that delegation." *See Mayfield v. U.S. Dep't of Labor*, 117 F.4th 611, 617 (5th Cir. 2024) (citing *Loper Bright*, 144 S. Ct. at 2268). Under *Loper Bright*, moreover, this Court "ask[s] only that the [agency] exercise 'reasoned' judgment, not perfect judgment." *Pickens*, 133 F.4th at 590-91 (quoting *Loper Bright*, 603 U.S. at 395; further quotations omitted); *see also Mayfield*, 117 F.4th at 619 (upholding "a permissible choice" in a labor rule). This Court "will uphold the regulations," as long as the agency "has 'regulate[d] subject to the limits imposed by [the] term or phrase' at issue." *Pickens*, 133 F.4th at 588 (quoting *Loper Bright*, 603 U.S. at 395).

The disallowance rule is, at minimum, an "appropriate" means to "prevent the avoidance of" section 965's purposes—specifically, the purpose of section 965(g)—and is thus within the boundaries of the delegation of discretionary authority in section 965(o). Discerning the scope of the delegation, guided by section 965's purposes, starts with statutory text and includes an analysis of its context and structure, as well as the broader legal context. *See Ohio Telecom Assoc. v. FCC*, 150 F.4th 694, 711-18 (6th Cir. 2025) (upholding agency authority under broad delegation to prescribe "necessary" rules and regulations); *Lesko*

*v. United States*, ___ F.4th ___, 2025 WL 3562218, at \*5 (Fed. Cir. 2025) (*en banc*) (upholding regulatory definition of statutory term under "flexible," "fill-up-the-details delegation" to prescribe regulations "necessary for administering" the statute).

Section 965's purposes concerning FTCs are made evident through the precisely measured limits on FTCs in section 965(g), which is the only provision of section 965 that directly addresses FTCs. Because Congress imposed reduced tax rates for the transition tax (under section 965(c)), Congress in section 965(g) correspondingly reduced the available amount of FTCs for the foreign earnings that are subject to the transition tax. In this way, section 965(g) limits the FTCs that would otherwise be allowed to only the amount that is necessary to prevent double taxation in light of the transition tax's reduced rate.

Section 965(g) thus manifests the same Congressional purpose as the original limitation on FTCs enacted over a century ago: to mitigate *double* taxation. *See supra* at 8-9. As Congress has long recognized, allowing FTCs for foreign taxes paid on income that is *not* also taxed by the United States would effectively (1) reduce U.S. tax on domestic income, (2) reimburse U.S. taxpayers for foreign taxes, and (3) subsidize

foreign governments at the expense of the U.S. Treasury. Congress should not lightly be presumed to have intended these outcomes. And section 965(g) makes clear that Congress's purpose was far more limited: to allow FTCs only to the extent necessary to prevent double taxation.

The disallowance rule is well within the boundaries of Treasury's delegated authority "to prevent the avoidance of the purposes of [section 965]" because *allowing* FTCs for Offset Earnings Foreign Taxes *would avoid* the purpose of section 965(g). Indeed, since Offset Earnings are subject to zero U.S. tax, the amount of FTCs necessary to prevent double taxation of Offset Earnings is zero.

To be sure, section 965(g) itself limits FTCs only with respect to the non-Offset Earnings subject to the transition tax. Indeed, there is nothing to suggest that Congress had even contemplated that anyone might claim FTCs with respect to the Offset Earnings it took pains to exempt from U.S. taxation. But that type of unforeseen circumstance is precisely why Congress delegated authority to Treasury to prevent the avoidance of section 965's "purposes." *See Lesko*, ___ F.4th ___, 2025 WL 3562218, at *5 (although statute was "silent" about certain

"formalities," it was "not silent about *who* Congress intended to fill in those details" by "delegat[ing] rulemaking authority to OPM").[8]  And there is no plausible *purpose* for section 965(g)'s limitation on FTCs for earnings that *are* subject to the transition tax that would *not* be avoided by allowing FTCs for Offset Earnings on which there is *no* U.S. tax.

There is no merit to the District Court's speculation that Congress "might have intended" to grant FTCs for Offset Earnings Foreign Taxes because of "a policy of encouraging repatriation of foreign funds." (Order, RE 49, Page ID # 989.)  If Congress had intended to supercharge incentives for repatriation by allowing FTCs in the absence of double taxation—sharply departing from its longstanding policy— then Congress would not have enacted the limitation on FTCs in section

---

[8] Such unforeseen circumstances are also why Congress, in I.R.C. § 7805(a), required that Treasury "shall" promulgate "regulations as may be necessary by reason of any alteration of law in relation to internal revenue."  Although the disallowance rule fits well within the boundaries of the delegated authority in section 965(o)—and no other delegation thus is necessary—the rule also comes within section 7805(a)'s mandate because it clarifies how the newly enacted TCJA provisions in section 965 work with the well-established subpart F and FTC statutory schemes.  For similar reasons, the rule also is encompassed by the delegated authority in I.R.C. § 902(c)(8) to provide "necessary or appropriate" regulations "to carry out the provisions of" I.R.C. §§ 902 and 960.

