Case No.: 25-5694

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

FedEx Corporation and Subsidiaries,

*Plaintiff-Appellee*,

v.

United States of America,

*Defendant-Appellant*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE
Case No. 2:20-cv-02794

_____

**BRIEF OF NATIONAL FOREIGN TRADE COUNCIL, INC. AS *AMICUS
CURIAE* IN SUPPORT OF APPELLEE**

Rocco Femia
Lisandra Ortiz
Jeffrey Tebbs
Miller & Chevalier Chartered
900 16th Street NW
Washington, DC 20006
Tel: (202) 626-5800

*Counsel for National Foreign Trade
Council, Inc.*

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-5694      Case Name: FedEx Corporation and Subsidiaries v. United States of America

Name of counsel: Rocco V. Femia

Pursuant to 6th Cir. R. 26.1, National Foreign Trade Council
*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____March 30, 2026_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Rocco V. Femia

_____

_____

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

Page(s)

Interest of *Amicus Curiae* .................................................................................1

Argument.............................................................................................................2

I.    The Delegation of Rulemaking Authority in this Case Cannot
      Authorize Agency Regulations that Override a Statute .................................2

      A.    Issue Presented and Decision Below......................................................2

      B.    It Is the Court's Responsibility to Independently Determine the
            Best Reading of Section 960 ................................................................4

      C.    Section 960 Fixes the Boundaries of the Delegation of
            Authority in Section 965 ....................................................................6

            1.    The Grant of Rulemaking Authority to Prevent the
                  Avoidance of the Purposes of Section 965 Cannot Be
                  Deployed to Override a Separate Statute ...................................8

            2.    In Contrast to Other Delegations in the Code, the
                  Delegation in Section 965(o) Does Not Purport to
                  Authorize Any Departure from Any Statute..............................9

      D.    In the Aftermath of *Loper Bright*, Courts Have Repeatedly
            Rejected Agency Rules Contrary to a Statute, Even Where the
            Agency Purports to Have Acted Within a Delegation .......................11

II.   The Disallowance Rule Does Not "Prevent the Avoidance of the
      Purposes of" Section 965..........................................................................14

      A.    Congress Enacted Section 965 to Account for Historic
            Undistributed Foreign Earnings Before Transitioning to a New
            International Tax System ....................................................................15

      B.    Congress Added the Delegation in Section 965(o)(2) to Prevent
            Taxpayers from Artificially Reducing Historic Earnings
            Measured by Section 965 ...................................................................16

      C.    The Government Misconstrues the Purposes of Section 965 .............18

            1.    Congress Designed Section 965 to Promote the Ability of
                  Taxpayers to Credit Foreign Taxes While Transitioning
                  to a New International Tax System...........................................18

2. The Government's Position on the Purposes of Section 965 Cannot Be Reconciled with Congress's Decision to Provide the Election in Section 965(n)...................................19

3. The Government's Position on the Purposes of Section 965 Cannot Be Reconciled with Treasury's "Hovering Deficit" Regulations Issued Under Section 965(o) ..................21

4. Section 965 Did Not Modify the Longstanding Rules Providing that Foreign Taxes May Be Credited Against Unrelated Foreign Source Income ............................................23

D. The Government's Misleading Description of Offset Earnings as "Exempt" Conceals the Risk That a Distribution of Offset Earnings May Result in Double Taxation ..........................................25

III. Conclusion ..................................................................................27

# TABLE OF AUTHORITIES

**Cases**                                            **Page(s)**

*3M Co. v. Comm'r*,
154 F.4th 574 (8th Cir. 2025) ............................................................. 13

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ............................................................................. 5

*Insurance Marketing Coalition Ltd. v. FCC*,
127 F.4th 303 (11th Cir. 2025) ........................................................... 13

*JM Assets, LP v. Comm'r*,
No. 2531-24, 2025 U.S. Tax Ct. LEXIS 1629 (2025) ........................ 14

*Lesko v. United States*,
161 F.4th 1352 (Fed. Cir. 2025) ...................................................... 6, 7

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ..................................................................*passim*

*Moore v. United States*,
602 U.S. 572 (2024) ........................................................................ 8, 15

*Ohio Telecom Ass'n v. FCC*,
124 F.4th 993 (6th Cir. 2025) ............................................................. 11

*Pickens v. Hamilton-Ryker IT Sols., LLC*,
133 F.4th 575 (6th Cir. 2025) ..................................................... 5, 6, 11

*United States v. Bricker*,
135 F.4th 427 (6th Cir. 2025) ............................................. 6, 9, 11, 12

*Varian Medical Systems, Inc. & Subs. v. Commissioner*,
163 T.C. 76 (2024) ...................................................................... 12, 14

**Statutes**

I.R.C. § 367(a)(5) ...................................................................................... 10

I.R.C. § 381 .............................................................................................. 22

I.R.C. § 871(m)(3)(B) ............................................................................... 10

I.R.C. § 904(c)............................................................................................25

I.R.C. § 904(d) ...........................................................................................24

I.R.C. § 904(d)(2)(H) ..................................................................................24

I.R.C. §§ 951-964.....................................................................................8, 15

I.R.C. § 965(a)......................................................................................8, 15, 20

**Other Authorities**

Fed. R. App. P. 29(a)(2).................................................................................1

H.R. 1, 115th Cong., § 4004 (2017)........................................................16, 19