965(g). It is wholly implausible that Congress, while expressly limiting FTCs for earnings that *are* subject to the transition tax, intended to create a special incentive only for U.S. corporations that happened to have historically unprofitable foreign subsidiaries by allowing unlimited FTCs with respect to *tax-exempt* Offset Earnings. *See Burns v. United States*, 501 U.S. 129, 136 (1991) ("An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent."), *abrogated on other grounds, as recognized in*, *Dillon v. United States*, 560 U.S. 817, 820 (2010).

The TCJA, moreover, did not incentivize repatriation at all costs, and FedEx's preferred interpretation is not better just because it would double-down on those incentives. *See Pulsifer v. United States*, 601 U.S. 124, 152 (2024). "No law pursues its purposes at all costs." *Id.* (internal quotations and alterations removed). Rather, the mechanism Congress chose to incentivize repatriation was to exempt, from U.S. taxation, distributions of foreign earnings to U.S. shareholders. *See supra* at 20-22.

It is among the "bedrock principles of statutory construction" that "courts should prefer textually permissible readings that would advance statutory or regulatory goals over ones that would frustrate them." *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 371 (D.C. Cir. 2024) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011)); Antonin Scalia & Bryan A. Garner, *Reading Law* 63 (2012).  Therefore, the fact that section 965 does not *explicitly* bar FTCs for Offset Earnings Foreign Taxes should not be read to impute to Congress a narrow, self-defeating purpose to *sub silentio* allow FTCs with respect to U.S.-tax-free Offset Earnings while explicitly limiting FTCs for amounts subject to U.S. tax.  Again, there is no plausible *purpose* for section 965(g)'s adoption of that explicit limitation on FTCs that would not be avoided by allowing FTCs for Offset Earnings Foreign Taxes.  Because section 965(o) expressly grants Treasury authority to "prevent" such "avoidance" of section 965's "purposes," the disallowance rule barring FTCs for Offset Earnings Foreign Taxes is valid, and the District Court's judgment must therefore be reversed.

Without considering the text of section 965(o) or section 965's purposes—in particular, the purpose of section 965(g)—the District

Court held that FTCs are allowed for distributions of Offset Earnings under section 960(a)(3). As we have explained, section 960(a)(3) provides a narrow exception to section 960(a)(2)'s disallowance of FTCs for distributions of earnings previously taxed as subpart F income. *See supra* at 15-16. And as we will explain, the District Court's interpretation of section 960(a)(3) and related statutes is erroneous.

But this Court need not decide that question because limiting otherwise allowable FTCs to only the amount needed to mitigate double taxation is the very purpose of section 965(g) and is thus within the regulatory authority granted to Treasury under section 965(o). Indeed, but for the limitation in section 965(g), section 960 would allow FTCs for foreign taxes on transition-taxed earnings to the same extent as any other item of subpart F income, notwithstanding the transition tax's reduced tax rate. So, if this Court agrees with the Government that section 965(o) authorizes Treasury to correspondingly limit FTCs for Offset Earnings Foreign Taxes to the amount necessary to prevent double taxation—*i.e.*, zero—then there is no need for the Court to delve into the intricacies of section 960.

**B.    In any event, the best reading of the integrated statutory scheme is that section 960(a)(3) does not allow FTCs related to distributions of Offset Earnings**

As explained above, section 965(o) authorized Treasury to disallow FTCs for Offset Earnings Foreign Taxes to prevent the avoidance of section 965(g)'s purpose.  But even without the disallowance rule, the relevant, interlocking provisions of the Internal Revenue Code—when correctly interpreted in context, rather than in isolation—would not allow FTCs for Offset Earnings Foreign Taxes.  Parsing these provisions is not easy because the ways in which they interact are extremely complicated.  But to the extent they leave any doubt whether FTCs are allowed, the doubt must be resolved in favor of the Government because statutes allowing tax credits are strictly construed.  For these reasons, if this Court reaches this issue, it should reject the District Court's conclusion that section 960(a)(3) unambiguously allows FTCs for Offset Earnings Foreign Taxes when Offset Earnings are distributed.

Section 965(b)(4)(A) provides that when Offset Earnings are distributed, they "shall be treated as" having been previously included in subpart F income under section 951(a).  I.R.C. § 965(b)(4)(A).  Section

965(b)(4)(A) does so "[f]or purposes of applying section 959." *Id.* This makes distributions of Offset Earnings free from U.S. tax under section 959. But contrary to the District Court's erroneous conclusion, section 965(b)(4)(A)'s fictional treatment of Offset Earnings also has consequences for section 960(a)(3).

That FedEx's reading of section 965(b)(4)(A) is "simpler" than the Government's (Order, RE 49, Page ID # 985) does not make it correct, especially in the context of a statutory scheme as notoriously complex as this. In adopting FedEx's approach, the District Court misinterpreted the relevant statutory provisions and failed to consider those provisions within the broader context of this integrated statutory scheme. Moreover, in doing so, the District Court failed to recognize that even its own erroneous analysis precludes FTCs for Offset Earnings.