H.R. Rep. No. 115-409 (2017)..................................................15, 16, 17, 19

H.R. Rep. No. 115-466 (2017)...............................................................*passim*

J. COMM. TAX'N, GENERAL EXPLANATION OF PUBLIC LAW 115-97,
    JCS-1-18, (Dec. 2018) ........................................................................20

J. COMM. TAX'N, JCS-10-87, GENERAL EXPLANATION OF THE TAX
    REFORM ACT OF 1986, at 867 (1987) .................................................24

KUNTZ, PERONI & BOGDANSKI: U.S. INTERNATIONAL TAXATION,
    ¶ B3.04A Deemed Repatriation Tax on Deferred Income (Section
    965). (Dec. 2025) ..............................................................................20

Senate Amdt. 1681, 163 Cong. Rec. S7457 (2017)..................................16

S. Prt. 115-20 (2017)..............................................................................16, 17

Tax Cuts and Jobs Act, Pub. L. No. 115-97, 131 Stat. 2054 (2017) ...............*passim*

T.D. 9846, 84 Fed. Reg. 1838 (Feb. 5, 2019)......................................21, 26

Treas. Reg. § 1.367(b)-7(d)(2) .................................................................22

Treas. Reg. § 1.965-2(f) ..........................................................................26

Treas. Reg. § 1.965-5(c)(1)(ii) ...................................................................3

Treas. Reg. § 1.965-6(d) .........................................................................21

U.S. D<span></span>EP'T OF TREASURY, GENERAL EXPLANATION OF THE
ADMINISTRATION'S FISCAL YEAR 2022 REVENUE PROPOSALS (May
2021), https://home.treasury.gov/policy-issues/tax-policy/revenue-
proposals ....................................................................................................24

## Interest of *Amicus Curiae*[1]

*Amicus curiae* the National Foreign Trade Council, Inc. ("NFTC") is the premier business association advancing trade, tax, national security, and supply chain policies that support access to the global marketplace. Founded in 1914, NFTC promotes an open, rules-based global economy on behalf of a diverse membership of U.S.-based businesses, who account for over $6 trillion in revenue and employ nearly 6 million people in the United States.

This case implicates issues of paramount importance to the NFTC and its members. Although the case involves technical rules of our international tax system, at its core the case presents the fundamental question of whether an agency has the power to rewrite statutes enacted by Congress. The government's position poses serious risks to the separation of powers, impermissibly appropriating legislative power for the executive branch. The outcome of this case will significantly impact rulemaking in the tax context, as similar delegations of rulemaking authority are common throughout the Internal Revenue Code. Moreover, any decision will reverberate beyond tax, affecting the breadth of rulemaking permitted under grants of authority to other federal agencies. This case

---

[1] No counsel for a party authored this brief in whole or in part, and no person or entity, other than *amicus curiae*, its members, and its counsel, made a monetary contribution to the preparation or submission of this brief. NFTC has received consent from all parties to file this *amicus* brief in accordance with Fed. R. App. P. 29(a)(2).

presents an opportunity for this Court to provide a framework for evaluating delegations of authority, particularly after *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), to ensure that agencies do not override the will of Congress in an unauthorized attempt to make law.

The government's position in this case would effectively provide free rein to agencies to issue regulations that undo the result otherwise intended by Congress, with serious consequences for taxpayers and businesses who rely on the enacted law to engage in commercial transactions. Businesses need to understand the consequences of their actions, and the consequences of alternatives under consideration, which requires that the law cannot change solely based on an agency's view of statutory purpose. The NFTC respectfully submits this *amicus* brief, urging the Court to enforce the boundaries of the rulemaking delegation in this case, preserving the balance between legislative and executive power, and promoting the stability essential to cross-border trade and investment.

<u>Argument</u>

I. **The Delegation of Rulemaking Authority in this Case Cannot Authorize Agency Regulations that Override a Statute**

A. **Issue Presented and Decision Below**

A fundamental issue presented by this appeal is the extent to which a federal agency can, by regulation, override statutory text. The District Court held, based on its interpretation of section 960 and related statutes, that "[u]nder the plain

language of the tax code, FedEx is entitled to a credit for foreign taxes paid on Offset Earnings."[2] Order on Cross Mots. for Partial Summ. J., Dkt. No. 49 at 28-29. Accordingly, the District Court set aside Treas. Reg. § 1.965-5(c)(1)(ii) (the "Disallowance Rule"), which disallows credits for foreign taxes paid on Offset Earnings, because it provides a result that is plainly contrary to unambiguous statutory text. *See id.* at 29.

On appeal, the government justifies the Disallowance Rule based on a delegation of authority in section 965(o) to "prescribe such regulations … as may be necessary or appropriate to carry out the provisions of [section 965], including … regulations or other guidance to prevent the avoidance of the purposes of [section 965]." *See* Opening Brief for the Appellant, Dkt. No. 22 ("Def. Br.") at 24, 35-47. Under the government's position, this delegation authorizes Treasury to issue any regulation, overriding *any* statute, if it furthers the agency's view of the rules necessary to prevent the avoidance of the purposes of section 965. Based on its unilateral view on the purposes of section 965, the government urges the Court to ignore the unambiguous text of a different statute, section 960, which is the statute that determines whether FedEx is entitled to the claimed foreign tax credits.