> **1.    The District Court's primary rationale, though incorrect, forecloses FTCs for Offset Earnings Foreign Taxes**

The District Court concluded that section 965(b)(4)(A)'s use of the limiting phrase "[f]or purposes of applying section 959" means that section 965(b)(4)(A)'s fictional treatment of Offset Earnings as "an amount which was included" in gross income under section 951(a)

"applies to section 959, but not to other sections"—in particular, not to section 960. (Order, RE 49, Page ID # 980-982.) That conclusion is wrong for reasons we will explain. But even if it were right, it would support the Government's position, not FedEx's.

The District Court held that FTCs are allowed for Offset Earnings Foreign Taxes under the narrow exception, in section 960(a)(3), to section 960(a)(2)'s disallowance of FTCs upon distributions of earnings previously taxed as subpart F income. *See supra* at 15-16. Section 960(a)(3) is comprised of a single lengthy sentence that allows FTCs upon distributions only if two requirements are satisfied. First, the distribution must be one that "is excluded from gross income under section 959(a)." I.R.C. § 960(a)(3). Second, the foreign taxes for which FTCs are sought must be taxes that "were not deemed paid by the domestic corporation under [section 960(a)(1)] for any prior taxable year." I.R.C. § 960(a)(3).

But under the District Court's interpretation of section 965(b)(4)(A), distributions of Offset Earnings cannot meet section 960(a)(3)'s first requirement. Recall that section 959(a) generally exempts, from U.S. taxation, distributions of foreign income that

already has been included in the distributee's gross income (and thus been taxed) under section 951(a). *See supra* at 11-12. Offset Earnings are *never* included in gross income. Therefore, a distribution of Offset Earnings could never satisfy section 960(a)(3)'s first condition— exclusion from gross income under section 959(a)—without the statutory fiction created by section 965(b)(4)(A) that *treats* Offset Earnings *as if* they were so excluded.

FedEx's claim for FTCs under section 960(a)(3) is thus *contingent* on applying section 965(b)(4)(A)'s fictional treatment to section 960(a)(3). But the District Court held that section 965(b)(4)(A) applies only to section 959, and not to 960. (Order, RE 49, Page ID # 980-982.) Although the Government disagrees with that rationale, accepting it would mean that FedEx's Offset Earnings cannot meet section 960(a)(3)'s first condition for allowing FTCs.

Consequently, the District Court's allowance of FTCs for FedEx's Offset Earnings Foreign Taxes, and its invalidation of the disallowance rule, must be reversed even under the District Court's own reasoning. As we explain below, however, the correct interpretation of the statutory scheme is that section 965(b)(4)(A) applies to *all* of section

960(a)(3), which means that FedEx's Offset Earnings Foreign Taxes cannot meet section 960(a)(3)'s *second* condition for allowing FTCs.

> **2.** **Section 960(a)(3) does not allow FTCs related to distributions of Offset Earnings because section 965(b)(4)(A) treats those earnings as if they were previously included in the distributee's income**

Section 965(b)(4)(A) creates a legal fiction in which Offset Earnings are "treated as an amount which was included in the gross income" of a U.S. shareholder under section 951(a). To shoehorn its claim for FTCs with respect to distributions of Offset Earnings into section 960(a)(3), FedEx needs that fictional treatment to apply to section 960(a)(3)'s first requirement (that the distribution is excluded from income under section 959(a)), but *not* to its second requirement (that the foreign taxes were not deemed paid under section 960(a)(1)). Why? Because treating its Offset Earnings as having been included in its gross income under section 951(a) for purposes of the second requirement would mean that the associated foreign taxes must be treated as having been "deemed paid" by FedEx under section 960(a)(1).

Thus, if section 965(b)(4)(A)'s fictional treatment applies to *both* requirements of section 960(a)(3), as the Government contends, then FedEx's claim fails at the second requirement. The Government is right

that the fictional treatment applies to both requirements because section 965(b)(4)(A) applies its fictional treatment of Offset Earnings "[f]or purposes"—plural—"of applying section 959." It does not say that this treatment applies only for the limited and singular purpose of excluding Offset Earnings from income under section 959, as the District Court concluded. (Order, RE 49, Page ID # 980-981.) Rather, the multiple "*purposes* of applying section 959" include its application to the entirety of section 960(a)(3).

> **a.    Section 965(b)(4)(A)'s fictional treatment of Offset Earnings applies to all of section 960(a)(3)—not just the part that helps FedEx—which is fatal to the claim for FTCs**

Section 959 applies to all of section 960(a)(3) because section 960(a)(3)'s single sentence expressly mandates the application of section 959 by allowing FTCs only if the distribution at issue "is excluded from gross income under section 959(a)." This express invocation of section 959 arises in the context of section 960(a)(3)'s first condition, to be sure, but it means section 960(a)(3) applies *only* to a distribution to which section 959 *also* applies. It follows, then, that the fictional treatment mandated by section 965(b)(4)(A) "[f]or purposes of applying section 959" should apply to the entire analysis mandated by section 960(a)(3),

including the second requirement that the foreign taxes at issue "were not deemed paid by the domestic corporation under [section 960(a)(1)]."