---

[2] All section references are references to the Internal Revenue Code of 1986, as amended and in effect on the date of the transactions at issue in this case (the "Code"). Unless otherwise defined, this brief follows defined terms in the government's brief.

The government wraps this audacious view of agency power in the mantle of *Loper Bright*, a case that did not involve any delegation of rulemaking authority, in which the Supreme Court counseled the judiciary to "fix the boundaries" of any delegation at issue in future cases. *Loper Bright*, 603 U.S. at 395 (cleaned up).

Contrary to the government's assertion, *Loper Bright* does not change the outcome of this case and does not support the government's position. A regulation that, as the District Court determined, is contrary to clear statutory language is invalid, before and especially after *Loper Bright*. The delegation of authority in section 965(o) does not save the Disallowance Rule. The grant of authority the government relies on says nothing about section 960 or coordination with the longstanding foreign tax credit rules in that section. The government's attempt to negate the outcome dictated by the operative statutory provisions is outside any conceivable scope of the delegation in section 965(o).

### B. It Is the Court's Responsibility to Independently Determine the Best Reading of Section 960

The government plaintively asserts that "there is no need for the Court to delve into the intricacies of section 960" or decide whether "the District Court's interpretation of section 960(a)(3) and related statutes is erroneous." Def. Br. at 47. Rather, the government asks the Court to defer to the agency interpretation set forth in the Disallowance Rule by claiming that the interpretation furthers the agency's view of the statutory purposes of a different statute, section 965, and is

4

therefore within the authority delegated to Treasury by section 965(o)(2). *See id.* The government's contention contravenes bedrock principles around the judiciary's role in cases of statutory interpretation, as recently reaffirmed by the Supreme Court in *Loper Bright*.

In *Loper Bright*, the Supreme Court overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), because deferring to agency interpretations contrary to the best reading of the applicable statute was squarely at odds with the mandate in the Administrative Procedure Act ("APA") that "courts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright*, 603 U.S. at 394. In doing so, the Supreme Court emphasized that every statute has "a single, best meaning," and that it is the courts' responsibility "to determine the best reading of the statute." *Id.* at 400. While the Court recognized the longstanding principle that Congress might delegate discretionary authority to an agency, it did not suggest, as the government contends here, that courts need not grapple with the statutory text in cases where the agency is authorized to exercise discretion. Courts must respect constitutional delegations, "fix[] the boundaries of the delegated authority" and "ensur[e] the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.* at 395, 413 (citations and alterations omitted); *see Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587-88 (6th Cir. 2025).

As this Court recently explained, in determining whether an agency has permissibly exercised delegated discretion, the court "must decide for [itself] 'whether the law means what the agency says.'" *Pickens*, 133 F.4th at 587-88 (citation omitted). That is, even in cases involving express delegations of authority, "[the court's] duty remains the same: to 'independently interpret the statute and effectuate the will of Congress …" *United States v. Bricker*, 135 F.4th 427, 440-41 (6th Cir. 2025). Here, to effectuate the will of Congress, this Court must independently determine the best reading of section 960 to decide whether FedEx is entitled to the foreign tax credits claimed under that statute. If the Disallowance Rule is contrary to the best reading of section 960, then it cannot stand, no matter the agency's view of the statutory purposes of a different statute, section 965.

### C.    Section 960 Fixes the Boundaries of the Delegation of Authority in Section 965

Under *Loper Bright*, courts must interpret grants of authority, just like any other statutory text, to police the outer limits of the delegation and "ensur[e] that the agency acts within it." *Loper Bright*, 603 U.S. at 413. In *Loper Bright*, the Supreme Court enumerated different types of express delegations of discretionary authority to an agency. Certain statutes give "an agency the authority to give meaning to a particular statutory term." *Id.* at 394 (quoting *Batterton v. Francis*, 432 U.S. 416 (1977)). "Others empower an agency to prescribe rules to 'fill up the details' of a statutory scheme …" *Id.* (citation omitted). For example, in *Lesko v.*

6

*United States*, 161 F.4th 1352, 1358-59 (Fed. Cir. 2025), the court determined that the statute mandated a process for determining when overtime was "officially ordered or approved," but "provide[d] no guidance as to the mechanics of that process." By delegating authority to the agency to "prescribe regulations … necessary for the administration" of the statute, the court concluded that Congress gave the agency discretion to "fill up the details of the authorization process." *Id.* at 1359-60. Finally, some statutes allow an agency "to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility, such as 'appropriate' or 'reasonable.'" *Loper Bright*, 603 U.S. at 395 (internal citation omitted). As an example, *Loper Bright* cites a statute that directs the EPA "to regulate power plants 'if the Administrator finds such regulation is appropriate and necessary.'" *Id.* n.6; *see Lesko*, 161 F.4th at 1360 (finding that the delegation at issue was "also a flexible delegation").

The grant of authority in section 965(o) does not fall squarely within any of the types of delegations discussed in *Loper Bright*. It is not a delegation of authority leaving discretion to the agency to define a statutory term or fill up details contemplated by section 965. The delegation is arguably a variant of the "flexible delegations" described in *Loper Bright*, affording the agency discretionary authority to determine whether or the extent to which to regulate. But delegations are subject to limits, principally those imposed by the statute itself.