That is the best reading of these interlocking statutory provisions. Section 960(a)(3)'s requirements are conveyed in one sentence within in a single statutory subsection, without separate numeration. And there is no reason to think that, when Congress enacted section 965, it intended the phrase "[f]or purposes of applying section 959" to mean that the treatment of Offset Earnings as previously included in income under section 951(a) would apply when determining whether section 960(a)(3) *applies* to a distribution, only to then be ignored in determining whether section 960(a)(3) *allows FTCs*.

Indeed, Congress chose to implement section 965's transition tax through the well-established, sixty-year-old framework of subpart F. Under that framework, when an amount is included in gross income under section 951(a), FTCs simultaneously are made available through section 960(a)(1). Section 960(a)(1) applies section 902—the deemed-paid FTC—to the amount included in income under section 951(a). And section 902 deems the related foreign income taxes as having been paid

by the domestic corporation, which generates FTCs under section 901. *See supra* at 13-14.

For Offset Earnings, all of that is treated as though it *already happened* in the past, triggered by section 965(b)(4)(A)'s treatment of an Offset Earnings distribution "as an amount which *was* included" in gross income under section 951(a). And with Offset Earnings treated as though they *previously were* included in gross income, it follows that the associated foreign taxes must be treated as though they *previously were* deemed paid (and, therefore, as though FTCs previously were allowed) under section 960(a)(1).

Thus, a distribution of Offset Earnings satisfies section 960(a)(3)'s first requirement because, by virtue of section 965(b)(4)(A)'s fictional treatment, it is "excluded from gross income under section 959(a)." But a distribution of Offset Earnings cannot satisfy section 960(a)(3)'s second requirement because, again by virtue of section 965(b)(4)(A)'s fictional treatment, any associated Offset Earnings Foreign Taxes must be treated as having previously been "deemed paid by the domestic corporation under [section 960(a)(1)]." Accordingly, there is no loophole

in the interaction between sections 965(b)(4)(A) and 960(a)(3) that allows FTCs with respect to distributions of Offset Earnings.

### b. Section 959(a) applies to a whole chapter of the Internal Revenue Code, including section 960

The District Court's conclusion that section 965(b)(4)(A) "applies to section 959, but not to other sections," and specifically not to section 960 (Order, RE 49, Page ID # 980-982), contravenes not only section 960(a)(3), as explained above, but also section 959 itself. "For purposes of applying section 959," section 965(b)(4)(A) treats Offset Earnings as though they were previously included in income under section 951(a). And section 959(a), by its own terms, is limited primarily to distributions of foreign earnings but otherwise applies broadly "[f]or purposes of this chapter," *i.e.*, Chapter 1 (Normal Taxes and Surtaxes) of Subtitle A (Income Taxes) of the Internal Revenue Code—which includes section 960.

Treating Offset Earnings as though they were previously included in income "for purposes of applying section 959," under I.R.C. § 965(b)(4)(A), therefore requires applying that treatment for purposes of section 960(a)(3), which not only concerns distributions of foreign

earnings, but also explicitly references section 959(a). And as explained above, applying section 965(b)(4)(A)'s treatment of Offset Earnings to section 960(a)(3) compels the conclusion that FTCs for Offset Earnings Foreign Taxes are not allowed.

That section 959 applies specifically to *distributions* of foreign earnings, moreover, belies the District Court's assertion that the Government is ascribing "self-contradictory roles" to section 960(a)(1). (Order, RE 49, Page ID # 985.) The treatment of Offset Earnings in Section 965(b)(4)(A) does not mean that foreign taxes related to Offset Earnings are *presently and actually* deemed paid under section 960(a)(1). Rather, foreign taxes related to Offset Earnings are *treated as if* they were deemed paid under section 960(a)(1), *for purposes of section 960(a)(3).*

This follows from the fact that sections 960(a)(3), 959, and 965(b)(4)(A) all concern the tax treatment of foreign earnings when they are distributed, whereas section 960(a)(1) concerns the tax treatment of foreign earnings when included in subpart F income. *See supra* at 13-14. In other words, because sections 959 and 965(b)(4)(A) are concerned with distributions of foreign earnings, they *do not* apply to the

determination under section 960(a)(1) whether a subpart F inclusion gives rise to FTCs. But for the same reason, sections 959 and 965(b)(4)(A) *do* apply to the determination under 960(a)(3) whether a distribution of foreign earnings gives rise to FTCs, and *for purposes of that distribution-specific determination*, they require that the foreign taxes be treated *as if* they had been deemed paid under section 960(a)(1). There is no contradiction in the Government's position.

### c. The District Court's concern, raised *sua sponte*, about the "prior taxable year" language was both misplaced and beyond its authority to consider

The District Court also erred in identifying, *sua sponte*, a purported "problem" with the Government's interpretation related to section 960(a)(3)'s second requirement that the relevant foreign taxes must not have been deemed paid under section 960(a)(1) "for any prior taxable year." (Order, RE 49, Page ID # 986-987.) According to the court, accepting the Government's interpretation of the statutory scheme would mean that "the foreign taxes associated with Offset Earnings could not have been deemed paid 'for any *prior* taxable year' as required by the statute [section 960(a)(3)] to deny a credit" in a "subset of cases in which a corporation distributes its Offset Earnings in

the *same* taxable year that they would have been included in income."
(Order, RE 49, Page ID # 986-987 (emphasis added).)  But that is
simply wrong because Offset Earnings are *never* included in income.