1.     The Grant of Rulemaking Authority to Prevent the Avoidance of the Purposes of Section 965 Cannot Be Deployed to Override a Separate Statute

A statutory limit on the grant of authority in section 965(o)(2) is that any regulations issued under that grant must be limited to preventing the avoidance of the purposes of section 965 itself and cannot contradict the terms of section 960 or other statutes. As discussed in further detail in Part II, Congress designed section 965 to identify and measure certain historic items, before the transition to a new international tax system. Specifically, section 965 determines "undistributed foreign earnings," and related foreign income taxes, accumulated by certain foreign subsidiaries between January 1, 1987 and December 31, 2017. Congress then subjected those historic earnings to U.S. tax by requiring certain U.S. shareholders to include such earnings in income under existing statutes: the longstanding rules of "subpart F," including the associated foreign tax credit rules in section 960. *See* I.R.C. § 965(a) (deeming an inclusion of "subpart F income"), §§ 951-964 (subpart F of Part III of Subchapter N of Chapter 1 of Subtitle A of the Code). The legislative history for the Tax Cuts and Jobs Act explicitly states that the "mechanism for the mandatory inclusion of pre-effective date foreign earnings is subpart F." H.R. Rep. No. 115-466 at 606 (2017) (Conf. Rep.) (describing House bill); *id.* at 613 (same, describing Senate bill); *see also Moore v. United States*, 602 U.S. 572, 596 (2024) (describing the section 965 transition tax as "integrated into

subpart F's framework"). For the dates at issue in this dispute, Congress did not modify the relevant existing rules of subpart F, including section 960.

The Disallowance Rule does not address the determination of the historic items measured by section 965. Instead, the Disallowance Rule purports to rewrite the subpart F "mechanism" that Congress provided would apply to those section 965 items. Neither the text of the delegation in section 965(o), nor the text of subpart F, afford any such authority to Treasury. Rather than honoring the will of Congress by respecting the preexisting rules in section 960 that Congress selected as a mechanism for taxing items related to section 965, the Disallowance Rule undoes the result intended by Congress. *See Bricker*, 135 F.4th at 445 (concluding that the statutory grants of authority "did not empower the [Sentencing] Commission to overrule or disregard other statutes. The Commission must interpret statutes in a way that complies or coexists with other statutes.").

2.     In Contrast to Other Delegations in the Code, the Delegation in Section 965(o) Does Not Purport to Authorize Any Departure from Any Statute

Further proof that the grant of authority in section 965(o) does not provide Treasury with authority to change the outcome mandated by section 960 is found by comparing the delegation at issue here with others in the Code. In other instances, Congress has delegated authority to Treasury to limit certain statutory rules. For example, section 367 provides general rules with respect to the tax

consequences of certain transfers of property by U.S. persons to a foreign corporation. The statute authorizes Treasury to issue regulations to limit those rules in certain circumstances. *See, e.g.*, I.R.C. § 367(a)(5) (giving Treasury discretion to exempt certain transactions from application of the general rules in section 367(a) "in order to carry out the purposes" of the statute). As another example, section 871(m)(3) provides a general definition of "specified notional principal contract" and delegates authority to Treasury to exempt certain contracts from that definition if "the Secretary determines that such contract is of a type which does not have the potential for tax avoidance." I.R.C. § 871(m)(3)(B). Those types of delegations present challenging questions on whether the Constitution permits Congress to delegate authority to an agency to provide exceptions to a statute. This case is much simpler because the delegation provides no such authority.

Section 965(o) limits Treasury's authority to prescribing regulations "as may be necessary or appropriate to carry out the provisions of [section 965]" and lists certain issues that should be addressed "to prevent the avoidance of the purposes" of section 965. The delegation does not purport to provide Treasury with authority to delineate exceptions to section 965, much less any other statute. The delegation does not reference section 960 or direct Treasury to coordinate section 965 with existing foreign tax credit rules in the Code. On its face, the grant of authority on which the government relies for the Disallowance Rule "gives [the] agency no

room at all to maneuver" and undo the result that another statute plainly allows. *See Pickens*, 133 F.4th at 588.

**D.** **In the Aftermath of *Loper Bright*, Courts Have Repeatedly Rejected Agency Rules Contrary to a Statute, Even Where the Agency Purports to Have Acted Within a Delegation**

Lacking authority for the Disallowance Rule in the delegation in section 965(o), the government's position contravenes a fundamental principle: an express grant of authority is not *carte blanche* for an agency to rewrite the law. That is, an agency cannot override a statute under the auspices of an express delegation of authority. *See Ohio Telecom Ass'n v. FCC*, 124 F.4th 993, 1012 (6th Cir. 2025) ("[D]elegation is not unfettered … And we see nothing in the statute that permits the FCC to effectively change the statute's original meaning …"). This Court recently confirmed as much in *Bricker*. *See* 135 F.4th 427. There, the Sentencing Commission (the "Commission") issued a policy statement defining when a nonretroactive change in the law can qualify as an "extraordinary and compelling" reason justifying a sentence reduction under a compassionate-release statute. *See id.* at 430. Even though this Court acknowledged that the Commission has "significant discretion," it explained that "even with an express delegation of authority, the Commission does not have limitless power to define 'extraordinary and compelling' to mean what it plainly does not allow …" *Id.* at 439, 443. The Court concluded that the Commission's policy statement conflicted with several