Furthermore, the District Court was apparently unaware, having
raised the "prior taxable year" issue *sua sponte*, that the relevant
regulation, Treas. Reg. § 1.960-2(a) (2017), applies the rule of section
960(a)(3) regardless of the taxable year for which the foreign taxes were
deemed paid.  The regulation's approach makes sense because, outside
the context of Offset Earnings, allowing FTCs for distributions unless
the foreign taxes were deemed paid for a *prior* taxable year would
create a loophole where a corporate taxpayer could claim *double* FTCs
for the same taxes—once under section 960(a)(1) and again under
section 960(a)(3)—simply by making a distribution of Subpart F income
in the same year in which that income is included in gross income under
section 951(a).

In any event, the District Court had no authority to invoke its
(mis)reading of section 960(a)(3)'s "prior taxable year" language because
FedEx never said anything about that language in its administrative
refund claims (or in this litigation), much less argued that it supports

FedEx's position that the disallowance rule is invalid. (*See* Complaint Ex. 1, RE 1-1, Page ID # 33-54, Ex. 2, RE 1-2, Page ID 55-76.) "Numerous cases sustain the principle that the grounds on which a claim for a tax refund is made must be specifically set forth in the claim for refund itself[.]" *Estate of Bird*, 534 F.2d 1214, 1219 (6th Cir. 1976). "[O]therwise the court in a refund action is without jurisdiction to consider them." *Id.*; *see also, e.g.*, *Charter Co. v. United States*, 971 F.2d 1576, 1579 (11th Cir. 1992); *Salyersville Nat'l Bank v. United States*, 613 F.2d 650, 651-52 (6th Cir. 1980); 15 *Mertens Law of Federal Income Taxation* § 58A:17 (July 2025 update).

This "variance doctrine" is founded on the jurisdictional grant for tax refund suits in I.R.C. § 7422(a) and requirements for administrative refund claims in Treas. Reg. § 301.6402-2(b)(1). *See, e.g.*, *Mallette Bros. Const. Co. v. United States*, 695 F.2d 145, 155 (5th Cir. 1983); *Rodgers v. United States*, 843 F.3d 181, 195 (5th Cir. 2016). "A taxpayer is the master of his refund claim, and it is not the IRS's responsibility"—nor is it within a district court's jurisdiction—"to make a case for the taxpayer that the taxpayer himself has opted not to make." *Muskat v. United States*, 554 F.3d 183, 195 (1st Cir. 2009). Because FedEx did not raise

any argument regarding the "prior taxable year" language in section 960(a)(3) in its administrative refund claims, the District Court lacked jurisdiction to address it.

### d. Statutory context confirms that FTCs are not available for Offset Earnings Foreign Taxes

Statutory context and structure confirm that FTCs are not available for Offset Earnings Foreign Taxes. Courts do not interpret statutes "in isolation," as the District Court did here, because "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotations omitted), *superseded on other grounds, as recognized in*, *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 550-51 (2025). *Loper Bright* emphasized that "courts use every tool at their disposal to determine the best reading of the statute," 603 U.S. at 400, and stated the familiar rule that "statutes can be sensibly understood only by reviewing text in context" *id.* at 392 n.4 (internal quotations omitted). Courts thus "do not woodenly interpret a legal text in a vacuum, but instead discern the meaning of a statement

in a law from the context in which it is made." *United States v. Tate*, 999 F.3d 374, 378 (6th Cir. 2021) (citations and internal quotations omitted).

When interpreting provisions of the "unified statutory scheme" governing FTCs, a contextual approach is especially important. *R.H. Donnelley*, 641 F.3d at 76. Particularly given the interlocking nature of the statutory provisions relevant here, they must be interpreted "as a symmetrical and coherent regulatory scheme" and as part of "an harmonious whole." *See Brown & Williamson*, 529 U.S. at 133 (internal quotations omitted). "Statutory history is an important part of [the] context" in analyzing these highly technical statutes. *See United States v. Hansen*, 599 U.S. 762, 775 (2023). The unified and coherent scheme governing FTCs is predicated on the long-settled policy that Congress generally allows FTCs to mitigate double taxation of foreign earnings, meaning taxation by *both* a foreign country and the United States. *See Burnet*, 285 U.S. at 7. The "well-established limitation" on that policy is that the FTC does not "relieve taxpayers from bearing the full United States tax burden attributable to income arising from sources within this country." *Associated Tel. & Tel. Co. v. United States*, 306 F.2d 824,

832 (2d Cir. 1962). To allow FTCs with respect to Offset Earnings, which are exempt from U.S. taxation, "would be to fracture th[e] unity" in the statutes governing FTCs. *See R.H. Donnelley*, 641 F.3d at 76.