11

statutes, and that "the Commission cannot interpret a statute in a way that contradicts or negates other statutes." *Id.* at 442. As the Court explained, an agency cannot "ignore other statutes." *Id.* at 443. Allowing an agency to do so would pose serious risks to the separation of powers by "empower[ing] the [agency] to exercise the legislative powers vested in Congress, and allow the [agency] to override existing law." *Id.*

The Tax Court unanimously reached a similar conclusion in *Varian Medical Systems, Inc. & Subs. v. Commissioner*, 163 T.C. 76 (2024). In *Varian*, the Tax Court evaluated Treasury's authority to issue regulations addressing the operation of an existing Code provision (section 78) in light of a new statute enacted by the Tax Cuts and Jobs Act (section 245A). Treasury had issued a regulation that "purport[ed] to modify the effective date provision" for amendments to section 78. *Id.* at 107. Treasury asserted that the regulation was authorized under section 245A(g), which directs Treasury to "prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of [section 245A]." The Tax Court concluded that a regulation that "impermissibly attempts to change an unambiguous provision" of section 78 necessarily "falls outside the boundaries of any authority that Congress may have delegated" to Treasury in section 245A. *Id.* (citations omitted). In the case of the Disallowance Rule, Treasury's attempt to rewrite the plain terms of section 960 necessarily "falls outside the boundaries of

any authority that Congress may have delegated" to prevent the avoidance of the purposes of section 965.

Sister circuits have also invalidated regulations that contradict a statute, notwithstanding an express delegation of rulemaking authority. For example, in *Insurance Marketing Coalition Ltd. v. FCC*, 127 F.4th 303, 317-18 (11th Cir. 2025), the Eleventh Circuit Court of Appeals concluded that the agency "overstepped statutory boundaries" when it issued a rule imposing restrictions that conflicted with the ordinary meaning of the relevant statutory text. The agency defended the rule based on a delegation in the statute authorizing it to "prescribe regulations to implement" the statute. *See id.* at 311. The court explained that "[t]o implement means to complete, perform, carry into effect … It does not mean to alter." *Id.* at 312 (cleaned up) (citation omitted). As the court explained, "a generic grant of rulemaking authority to fill gaps does not allow the [agency] to alter the specific choices Congress made." *Id.* (cleaned up) (citation omitted). Similarly here, the delegation in section 965(o) did not provide Treasury with authority to "alter the specific choices Congress made" in section 960. By issuing the Disallowance Rule, Treasury treated the Code as "an open book," "changing the plot line" in purported furtherance of statutory purpose. *See id.* at 317-18; *see also 3M Co. v. Commissioner*, 154 F.4th 574, 582 (8th Cir. 2025) (declining to defer to a regulation despite the IRS's contention that the statute "delegat[es] discretionary

authority" because the court determined a "better reading" of the statute than the regulation at issue); *JM Assets, LP v. Commissioner*, No. 2531-24, 2025 U.S. Tax Ct. LEXIS 1629, at *17-18 (T.C. 2025) (finding that as applied in the case, "there is a direct conflict between the statute and the regulation" and "the regulation must give way to the statute" because "even where Congress expressly delegates broad rulemaking authority, that authority does not extend to contradicting statutory text") (citing *Varian*, 163 T.C. at 107).

## II. The Disallowance Rule Does Not "Prevent the Avoidance of the Purposes of" Section 965

As discussed above, the government has asserted that "this Court need not decide" whether "the District Court's interpretation" of section 960 is correct, because the delegation of rulemaking authority in section 965(o) authorizes Treasury to issue any regulation that "prevent[s] the avoidance of the purposes of" section 965. Def. Br. at 2, 47. Even accepting the government's remarkable claim, the Disallowance Rule does not "prevent the avoidance of the purposes of" section 965. The government's description of the "purposes of" section 965 radically departs from the statutory purpose reflected in the terms of section 965, the legislative history for the Tax Cuts and Jobs Act, and fundamental principles of the U.S. foreign tax credit system.

**A.      Congress Enacted Section 965 to Account for Historic Undistributed Foreign Earnings Before Transitioning to a New International Tax System**

Section 965 represented a critical component in the "transition[] to a new participation exemption system," which Congress adopted "to enhance both the global competitiveness of U.S. businesses and to encourage investment in the United States." H.R. Rep. No. 115-409, at 375 (2017); *Moore*, 602 U.S. at 580 ("As part of the complicated transition to a more territorial system, the 2017 Act imposed a one-time, backward-looking tax on that accumulated income."). Specifically, the transition tax imposed "U.S. residual tax" on undistributed foreign earnings accrued between 1987 and 2017. The mechanism Congress chose to impose the transition tax was to require certain U.S. shareholders to deem those undistributed earnings to have been included in the gross income of U.S. shareholders under a longstanding statutory scheme known as subpart F. I.R.C. § 965(a), §§ 951-964. Going forward, actual distributions of those earnings (including Offset Earnings) would be subject to the longstanding subpart F rules intended to ensure that previously taxed earnings are not taxed a second time. The section 245A participation exemption provided a 100 percent dividends received deduction for other specified foreign earnings distributed after 2017. Together, these reforms were intended to eliminate the "lock-out effect" under prior law, in which U.S. businesses refrained from reinvesting foreign earnings in the United

States in order "to avoid the U.S. residual tax on those earnings." S. Prt. 115-20, at 358 (2017).