Courts have, moreover, consistently interpreted the statutes implementing the FTC in harmony with these longstanding principles. In *National Cash Register*, this Court relied on the FTC's purpose of preventing double taxation to conclude that a taxpayer was not entitled to FTCs on retained foreign earnings, which were not distributed as dividends to a U.S. taxpayer and were not subject to U.S. taxes. 400 F.2d at 825-26. For those earnings "there [was] no danger of international double taxation"—just like the Offset Earnings at issue here.[9] *Id.* In *Marsman v. Commissioner*, the Fourth Circuit declined to apply a taxpayer's literal reading of FTC statutes, where that would have allowed FTCs on "income which was never subjected and could not be subjected" to U.S. income tax. 205 F.2d 335, 342 (4th Cir. 1953). The Second Circuit similarly disallowed FTCs on liquidating

---

[9] *National Cash Register* allowed FTCs related to dividends distributed to the U.S. taxpayer (for the "standard tax appropriate to the dividend"), which *were* subject to U.S. taxes, but the taxpayer had to choose whether to claim those credits under section 902 or a tax treaty. *See* 400 F.2d at 823, 825-26.

distributions, taxed at lower rates for capital gains, because allowing FTCs "would facilitate a convenient scheme for avoiding the United States income tax." *Associated Tel.*, 306 F.2d at 833; *see also Fowler Hosiery Co. v. Commissioner*, 301 F.2d 394, 399 (7th Cir. 1962) (rejecting a similar attempt at "tax avoidance"). These historic cases support the Government's argument that allowing FTCs on Offset Earnings Foreign Taxes, effectively permitting a taxpayer to use those FTCs to avoid U.S. tax on other income, would be at odds with the overall history and structure of the FTC statutory scheme.

Given the context surrounding the FTC—both in terms of its history and considering the structure of the statutory framework in which it operates—it is implausible that Congress's failure, in the TCJA, to more explicitly disallow FTCs for Offset Earnings Foreign Taxes reflects a choice to radically depart from the settled purpose of FTCs. Through "vague terms or ancillary provisions," Congress did not "alter the fundamental details of [the] regulatory scheme" concerning FTCs—"it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001). And Congress did not, *sub silentio*, create a loophole that allows FedEx to

claim $233 million in FTCs with respect to foreign income that U.S. taxes will never reach.

### 3. Any doubt that the Code bars FTCs for Offset Earnings Foreign Taxes must be resolved in the Government's favor

To be sure, the statutory scheme in which Congress engrafted the transition tax onto the preexisting provisions of subpart F is complex. But to the extent there is any doubt whether the scheme disallows FTCs for Offset Earnings Foreign Taxes, the doubt must be resolved in the Government's favor because statutes granting federal tax credits "are matters of legislative grace and are strictly construed in favor of the government." *Audio Technica U.S., Inc. v. United States*, 963 F.3d 569, 578 (6th Cir. 2020) (internal quotations omitted); *accord Schiff v. United States*, 942 F.2d 348, 352 (6th Cir. 1991); *cf. INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992) (same as to tax deductions); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934) (same).

Indeed, as this Court explained in 1943, the right to an FTC "is a privilege granted by the Government, and hence the statute is to be strictly construed in favor of the Government." *Burroughs Adding Mach. Co. v. Terwilliger*, 135 F.2d 608, 610 (6th Cir. 1943). In a 2006

opinion regarding the statute of limitations for FTCs, this Court applied the familiar rule that statutes "granting a deduction are matters of legislative grace and are strictly construed in favor of the government." *Chrysler Corp.*, 436 F.3d at 654 (internal quotations omitted). Moreover, just this year, this Court reaffirmed that "taxpayers must clearly show the right to their claimed deduction." *McGowan v. United States*, 143 F.4th 686, 701 (6th Cir. 2025) (internal quotations and alterations removed). Section 960(a)(3) does not allow, much less *clearly* allow, FTCs for Offset Earnings, and any doubt on that front must be resolved in the Government's favor.[10]

---

[10] In an eighty-year-old FTC case decided soon after *Burroughs*, this Court appeared to cast doubt on the rule of strict construction by instead seeking "justice in determining the true net income of the taxpayer" regarding Congress's "general purpose" and "policy" to relieve double taxation. *Gentsch v. Goodyear Tire & Rubber Co.*, 151 F.2d 997, 1000-01 (6th Cir. 1945) (ruling for the taxpayer). This Court later, however, quoted *Gentsch*'s "justice" language to *limit* FTCs to the amount "deemed necessary to alleviate the burden of international double taxation." *Nat'l Cash Register*, 400 F.2d at 826. And in any event, the Court's more recent decisions in *Chrysler* and *McGowan* confirm that strict construction is the proper standard.

## CONCLUSION

The District Court's decision invalidating the disallowance rule is erroneous. This Court should reverse that ruling, vacate the judgment, and remand for further proceedings.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
JOSHUA WU
  *Deputy Assistant Attorney General*

/s/ Norah Bringer

CLINT A. CARPENTER      (202) 514-4346
NORAH E. BRINGER      (202) 307-6224
  *Attorneys, Tax Litigation Branch*
  *Civil Division, U.S. Department of Justice*
  *Post Office Box 502, Washington, D.C. 20044*

JANUARY 7, 2026

## CERTIFICATE OF COMPLIANCE

### Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

     1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    [X]   this document contains 12,989 words, **or**

    [ ]   this brief uses a monospaced typeface and contains _____ lines of text.

     2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X]   this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

    [ ]   this brief has been prepared in a monospaced typeface using _____ with _____.