**B.      Congress Added the Delegation in Section 965(o)(2) to Prevent Taxpayers from Artificially Reducing Historic Earnings Measured by Section 965**

When the Tax Cuts and Jobs Act was introduced in the House of Representatives, the proposed delegation of rulemaking authority in section 965 was limited to authorizing Treasury to "prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of this section." H.R. 1, 115th Cong., § 4004, at 355 (2017). The Senate amended the proposed delegation, adding the operative language that authorizes regulations "to prevent the avoidance of the purposes of this section, including through a reduction in earnings and profits through changes in entity classification, changes in accounting methods, or otherwise." S. Amdt. 1681, 163 Cong. Rec. S7457 (2017).[3]

A complete and accurate accounting of "undistributed foreign earnings" accumulated between January 1, 1987 and December 31, 2017 was essential to fulfill the statutory purposes of section 965 before the United States "transition[ed] to a new participation exemption system" that allows a 100 percent deduction for dividends received by U.S. shareholders after December 31, 2017. H.R. Rep. No.

---

[3] The Conference Committee later supplemented the general delegation with authority in section 965(o)(1) to issue regulations providing "appropriate basis adjustments." H.R. Rep. No. 115-466, at 158, 619 (2017) (Conf. Rep.).

115-409, at 375 (2017). To that end, the delegation in section 965(o)(2) identifies the "reduction of earnings and profits" as an issue to be addressed through regulations, without identifying any other specific avoidance concerns. The legislative history confirms that Congress was focused on combatting "tax strategies" that would artificially reduce the undistributed foreign earnings subject to inclusion under section 965:

> The conferees are also aware that certain taxpayers may have engaged in tax strategies designed to reduce the amount of post-1986 earnings and profits in order to decrease the amount of the inclusion required under this provision. Such tax strategies may include a change in entity classification, accounting method, and taxable year, or intragroup transactions such as distributions or liquidations. The conferees expect the Secretary to prescribe rules to adjust the amount of post-1986 earnings and profits in such cases in order to prevent the avoidance of the purposes of this section.

H.R. Rep. No. 115-466, at 619 (2017) (Conf. Rep.); *see also* S. Prt. 115-20, at 369 (2017) ("A specific grant of regulatory authority … specifies that the Secretary shall prescribe rules or guidance in order to deter tax avoidance through use of entity classification elections and accounting method changes, among other possible strategies."). Neither the text of the delegation, nor the legislative history, provides any indication that Congress viewed the "purposes of" section 965 as extending beyond the measurement of section 965 items such as undistributed foreign earnings and into the alteration of longstanding foreign tax credit rules in

separate sections of the Code, including the foreign tax credit rules that applied to distributions of previously taxed earnings.

### C. The Government Misconstrues the Purposes of Section 965

1. Congress Designed Section 965 to Promote the Ability of Taxpayers to Credit Foreign Taxes While Transitioning to a New International Tax System

The government contends that the Disallowance Rule falls "within the regulatory authority granted to Treasury under section 965(o)," because "limiting otherwise allowable FTCs to only the amount needed to mitigate double taxation is the very purpose of section 965(g)[.]" Def. Br. at 47. Further, the government asserts that the Court need not evaluate any statutory purpose beyond the narrow rule of section 965(g), because section 965(g) "is the only provision of section 965 that directly addresses FTCs." *Id.* at 42. The Government's myopic fixation with section 965(g) distorts the proper interpretation of the "purposes of" section 965. Even with respect to the specific topic of foreign tax credits, critical aspects of section 965 were designed to ensure that foreign taxes imposed between 1987 and 2017 would be deemed paid and able to be credited by U.S. shareholders, reflecting policy choices made by Congress in the transition to a new international tax system.

2.     The Government's Position on the Purposes of Section 965 Cannot Be Reconciled with Congress's Decision to Provide the Election in Section 965(n)

Congress recognized that section 965, combined with the new international tax system, might make it difficult for certain taxpayers to credit foreign taxes imposed under the prior system. When the Tax Cuts and Jobs Act was introduced in the House of Representatives, the proposed legislation would have addressed this problem by permitting taxpayers to carry forward foreign taxes deemed paid as a result of section 965 for a period of 20 years, rather than the 10-year period afforded by existing law. *See* H.R. 1, § 4004 (2017); H.R. Rep. No. 115-466, at 611 (2017).[4] In lieu of the approach proposed in the House of Representatives, the Senate bill allowed taxpayers to elect to refrain from applying net operating losses to offset the income included under section 965. Congress adopted the Senate's approach and enacted section 965(n) to reduce the risk that the transition to a new international tax system would deprive U.S. taxpayers of their last, best chance to credit foreign taxes imposed between 1987 and 2017.