(s)   /s/ Norah E. Bringer

Attorney for  United States of America

Dated:    January 7, 2026

# ADDENDUM

## DESIGNATION OF RELEVANT
## DISTRICT COURT DOCUMENTS

## Pursuant to Sixth Circuit Rule 30(g)

| Record Entry No. | Description | Page ID Range |
|---|---|---|
| 1 | Complaint | 1-112 |
| 42 | FedEx's motion for partial summary judgment and memorandum of law | 235-272 |
| 42-1 | Joint statement of undisputed material facts | 273-278 |
| 43 | Government's motion for partial summary judgment | 838-839 |
| 43-1 | Government's memorandum in support of its motion for partial summary judgment | 840-875 |
| 49 | Order granting FedEx's motion for partial summary judgment and denying Government's motion for partial summary judgment | 962-990 |
| 75 | Judgment | 1173-1174 |
| 76 | Notice of appeal | 1175-1176 |

# STATUTORY ADDENDUM

## Internal Revenue Code (26 U.S.C.):

§ 901 (2016)......................................................................71
§ 902 (2016)......................................................................71
§ 951 (2016)......................................................................72
§ 959 (2016)......................................................................73
§ 960 (2016)......................................................................73
§ 965 ..............................................................................74

**Internal Revenue Code (26 U.S.C.)**

**§ 901. Taxes of foreign countries and of possessions of United States (2016)**

(a) Allowance of credit.--If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter shall, subject to the limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b) plus, in the case of a corporation, the taxes deemed to have been paid under sections 902 and 960. . . .

. . .

**§ 902. Deemed paid credit where domestic corporation owns 10 percent or more of voting stock of foreign corporation (2016)**

(a) Taxes paid by foreign corporation treated as paid by domestic corporation.--For purposes of this subpart, a domestic corporation which owns 10 percent or more of the voting stock of a foreign corporation from which it receives dividends in any taxable year shall be deemed to have paid the same proportion of such foreign corporation's post-1986 foreign income taxes as--

(1) the amount of such dividends (determined without regard to section 78), bears to

(2) such foreign corporation's post-1986 undistributed earnings.

. . .

## § 951. Amounts included in gross income of United States shareholders (2016)

(a) Amounts included.--

(1) In general.--If a foreign corporation is a controlled foreign corporation for an uninterrupted period of 30 days or more during any taxable year, every person who is a United States shareholder (as defined in subsection (b)) of such corporation and who owns (within the meaning of section 958(a)) stock in such corporation on the last day, in such year, on which such corporation is a controlled foreign corporation shall include in his gross income, for his taxable year in which or with which such taxable year of the corporation ends--

(A) the sum of--

(i) his pro rata share (determined under paragraph (2)) of the corporation's subpart F income for such year,

(ii) his pro rata share (determined under section 955(a)(3) as in effect before the enactment of the Tax Reduction Act of 1975) of the corporation's previously excluded subpart F income withdrawn from investment in less developed countries for such year, and

(iii) his pro rata share (determined under section 955(a)(3)) of the corporation's previously excluded subpart F income withdrawn from foreign base company shipping operations for such year; and

(B) the amount determined under section 956 with respect to such shareholder for such year (but only to the extent not excluded from gross income under section 959(a)(2)).

. . .

## § 959. Exclusion from gross income of previously taxed earnings and profits (2016)

(a) Exclusion from gross income of United States persons.--For purposes of this chapter, the earnings and profits of a foreign corporation attributable to amounts which are, or have been, included in the gross income of a United States shareholder under section 951(a) shall not, when--

(1) such amounts are distributed to, or

(2) such amounts would, but for this subsection, be included under section 951(a)(1)(B) in the gross income of,

such shareholder (or any other United States person who acquires from any person any portion of the interest of such United States shareholder in such foreign corporation, but only to the extent of such portion, and subject to such proof of the identity of such interest as the Secretary may by regulations prescribe) directly or indirectly through a chain of ownership described under section 958(a), be again included in the gross income of such United States shareholder (or of such other United States person). . . .

. . .

## § 960. Special rules for foreign tax credit (2016)

(a) Taxes paid by a foreign corporation.--

(1) Deemed paid credit.--For purposes of subpart A of this part, if there is included under section 951(a) in the gross income of a domestic corporation any amount attributable to earnings and profits of a foreign corporation which is a member of a qualified group (as defined in section 902(b)) with respect to the domestic corporation, then, except to the extent provided in regulations, section 902 shall be applied as if the amount so included were a dividend paid by such foreign corporation (determined by applying section 902(c) in accordance with section 904(d)(3)(B)).

(2) Taxes previously deemed paid by domestic corporation.-- If a domestic corporation receives a distribution from a foreign corporation, any portion of which is excluded from gross income under section 959, the income, war profits, and excess profits taxes paid or deemed paid by such foreign corporation to any foreign country or to any possession of the United States in connection with the earnings and profits of such foreign corporation from which such distribution is made shall not be taken into account for purposes of section 902, to the extent such taxes were deemed paid by a domestic corporation under paragraph (1) for any prior taxable year.