Specifically, without the section 965(n) election, a net operating loss may have eliminated a taxpayer's liability under section 965. If the net operating loss

---

[4] In addition, the House Ways and Means Committee Report observed that "the existing net operating loss (NOL), overall domestic loss (ODL), and foreign tax credit carry-forward rules may interact with income inclusions arising from section 965 in ways that may not be appropriate and that require additional consideration." H.R. Rep. No. 115-409, at 382.

offset the foreign source income included under section 965(a), then foreign taxes deemed paid as a result of section 965 could not have been credited in 2017. Those "unused foreign taxes" would instead be carried forward into tax years governed by the new international tax system, with the risk that such taxes would expire. With the section 965(n) election, a taxpayer was instead permitted to credit foreign taxes deemed paid under section 965 against the taxpayer's liability under section 965, while saving their net operating losses for application in a future period. *See* KUNTZ, PERONI & BOGDANSKI: U.S. INTERNATIONAL TAXATION, ¶ B3.04A Deemed Repatriation Tax on Deferred Income (Section 965) (Dec. 2025) (section 965(n) election "allow[s] foreign tax credits to offset the tax triggered by Section 965, with the passed up net operating loss deduction being carried to offset income in other years[.]"); J. COMM. TAX'N, GENERAL EXPLANATION OF PUBLIC LAW 115-97, JCS-1-18, at 363 (Dec. 2018) ("Depending on a taxpayer's circumstances, a possible effect of this election may be that the taxpayer offsets its U.S. tax in the transition tax year with a foreign tax credit that, had net operating losses reduced taxable income below the amount of the inclusion, would have been carried forward to future tax years to which the participation exemption regime applies."). The election provided by section 965(n) demonstrates that Congress intended to ensure taxpayers were able to credit foreign taxes imposed under the prior tax

system, even in a circumstance in which an attribute (a net operating loss) was available to offset the income inclusion under section 965.

3. The Government's Position on the Purposes of Section 965 Cannot Be Reconciled with Treasury's "Hovering Deficit" Regulations Issued Under Section 965(o)

The legislative history to section 965 includes further evidence that Congress intended to ensure that taxpayers could credit foreign taxes imposed between 1987 and 2017 in the transition to the new international tax system. In the discussion of section 965(o) in the Conference Report, Congress directed Treasury to issue regulations ensuring that foreign taxes related to "hovering deficits" were included in the pool of foreign taxes eligible to be deemed paid. H.R. Rep. No. 115-466, at 619.[5] Exercising its authority under section 965(o), Treasury issued regulations implementing that Congressional directive. *See* T.D. 9846, 84 Fed. Reg. 1838 (Feb. 5, 2019); Treas. Reg. § 1.965-6(d) (the "Hovering Deficit" regulations). As explained below, the government's assertions on the purposes of section 965 cannot be reconciled with the Hovering Deficit regulations.

---

[5] Although the terminology is similar, the rules governing "hovering deficits" are different from the Offset Earnings rules in section 965(b), which address earnings of one foreign corporation that are offset by an allocation of foreign E&P deficits from a separate foreign corporation (an E&P deficit foreign corporation).

When a corporation with an earnings deficit liquidates or reorganizes into another corporation with accumulated earnings, the deficit carries over to the surviving entity. *See generally* I.R.C. § 381. However, that deficit "hovers" and is only available to offset the surviving corporation's earnings that accrue *after* the transaction. *See* Treas. Reg. § 1.367(b)-7(d)(2). Under existing regulations at the time of the Tax Cuts and Jobs Act, any earnings of a foreign corporation that accrued in 2017 could not have been offset by a hovering deficit until 2018. The Hovering Deficit regulations correct the timing mismatch and allow for the hovering deficit to offset 2017 earnings, for purposes of computing net earnings subject to section 965. The Hovering Deficit regulations further provide that the foreign taxes related to that hovering deficit are added to the foreign tax pool of the foreign surviving corporation and available to be credited by U.S. shareholders.

Section 965 does not impose any tax on a hovering deficit or the earnings offset by that hovering deficit. Nevertheless, the Hovering Deficit regulations provide that foreign taxes associated with a hovering deficit are included in the foreign tax pool of a deferred foreign income corporation, causing additional foreign income taxes to be available to be credited as a result of the inclusion of earnings under section 965. Any credit for those foreign taxes could only offset U.S. tax on unrelated foreign source income. Under the government's mistaken construction of the foreign tax credit, when a specific item of income is "subject to

zero U.S. tax, the amount of FTCs necessary to prevent double taxation … is zero." Def. Br. at 43. Yet, in the Hovering Deficit regulations, Treasury exercised the delegation in section 965(o) to provide that foreign taxes are eligible to be credited in precisely that circumstance. The government has advanced a novel theory on the purposes of section 965 that cannot be squared with the direction provided by Congress to permit these foreign taxes to be credited against U.S. taxes on unrelated income – an instruction that Treasury implemented in final regulations.

4. Section 965 Did Not Modify the Longstanding Rules Providing that Foreign Taxes May Be Credited Against Unrelated Foreign Source Income

The government asserts that "the District Court's erroneous interpretation results in double *nontaxation* of Offset Earnings by requiring the Treasury to reimburse (in the form of FTCs) the foreign taxes paid on earnings that are already exempt from U.S. taxes." Def. Br. at 3. Congress has enacted complex and precise rules, articulating the legal standard for when a credit for foreign taxes is provided to relieve double taxation of foreign source income. That system does not apply, and has never applied, on an item-by-item basis, as posited in the government's brief. For decades, Congress has provided rules that allow foreign taxes imposed on one item of income to be credited against U.S. taxes on unrelated items of foreign source income, and section 965 did not modify this system.