(3) Taxes paid by foreign corporation and not previously deemed paid by domestic corporation.--Any portion of a distribution from a foreign corporation received by a domestic corporation which is excluded from gross income under section 959(a) shall be treated by the domestic corporation as a dividend, solely for purposes of taking into account under section 902 any income, war profits, or excess profits taxes paid to any foreign country or to any possession of the United States, on or with respect to the accumulated profits of such foreign corporation from which such distribution is made, which were not deemed paid by the domestic corporation under paragraph (1) for any prior taxable year.

. . .

## § 965. Treatment of deferred foreign income upon transition to participation exemption system of taxation

(a) Treatment of deferred foreign income as subpart F income.--In the case of the last taxable year of a deferred foreign income corporation which begins before January 1, 2018, the subpart F income of such foreign corporation (as otherwise determined for such taxable year under section 952) shall be increased by the greater of--

(1) the accumulated post-1986 deferred foreign income of such corporation determined as of November 2, 2017, or

(2) the accumulated post-1986 deferred foreign income of such corporation determined as of December 31, 2017.

(b) Reduction in amounts included in gross income of United States shareholders of specified foreign corporations with deficits in earnings and profits.--

(1) In general.--In the case of a taxpayer which is a United States shareholder with respect to at least one deferred foreign income corporation and at least one E&P deficit foreign corporation, the amount which would (but for this subsection) be taken into account under section 951(a)(1) by reason of subsection (a) as such United States shareholder's pro rata share of the subpart F income of each deferred foreign income corporation shall be reduced by the amount of such United States shareholder's aggregate foreign E&P deficit which is allocated under paragraph (2) to such deferred foreign income corporation.

(2) Allocation of aggregate foreign E&P deficit.--The aggregate foreign E&P deficit of any United States shareholder shall be allocated among the deferred foreign income corporations of such United States shareholder in an amount which bears the same proportion to such aggregate as--

(A) such United States shareholder's pro rata share of the accumulated post-1986 deferred foreign income of each such deferred foreign income corporation, bears to

(B) the aggregate of such United States shareholder's pro rata share of the accumulated post-1986 deferred foreign income of all deferred foreign income corporations of such United States shareholder.

(3) Definitions related to E&P deficits.--For purposes of this subsection--

(A) Aggregate foreign E&P deficit.--

(i) In general.--The term "aggregate foreign E&P deficit" means, with respect to any United States shareholder, the lesser of--

(I) the aggregate of such shareholder's pro rata shares of the specified E&P deficits of the E&P deficit foreign corporations of such shareholder, or

(II) the amount determined under paragraph (2)(B).

(ii) Allocation of deficit.--If the amount described in clause (i)(II) is less than the amount described in clause (i)(I), then the shareholder shall designate, in such form and manner as the Secretary determines--

(I) the amount of the specified E&P deficit which is to be taken into account for each E&P deficit corporation with respect to the taxpayer, and

(II) in the case of an E&P deficit corporation which has a qualified deficit (as defined in section 952), the portion (if any) of the deficit taken into account under subclause (I) which is attributable to a qualified deficit, including the qualified activities to which such portion is attributable.

(B) E&P deficit foreign corporation.--The term "E&P deficit foreign corporation" means, with respect to any taxpayer, any specified foreign corporation with respect to which such taxpayer is a United States shareholder, if, as of November 2, 2017--

(i) such specified foreign corporation has a deficit in post-1986 earnings and profits,

(ii) such corporation was a specified foreign corporation, and

(iii) such taxpayer was a United States shareholder of such corporation.

(C) Specified E&P deficit.--The term "specified E&P deficit" means, with respect to any E&P deficit foreign corporation, the amount of the deficit referred to in subparagraph (B).

(4) Treatment of earnings and profits in future years.--

(A) Reduced earnings and profits treated as previously taxed income when distributed.--For purposes of applying section 959 in any taxable year beginning with the taxable year described in subsection (a), with respect to any United States shareholder of a deferred foreign income corporation, an amount equal to such shareholder's reduction under paragraph (1) which is allocated to such deferred foreign income corporation under this subsection shall be treated as an amount which was included in the gross income of such United States shareholder under section 951(a).

. . .

(g) Disallowance of foreign tax credit, etc.--

(1) In general.--No credit shall be allowed under section 901 for the applicable percentage of any taxes paid or accrued (or treated as paid or accrued) with respect to any amount for which a deduction is allowed under this section.

(2) Applicable percentage.--For purposes of this subsection, the term "applicable percentage" means the amount (expressed as a percentage) equal to the sum of--

(A) 0.771 multiplied by the ratio of--

(i) the excess to which subsection (c)(1)(A) applies, divided by

(ii) the sum of such excess plus the amount to which subsection (c)(1)(B) applies, plus

(B) 0.557 multiplied by the ratio of--

(i) the amount to which subsection (c)(1)(B) applies, divided by

(ii) the sum described in subparagraph (A)(ii).

. . .

(o) Regulations.--The Secretary shall prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of this section, including--

(1) regulations or other guidance to provide appropriate basis adjustments, and

(2) regulations or other guidance to prevent the avoidance of the purposes of this section, including through a reduction in earnings and profits, through changes in entity classification or accounting methods, or otherwise.