In particular, under section 904, if foreign taxes paid (or deemed paid) with respect to an item of income exceed the amount necessary to mitigate double taxation for that item, the excess foreign taxes may be credited against U.S. taxes on unrelated foreign source income within the same separate limitation category. I.R.C. § 904(d). The number and breadth of the separate limitation categories have oscillated over time as Congress balanced competing policy objectives in different ways, but for decades, Congress has expressly permitted "cross-crediting" of foreign taxes within specified categories.[6] Section 904(d)(2)(H) even allows taxpayers to credit foreign taxes imposed "on an amount which does not constitute income under United States tax principles." The government's position that foreign taxes imposed on an item of income should not be creditable except as required to alleviate double taxation with respect to that item flies in the face of section 904(d)(2)(H) and numerous other facets of the foreign tax credit system designed by Congress. As another example, if foreign taxes paid or accrued exceed the

---

[6] *See, e.g.*, J. COMM. TAX'N, JCS-10-87, GENERAL EXPLANATION OF THE TAX REFORM ACT OF 1986, at 867 (1987) ("[I]t is frequently appropriate to allow cross-crediting of taxes paid by one unit of a worldwide business against income earned by another unit of that business."); U.S. DEP'T OF TREASURY, GENERAL EXPLANATION OF THE ADMINISTRATION'S FISCAL YEAR 2022 REVENUE PROPOSALS, at 4 (May 2021), https://home.treasury.gov/policy-issues/tax-policy/revenue-proposals (describing existing law as providing that "foreign income taxes paid to a high-tax foreign jurisdiction can be used to reduce the U.S. tax liability with respect to … income earned in lower-tax jurisdictions"). The government briefly acknowledges this principle in a footnote. Def. Br. at 9-10, n.4.

credit limitation in section 904(a) for a given year, the unused foreign taxes may be carried back 1 year and forward 10 years, to be credited against U.S. taxes on unrelated foreign source income earned in different years. I.R.C. § 904(c). In each of these situations, the Code allows foreign taxes imposed on an item of income to be credited against U.S. taxes on unrelated foreign source income, notwithstanding that incremental foreign tax credit is not necessary to alleviate double taxation with respect to the item of income on which the foreign taxes were imposed.

### D. The Government's Misleading Description of Offset Earnings as "Exempt" Conceals the Risk That a Distribution of Offset Earnings May Result in Double Taxation

Finally, the government asserts that Offset Earnings are "exempted" from U.S. tax. *See* Def. Br. at 1, 16, 19, 20, and 21. To be sure, the distribution of Offset Earnings to a domestic shareholder is excluded from gross income of the domestic shareholder, because such amounts are treated as previously taxed for the purpose of applying section 959. However, under section 961(b)(1), if a domestic shareholder receives earnings excluded from gross income under section 959(a), the domestic shareholder must reduce its adjusted basis in the stock with respect to which the earnings were distributed. If the amount distributed exceeds the adjusted basis of the domestic shareholder in the stock, section 961(b)(2) treats the excess as taxable gain from the sale or exchange of property.

25

Ordinarily, a downward adjustment to stock basis under section 961(b) would not result in gain, because the domestic shareholder would have received previously an upward adjustment to basis under section 961(a). Specifically, under section 961(a), a U.S. shareholder would increase its basis in stock of a controlled foreign corporation by the amount the shareholder was required to include in gross income under section 951(a). The upward basis adjustment ensures that the U.S. shareholder is not taxed a second time on the foreign earnings it has already included in gross income, if the shareholder sells the stock of the controlled foreign corporation before the previously taxed earnings are distributed. Here, however, section 965(b)(4)(A) only provides that Offset Earnings are treated as previously included in gross income of the U.S. shareholder for the purpose of section 959, and the U.S. shareholder never receives an upward adjustment to basis under section 961(a). This asymmetry creates the genuine risk that a distribution of Offset Earnings results in additional U.S. tax.

Treasury acknowledged that this asymmetry may cause a distribution of Offset Earnings to trigger U.S. tax and potentially discourage repatriation of Offset Earnings in contravention of the purposes of section 965. Specifically, Treasury issued regulations allowing a one-time basis adjustment election, which reduces but does not eliminate the risk that a distribution of Offset Earnings results in U.S. tax. *See* Treas. Reg. § 1.965-2(f); T.D. 9846, 84 Fed. Reg. 1838, 1847 (Feb. 5,

26

2019). Encouraging repatriation of foreign earnings was the touchstone of section 965 and the new international tax system enacted in the Tax Cuts and Jobs Act. Any inquiry into whether the Disallowance Rule furthers the "purposes of" section 965 ought to be viewed in light of that manifest purpose.

## III.    Conclusion

For the foregoing reasons, the NFTC urges the Court to affirm the District Court's well-reasoned rulings.

Respectfully submitted,

/s/_*Rocco Femia*_____
Rocco Femia
Lisandra Ortiz
Jeffrey Tebbs
Miller & Chevalier Chartered
900 16th Street NW
Washington, DC 20006
Tel: (202) 626-5800

*Counsel for National Foreign Trade Council, Inc.*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, as calculated by Microsoft Word, it contains 6,372 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(b). I also certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) and Circuit Rule 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Times New Roman font.

Dated: March 30, 2026          Respectfully submitted,

/s/ *Rocco Femia*_____
Rocco Femia
Miller & Chevalier Chartered
900 16th Street NW
Washington, DC 20006
Tel: (202) 626-5800

*Counsel for National Foreign Trade Council, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 30, 2026, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 30, 2026

Respectfully submitted,

/s/_Rocco Femia_____
Rocco Femia
Miller & Chevalier Chartered
900 16th Street NW
Washington, DC 20006
Tel: (202) 626-5800

*Counsel for National Foreign Trade Council, Inc.*