No. 25-5694

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FEDEX CORPORATION, AND SUBSIDIARIES,
Plaintiff – Appellee,

v.

UNITED STATES OF AMERICA,
Defendant – Appellant.

_____

On Appeal from the United States District Court for the
Western District of Tennessee, Case No. 2:20-cv-02794
Hon. Samuel H. Mays, Jr., United States Senior District Judge

## BRIEF OF *AMICUS CURIAE* BY
## SILICON VALLEY TAX DIRECTORS GROUP IN SUPPORT OF
## APPELLEE FEDEX CORPORATION AND AFFIRMANCE

Roderick K. Donnelly
MORGAN, LEWIS & BOCKIUS LLP
1400 Page Mill Road
Palo Alto, CA 94304
Telephone No. (650) 843-4000
Facsimile No. (650) 843-4001

Thomas M. Peterson
Scott J. Lee
MORGAN, LEWIS & BOCKIUS LLP
600 Montgomery Street, Suite 2300
San Francisco, CA 94111
Telephone No. (415) 442-1000
Facsimile No. (415) 442-1001

Counsel for Amicus Party
SILICON VALLEY TAX DIRECTORS GROUP

**DISCLOSURE OF CORPORATE AFFILIATIONS
AND FINANCIAL INTEREST**

In accordance with Sixth Circuit Rule 26.1, Amicus Curiae Silicon

Valley Tax Directors Group makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?
    If Yes, list below the identity of the parent corporation or affiliate and
    the relationship between it and the named party:

    No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has
    a financial interest in the outcome?  If yes, list the identity of such
    corporation and the nature of the financial interest:

    No.

                                          By:  *s/ Roderick K. Donnelly*
                                                   Roderick K. Donnelly
                                                   Counsel for Silicon Valley Tax
                                                   Directors Group

**TABLE OF CONTENTS**

Page

INTERESTS OF AMICUS CURIAE................................................................1

ARGUMENT ...........................................................................................4

I. TREASURY'S DISALLOWANCE RULE EXCEEDS THE AUTHORITY THAT CONGRESS DELEGATED TO TREASURY UNDER § 965(O)..........................................................4

    A. The best reading of § 965(b)(4)(A) is that it is restricted only to § 959...................................................................4

    B. In promulgating the disallowance rule, Treasury did not engage in reasoned decisionmaking within the boundaries of authority delegated in § 965(o)............................7

    C. The disallowance rule exceeds the authority delegated to Treasury under § 965(o)...........................................12

II. THE GOVERNMENT CAN'T IMPOSE ITS VIEW OF "HARMONY" ON A FOREIGN TAX CREDIT SYSTEM THAT CONGRESS HAS MADE DYNAMIC ................................18

    A. Congress routinely restructures the foreign tax credit around broader policy goals.......................................19

    B. The Code doesn't disallow credits for foreign taxes paid on foreign earnings offset by losses.........................22

III. CONCLUSION .............................................................................24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Chrysler Corp. v. Commissioner*,
436 F.3d 644 (6th Cir. 2006) ...................................................................5

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971)...................................................................................8

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992)...................................................................................4

*District of Columbia v. John R. Thompson Co.*,
346 U.S. 100 (1953) .................................................................................18

*Fisher Flouring Mills Co. v. United States*,
270 F.2d 27 (9th Cir. 1959) (en banc) ....................................................10

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
530 U.S. 1 (2000) .......................................................................................5

*Hubbard v. Commissioner*,
132 F.4th 437 (6th Cir. 2025) ..................................................................18

*Lamie v. U.S.*,
540 U.S. 526 (2003)...................................................................................4

*Lewyt Corp. v. Commissioner*,
349 U.S. 237 (1955)..................................................................................10

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)......................................................................... *passim*

*Moore v. United States*,
602 U.S. 572 (2024)......................................................................... *passim*

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).....................................................................................8

*National Federation of Independent Business, et al. v. Sibelius*,
567 U.S. 519 (2012)...................................................................................5

*Russello v. United States*,
464 U.S. 16 (1983) ...................................................................................7

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ...............................................................................8, 13

*Sidell v. Commissioner*,
225 F.3d 103 (1st Cir. 2000) ....................................................................19

*Utility Air Regulatory Group v. EPA*,
573 U.S. 302 (2014) ..................................................................................9

*Whirlpool Fin. Corp. v. Commissioner*,
19 F.4th 944 (6th Cir. 2021) ....................................................................19

**Statutes**

5 U.S.C. § 706(2)(A) ...................................................................................7

26 U.S.C. § 904(d)(1)(A) ...........................................................................21

26 U.S.C. § 904(d)(1)(C) ...........................................................................21

26 U.S.C. § 951A(f) ........................................................................ 6, 7, 21

26 U.S.C. § 951(a) ................................................................... *passim*

26 U.S.C. § 959 ...................................................................... *passim*

26 U.S.C. § 960 ...................................................................... *passim*

26 U.S.C. § 960(a)(1) ............................................................. 10, 11, 12

26 U.S.C. § 960(a)(3) ............................................................. 11, 12, 17

26 U.S.C. § 965 ...................................................................... *passim*

26 U.S.C. § 965(b)(4)(A) ....................................................... *passim*

26 U.S.C. § 965(b)(4)(B) ...........................................................................6

26 U.S.C. § 965(g) ................................................................. 13, 16, 17

26 U.S.C. § 965(o) ................................................................. *passim*

iv

**Treasury Regulations**

26 CFR § 1.902-1(f), Example 4(ii) ............................................................22

26 CFR § 1.965-5(c)(1) ..........................................................................8

26 CFR § 1.965-5(c)(1)(ii)........................................................................2

TD 9846, 84 Fed. Reg. 1838, 84 Fed. Reg. 14260, 84 Fed. Reg. 14261 ....................................................................... *passim*

**Other Authorities**

*Administrative Procedure Act*, 5 U.S.C. §§ 551–559 and 701– 709 ........................................................................ *passim*

*American Jobs Creation Act of 2004*, Pub. L. 108-357, 118 Stat. 1418 (2004).........................................................................20

A. Scalia and B. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (§ 10) ...................................................................17

Joint Committee on Taxation, General Explanation of Tax Legislation Enacted in the 108th Congress (JCS-5-05) .............................20

Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976 (JCS-33-76) ............................................................23

Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1986 (JCS-10-87) ...............................................................19

H.R. Rep. No. 115-466 (2017)................................................................ 15, 16

*Tax Cuts and Jobs Act*, Pub. L. 115-97, 131 Stat. 2054 (2017) .............. *passim*

*Tax Reform Act of 1986*, Pub. L. 99-514, 100 Stat. 2085 (1986).....................19

## INTERESTS OF AMICUS CURIAE[1]

Amicus Silicon Valley Tax Directors Group ("*SVTDG*") has more than 120 member corporations whose aggregate market capitalization exceeds $20 trillion, and whose businesses comprise a significant portion of the U.S. economy

SVTDG members are predominantly U.S. multinational corporations that sell products and services in all major world markets. Pub. L. 115-97, commonly called the *Tax Cuts and Jobs Act* ("**TCJA**"), in 2017 overhauled the way the Internal Revenue Code (26 U.S.C., the "*Code*") taxes the global business operations of U.S. multinational corporations. *Moore v. United States*, 602 U.S. 572, 579 (2024). The *TCJA* leveled the tax playing field so that U.S. multinationals could better compete internationally. Many SVTDG member acted in furtherance of the "primary goal" of the *TCJA*, which "was to encourage Americans who control[] foreign corporations to invest earnings from their foreign investments back in the United States instead of abroad." *Id*. One piece of the "intricate and multi-faceted" *TCJA* was § 965 of the Code, which imposed a one-time, backward-looking tax on the accumulated

---

[1]  No party's counsel authored this brief in whole or part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than the *amicus curiae* and its counsel contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

income held by foreign subsidiaries of U.S. multinational corporations. *Moore*, 602 U.S. at 579–580.  Many SVTDG members paid more U.S. corporate income tax as a result of § 965.

Amicus SVTDG agrees with the District Court's Order that the "***disallowance rule***" (26 CFR 1.965-5(c)(1)(ii)) is invalid.  The SVTDG has a substantial, ongoing interest in the lawful promulgation of effective Treasury regulations.  Treasury and the IRS (hereinafter "***Treasury***") responded to the challenge raised by *TCJA's* enactment by promulgating many regulations— other than the disallowance rule—that faithfully hew to, and complement, the *TCJA* statutes.  The SVTDG takes very seriously the right and civic duty to provide input to Treasury as part of notice-and-comment rulemaking.  Its members have spent significant time and money preparing and submitting comments on proposed regulations and participating in public hearings on regulations.  The SVTDG submitted comments—rejected by Treasury—on the disallowance rule when it was proposed, explaining why the rule should not be promulgated.  The government's appeal of the District Court's decision shows a lack of understanding of § 965 and the requirements agency regulations must meet under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

FedEx Corporation and Subsidiaries ("*FedEx*") has given the Court ample reasons to affirm the District Court's decision.  Amicus SVTDG hereby adds to them by: [I] explaining why the disallowance rule exceeds the authority Congress delegated to Treasury under § 965(o) (because (1) the best reading of § 965(b)(4)(A), governing the "Offset Earnings" at issue in the disallowance rule, is unambiguous and contrary to the disallowance rule; (2) the government didn't—in promulgating the disallowance rule—engage in reasoned decisionmaking under the *Administrative Procedure Act* by asserting, as "a technical matter," an interpretation of § 965(b)(4)(A) at odds with the plain meaning of the statute, and as "a policy matter," a justification for the disallowance rule that's contrary to the intent of Congress as expressed the unambiguous language of the statute; and (3) in its Opening Brief the government asserted a purpose of § 965 regarding foreign tax credits ("*FTCs*") that wasn't asserted when the rule was promulgated, and has no bearing on Offset Earnings or on § 965(b)(4)); and [II] explaining why Congress's repeated changes to the Code's FTC provisions, driven by differing policy goals over the years, undercut the government's assertion that a "symmetrical" and "harmonious" regulatory scheme supports the disallowance rule.

**ARGUMENT**

## I. TREASURY'S DISALLOWANCE RULE EXCEEDS THE AUTHORITY THAT CONGRESS DELEGATED TO TREASURY UNDER § 965(O)

As this Court appreciates, its role is "to independently interpret the statute [here, §§ 965(b)(4)(A) and 965(o)] and effectuate the will of Congress subject to constitutional limits." *Loper Bright,* 603 U.S. at 395. This Court fulfills its role by recognizing constitutional delegations of Congressional authority, fixing the boundaries of the delegated authority, and ensuring that Treasury and the IRS (hereafter, "***Treasury***") engage in "reasoned decisionmaking" within those boundaries. *Id*. (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).

Subparagraph 965(b)(4)(A) unambiguously restricts its treatment "[f]or purposes of applying section 959." Its plain language shows that. The *TCJA* shows that the 115th Congress used language very precisely when restricting application of specified tax treatment.

### A. The best reading of § 965(b)(4)(A) is that it is restricted only to § 959

"[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). *See also Lamie v. U.S.,* 540 U.S. 526, 534 (2003) ("The starting point in discerning congressional intent is the

4

existing statutory text."); *National Federation of Independent Business, et al. v. Sibelius*, 567 U.S. 519, 544 (2012) ("[T]he best evidence of Congress' intent is the statutory text.").  It is "the sole function of the courts—at least where the disposition required by the text is not absurd—'. . . to enforce [plain statutory text] according to its terms.'" *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).

Subparagraph 965(b)(4)(A) states:

> (A) REDUCED EARNINGS AND PROFITS TREATED AS PREVIOUSLY TAXED INCOME WHEN DISTRIBUTED.—<u>For purposes of applying section 959</u> in any taxable year beginning with the taxable year described in [§ 965(a)], with respect to any United States shareholder of a deferred foreign income corporation, an amount equal to such shareholder's reduction under [§ 965(b)(1)] which is allocated to such deferred foreign income corporation under this subsection shall be treated as an amount which was included in the gross income of such United States shareholder under [§ 951(a)]. [Emphasis added]

The statutory evidence is that Congress did exactly what it intended in restricting the application of § 965(b)(4)(A) to § 959 <u>only</u>.  The language of § 965(b)(4)(A) is evidence of this intention.  *Chrysler Corp. v. Commissioner*, 436 F.3d 644, 654 (6th Cir. 2006) ("legislative intent should be divined first and foremost from the plain language of the statute").

5

The sister provision to § 965(b)(4)(A) gives further evidence.

Subparagraph 965(b)(4)(B) (*E&P Deficits*) opens with the clause "[f]or

purposes of this title"—i.e., for purposes of the Internal Revenue Code.

These back-to-back provisions show that Congress knew how to write

language broadening the scope of a § 965 provision.  But more can be said.

As part of the same *TCJA* legislative exercise, Congress wrote § 951A

(*Global Intangible Income Included in Gross Income of United States*

*Shareholders*), creating a new deemed income inclusion ("***GILTI***") for U.S.

shareholders of foreign corporations.  Subsection 951A(f) (*Treatment as*

*Subpart F Income for Certain Purposes*) has two subparagraphs in paragraph

(1):

> (A) APPLICATION—Except as provided in subparagraph (B),
> any global intangible low-taxed income included in gross
> income under [§ 951A(a)] <u>shall be treated</u> in the same manner
> as an amount included under section 951(a)(1)(A) <u>for</u>
> <u>purposes of applying sections</u> 168(h)(2)(B), 535(b)(10),
> 851(b), 904(h)(1), <u>959</u>, 961, 962, 993(a)(1)(E), 996(f)(1),
> 1248(b)(1), 1248(d)(1), 6501(e)(1)(C), 6654(d)(2)(D), and
> 6655(e)(4).
>
> (B) EXCEPTION—<u>The Secretary shall provide rules for the</u>
> <u>application of subparagraph (A) to other provisions of this</u>
> <u>title</u> in any case in which the determination of subpart F
> income is required to be made at the level of the controlled
> foreign corporation.  [Emphases added]

The 115th (*TCJA*) Congress wasn't shy about specifying when part of the Act

applies to more than one Code provision, including Code provisions other

than § 959 (the <u>only</u> section mentioned in § 965(b)(4)(A)). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).

Paragraph 951A(f)(1), above, also shows that Congress knew how to authorize Treasury to write regulations to extend application <u>beyond</u> listed Code sections: it explicitly gave Treasury that authority. This undercuts any suggestion that, in § 965(b)(4)(A), this same Congress tacitly approved of Treasury expanding the scope of treatment beyond listed § 959.

    **B.**    **In promulgating the disallowance rule, Treasury did not engage in reasoned decisionmaking within the boundaries of authority delegated in § 965(o)**

This Court fulfills its role under the *Administrative Procedure Act* ("**APA**"), 5 U.S.C. §§ 551–559 and 701–709, "by recognizing constitutional delegations, fixing the boundaries of the delegated authority, . . . and ensuring the agency has engaged in <u>reasoned decisionmaking</u> within those boundaries." *Loper Bright*, 603 U.S. at 395 (internal quotation marks and citations omitted, emphasis added). Judges must "ensure that agencies exercise their discretion consistent with the [*APA*]." *Loper Bright*, 603 U.S. at 404. 5 U.S.C. § 706(2)(A), directs reviewing courts to "hold unlawful and

7

set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." An agency rule is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard takes a "searching and careful" look at an agency's reasoning and explanation for a rule. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). The agency must "articulate a satisfactory explanation for its action," that is, the agency "must cogently explain why it has exercised its discretion in a given manner." *State Farm*, 463 U.S. at 43, 48–49. "[A] reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency" at the time the rule was promulgated. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Treasury promulgated the disallowance rule (§ 1.965-5(c)(1)) in 2019 in Treasury Decision (TD) 9846 (84 Fed. Reg. 1838 (Feb. 5, 2019); corrected 84 Fed. Reg. 14260 (April 10, 2019); corrected 84 Fed. Reg. 14261 (April 10, 2019)). The preamble in TD 9846 asserts two rationales for the disallowance

8

rule, and discusses taxpayer comments asserting that the rule shouldn't be included in the final regulations. Treasury didn't budge. It promulgated the disallowance rule for two reasons: "[a] technical analysis of the relevant sections of the Code and the underlying policy." 84 Fed. Reg. at 1858 (emphasis added). Treasury's explanations show a lack of reasoned decisionmaking:

> The section 965(a) earnings amount offset by an aggregate foreign E&P deficit is excluded from U.S. taxable income and thereby effectively exempted from U.S. tax under section 965(b)(4)(A) and proposed §1.965-1(b)(2) or proposed §1.965-8(b). As a policy matter, this exclusion eliminates the need for a foreign tax credit. The purpose of the foreign tax credit is to mitigate double taxation by allowing foreign income taxes to reduce the U.S. tax that would otherwise be imposed on foreign source income. Allowing foreign income taxes imposed on income that is not subject to U.S. tax by reason of section 965(b) to be credited against U.S. tax on unrelated income would confer a windfall double benefit for taxpayers with [Offset Earnings].

84 Fed. Reg. at 1857 (emphases added). Nowhere in § 965(b)(4)(A) does the statute say that the specified treatment of Offset Earnings applies for purposes of any provision other than § 959; and nowhere in TD 9846 does Treasury say that § 965(b)(4)(A) is ambiguous. Yet Treasury, based on policy considerations, expanded the scope of § 965(b)(4)(A) beyond the section's application just to § 959. "An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Utility*

*Air Regulatory Group v. EPA*, 573 U.S. 302, 325 (2014). In promulgating the disallowance rule, TD 9846 also failed to observe or consider that the "primary goal" of the *TCJA* "was to encourage Americans who controlled foreign corporations to invest earnings from their foreign investments back in the United States instead of abroad." *Moore v. United States*, 602 U.S. at 579. Permitting foreign tax credits for a foreign corporation's distribution of Offset Earnings to its U.S. parent meets this goal. And a tax benefit clearly authorized in a statute won't be denied just because it creates an "unexpected windfall" for particular taxpayers. *Lewyt Corp. v. Commissioner*, 349 U.S. 237, 240 (1955); *Fisher Flouring Mills Co. v. United States*, 270 F.2d 27, 30 (9th Cir. 1959) (en banc). In asserting its policy reason supporting the disallowance rule, Treasury ignored these considerations. This was a lack of reasoned decisionmaking.

The TD 9846 preamble further states:

> As a technical matter, section 965(b)(4)(A) treats section 965(a) earnings amounts offset by an aggregate foreign E&P deficit as previously included in income under section 951(a) "for purposes of applying section 959." Accordingly, [Offset Earnings] are treated as previously taxed E&P resulting from a section 951(a) inclusion, despite never actually having been included in U.S. taxable income. Under section 960(a)(1), a domestic corporate shareholder that includes an amount in income under section 951(a) is deemed to have paid a ratable portion of the foreign corporation's foreign income taxes at the time of the income inclusion. Amounts treated as previously taxed E&P resulting from an income inclusion

under section 951(a) <u>should similarly be treated</u> as having resulted in foreign taxes deemed paid under section 960(a)(1).

84 Fed. Reg. at 1857 (emphases added). If "[a]s a technical matter" § 965(b)(4)(A)'s treatment of Offset Earnings holds "[f]or purposes of applying section 959," it doesn't follow that such treatment holds "[f]or purposes of applying sections 959 and 960." Commenters rightly identified the gap between language in statute and that in the proposed disallowance rule. Treasury responded:

> Comments argue that the plain language of section 965(b)(4)(A) means that section 965(a) earnings amounts offset by an aggregate foreign E&P deficit are treated as income previously included under section 951(a) <u>solely for purposes of applying section 959, and not for purposes of applying section 960(a)</u>. However, the application of section 959 is a precondition to the application of section 960(a)(3). <u>The Treasury Department and the IRS have determined that section 960(a)(3) cannot be applied independently of section 959 and that the Act did not change the relationship between these sections</u>. Indeed, the comments recognize the interaction between sections 959 and 960(a)(3) by recommending that a credit be allowed under section 960(a)(3) upon a distribution of section 965(b) previously taxed earnings and profits, which requires treating such amounts as previously taxed E&P for purposes of section 960(a)(3) as well as for purposes of section 959.

*Id*. (emphases added). Treasury missed the point. A foreign corporation's distribution of its Offset Earnings that is excluded from its domestic parent corporation's income under § 959 <u>entitles</u> the parent corporation to credit foreign taxes associated with the Offset Earnings, <u>unless</u> the foreign taxes

11

"were . . . deemed paid by the domestic corporation under [§ 960(a)(1)] for any prior taxable year." § 960(a)(3). To stifle crediting of such foreign taxes—as the disallowance rule does—the government argues that, somehow, § 960(a)(1) applies to deem the foreign taxes as paid by the domestic corporation. If successful, this argument would prevent crediting of the foreign taxes under § 960(a)(3). But § 965(b)(4)(A) only says that its treatment applies "[f]or purposes of applying section 959"—it doesn't say "[f]or purposes of applying section 959 or section 960(a)(1)." Treasury's justification for expanding the scope of the disallowance rule isn't reasoned decisionmaking.

### C. The disallowance rule exceeds the authority delegated to Treasury under § 965(o)

Subsection 965(o) provides—

> (o) REGULATIONS.—The Secretary shall prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of this section, including—
> * * *
> > (2) regulations or other guidance to prevent the avoidance of the purposes of this section . . . .

The government argues that its disallowance rule is valid under *Loper Bright* because it prevents avoidance of the purposes of § 965 "and is therefore within the boundaries of the discretionary authority that Congress granted to Treasury in [§ 965(o)]." Appellant's Opening Br. 2. The government

12

explains that Treasury promulgated the disallowance rule to "prevent the avoidance of section 965's purposes regarding FTCs—specifically, [§ 965(g)'s] purpose of allowing FTCs only to the extent necessary to mitigate double taxation." *Id*. 32. The government's assertion that the disallowance rule is necessary to preserve § 965(g)'s purpose of allowing FTCs only to the extent necessary to mitigate double taxation has two fatal flaws.

First, the government didn't make this argument when it promulgated the disallowance rule in 2019. Nowhere in its discussion of the disallowance rule in TD 9846 does Treasury mention § 965(g). 84 Fed. Reg. at 1857–1858. The government thus "did [not] exercise [its] discretion consistent with the [*APA*]," *Loper Bright*, 603 U.S. at 404, because *APA* reasoned decisionmaking is judged solely on the grounds invoked by the agency when it promulgates a rule. *Chenery Corp.*, 332 U.S. at 196. Explanations offered for the first time in court are irrelevant when an agency is trying to show it satisfied *APA* requirements.

Second, the argument in the Opening Brief has no merit. Subsection 965(g) has no bearing on Offset Earnings or on § 965(b)(4)(A). This is easiest seen using the simple example discussed by the District Court and shown below. USP is a U.S. corporation that owns all the stock of only two

controlled foreign corporations ("*CFCs*"), CFC1 and CFC2.  At the relevant

§ 965 measurement time, shown on the left, CFC1 has earnings and profits

("*E&P*") of $100, and CFC2 has an E&P deficit of $30 (shown as ($30)).

Section 965 applies to income that was accumulated in the past by CFC1 and

CFC2, but not taxed in the United States.  *Moore*, 602 U.S. at 597 n.6.

Congress chose not to tax USP on the $100 of CFC1's E&P, but rather on the

$100 as reduced by CFC2's $30 E&P deficit.  Paragraph 965(b)(1) has this

effect—reducing CFC1's $100 by CFC2's $30 deficit—and § 965(a), which

is "integrated into the subpart F framework," *Moore*, 602 U.S. at 596, then

piggybacks off subpart F by increasing CFC1's "subpart F income" by $70.

This $70 of CFC1 subpart F income is then, under § 951(a), included in

USP's income.  The remaining $30 of CFC1 E&P are the Offset Earnings.

This is shown on the right.  No transaction takes place, or is deemed to take

place, between CFC1 and CFC2—CFC2's $30 deficit remains and was used

to "tag" $30 of CFC1's $100 as Offset Earnings, so that USP's income

inclusion was only $70, not the full $100.



Section 965 imposed a tax rate of between 8–15½ percent on $70 of USP deemed income. *Moore*, 602 U.S. at 580. This was lower than the tax rate otherwise imposed on USP's other income. To ensure the appropriate tax rate is applied to USP's $70 deemed income inclusion, USP is allowed to deduct an amount from its $70 inclusion: "the total deduction from the amount of the section 951 inclusion is the amount necessary to result in a 15.5-percent rate of tax on accumulated post-1986 foreign earnings held in the form of cash or cash equivalents, and 8-percent rate of tax on all other earnings." H.R. Rep. No. 115-466, at 491 (2017). In tax and accounting parlance, the amount of the deduction is a "plug" used to ensure that the post-deduction amount remaining from the $70 is taxed at the appropriate amount in the range 8–15½ percent.

So much for the U.S. federal income tax rate imposed on USP's $70 deemed income inclusion. What about USP's foreign tax credits, which can

lower the total tax paid?  Subsection 965(g) (*Disallowance of foreign tax credit, etc.*) provides in paragraph (1):

> (1) IN GENERAL.—No credit shall be allowed under section 901 for the applicable percentage of any taxes paid or accrued (or treated as paid or accrued) with respect to any amount for which a deduction is allowed under this section.

Congress explained this.  "A portion of foreign income tax that is deemed paid or accrued <u>with respect to the section 951 inclusion</u> is not creditable . . . against the Federal income tax attributable to the inclusion."  *Id*. at 487 (emphasis added).  Subsection 965(g) thus denies USP a portion of the foreign taxes deemed paid or accrued only with respect to its $70 deemed inclusion.  Subsection 965(g) says <u>nothing</u> about creditability of foreign taxes attributable to CFC1's $30 of Offset Earnings.  CFC1's $70 is, under §§ 965 and 951(a)(1), included in USP's income.  CFC1's $30 of Offset Earnings isn't included.  To be sure, § 965(b)(4)(A) prescribes that CFC1's $30 of Offset Earnings is—for purposes of applying § 959—<u>treated</u> as an amount included in USP's gross income under § 951(a).  But this doesn't create a $30 inclusion in USP's income.  It merely tags (for purposes of applying § 959 to a distribution from CFC1) the $30 Offset Earnings <u>as if</u> they had been included in USP's income under § 951(a) (because of that tagging, § 959 provides that a distribution by CFC1 of its Offset Earnings shall not "be again

included in the gross income of" USP).  The § 965(g) reduction in USP's creditable foreign taxes applies only to foreign taxes attributable to USP's $70 deemed inclusion; it has <u>no effect</u> on foreign taxes attributable to CFC1's $30 of Offset Earnings, which may be distributed to USP at any time.

Subsection 965(g)'s purpose may have been, as the government now asserts, to "allow[] FTCs only to the extent necessary to mitigate double taxation."  Appellant's Opening Br. 32.   But § 965(g) applies only to foreign taxes attributable to a United States shareholder's inclusion under §§ 965 and 951(a)(1) (in our example, to USP's $70 inclusion from CFC1).  That assumed purpose <u>cannot</u> be extended to foreign taxes attributable to amounts <u>not included</u> in the shareholder's income (in our example, CFC1's $30 of Offset Earnings).  Section 965 is silent on creditability of such foreign taxes. This silence means, under the negative-implication (*expressio unius*) canon, that Congress was deliberate about <u>not prohibiting</u> FTCs to be claimed on Offset Earnings.  A. Scalia and B. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (§ 10).  Nothing, however, turns off § 960(a)(3) from applying and allowing USP to credit any foreign taxes associated with the $30 of Offset Earnings distributed by CFC1.  The government's inference—from its asserted purpose for § 965(g)—that such purpose is relevant to a situation untouched by § 965(g) displays a lack of reasoned decisionmaking.

17

**II. THE GOVERNMENT CAN'T IMPOSE ITS VIEW OF "HARMONY" ON A FOREIGN TAX CREDIT SYSTEM THAT CONGRESS HAS MADE DYNAMIC**

The government's second argument rests on the premise that the foreign tax credit forms a "symmetrical and coherent regulatory scheme" that must be preserved as part of "an harmonious whole." Appellant's Opening Br. 62. That premise is mistaken because the foreign tax credit system has had a dynamic architecture, reflecting congressional compromises over the years.

Since the system's creation in 1918, Congress has repeatedly revised the foreign tax credit rules—exercising its authority to "revise, alter, and revoke" prior laws, *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 106 (1953)—to address evolving policy concerns. Over the past century, those revisions have reflected shifting and often competing policy objectives, resulting in a regime defined by legislative compromises rather than a single, organizing principle.

That reality forecloses the government's invitation to impose "harmony" on the statute. The Court's task is to apply it as written. "At day's end . . . we will set these policy arguments to the side. We best effectuate Congress's nuanced policy judgments by applying the tax code as

written." *Hubbard v. Commissioner*, 132 F.4th 437, 446 (6th Cir. 2025) (internal quotation marks omitted).

### A. Congress routinely restructures the foreign tax credit around broader policy goals

This Court need not resort to legislative history to resolve this case. But to the extent context is relevant here, it confirms that Congress has repeatedly adjusted the foreign tax credit system in service of broader policy goals.

Congress dramatically modified the international tax system in 1962 when it enacted Subpart F to address the inappropriate use of foreign subsidiaries to indefinitely defer U.S. taxation. *Whirlpool Fin. Corp. v. Commissioner*, 19 F.4th 944, 951–52 (6th Cir. 2021). Because Subpart F caused certain foreign earnings to be taxed immediately, Congress simultaneously revised the foreign tax credit rules to accommodate those inclusions and prevent double taxation.

Congress again reworked the foreign tax credit framework in the *Tax Reform Act of 1986*, Pub. L. 99-514, 100 Stat. 2085 (1986), a comprehensive restructuring of the tax system that "sought to eliminate a host of tax shelters that savvy taxpayers had concocted over time." *Sidell v. Commissioner*, 225 F.3d 103, 108 (1st Cir. 2000). Congress created nine separate "baskets" of foreign income to prevent taxpayers from using high taxes paid on one

foreign income stream to wipe out U.S. tax on unrelated income earned in low-tax jurisdictions.  Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1986 (JCS-10-87), May 1987, p. 862.  These baskets have remained crucial features of the foreign tax credit system and are the primary mechanism that prevents taxpayers from inappropriately "cross-crediting" foreign taxes.

Congress reversed course in part less than twenty years later.  The *American Jobs Creation Act of 2004*, Pub. L. 108-357, 118 Stat. 1418 (2004), reduced those categories from nine to two in order to "reduce double taxation, make U.S. businesses more competitive, and create jobs in the United States."  Joint Committee on Taxation, General Explanation of Tax Legislation Enacted in the 108th Congress (JCS–5–05), May 2005, p. 273.  That policy choice relaxed prior limits on cross-crediting and produced clear distributional effects, benefiting some taxpayers while disadvantaging others.

Congress most recently reshaped the foreign tax credit regime in the 2017 *TCJA*, which fundamentally altered the taxation of multinational corporations' foreign earnings by moving away from a worldwide system toward a territorial approach.  As part of this "intricate and multi-faceted" legislation, Congress "imposed a one-time, backward-looking tax" (the transition tax) on previously untaxed foreign earnings.  *Moore*, 602 U.S. at

20

580. Congress also enacted new international tax provisions to address future foreign income including, among others, the GILTI regime in § 951A, which immediately taxes certain foreign earnings even if not repatriated.

Implementing those changes required Congress again to restructure the foreign tax credit system around these new provisions. Congress introduced two new categories of income (GILTI and foreign branch income) and corresponding "baskets" to govern how foreign taxes associated with those income streams could be credited. §§ 904(d)(1)(A) & (C).

This legislative history reveals a consistent pattern: Congress uses the foreign tax credit as a tool to advance broader policy objectives, not as a fixed or internally coherent system that must be preserved at all costs. In the *TCJA*, Congress extensively redesigned the foreign tax credit rules to function within a new international tax system. That pattern, as noted above in § I.A., confirms the proper textualist reading of § 965(b)(4)(A): Congress intended to permit foreign tax credits on Offset Earnings as part of the incentive structure accompanying the transition tax regime.

Such revisions produce asymmetric effects as Congress balances competing policy priorities. But that is not a flaw in the Code; it is a feature of how Congress legislates in this area. If the interaction of the foreign tax credit provisions produces results the government considers imperfect, the

remedy lies with Congress and not in administrative efforts to rewrite the statute under the guise of preserving the system as an "integrated whole."

**B.    The Code doesn't disallow credits for foreign taxes paid on foreign earnings offset by losses**

The government's position fails to recognize that the Code permits foreign tax credits for taxes paid on foreign earnings even if those earnings are offset by losses elsewhere.

First, a Treasury regulation under former § 902 reflects this principle. In 26 CFR 1.902-1(f), Example 4(ii), a foreign corporation has both positive earnings and losses, such that its net earnings are negative in a given year. In that circumstance, the U.S. shareholder isn't permitted to claim a foreign tax credit in that year. But the regulation doesn't reduce or eliminate those taxes. Instead, those taxes are preserved and later credited when sufficient earnings arise. In other words, the existence of losses does not require a permanent reduction, or "haircut," to the foreign taxes eligible for credit.

Second, a similar result obtains if a CFC operates through several disregarded entities—i.e., entities that are treated as part of the CFC for tax purposes. One entity may earn income and pay foreign taxes while another incurs losses. Those losses may reduce the CFC's overall income for U.S. tax purposes. But the foreign taxes paid on the profitable entity are not reduced or disallowed because of losses in the other entity. Instead, those taxes

remain fully creditable, even though the losses have reduced the amount of income subject to U.S. tax.

Third, the history of the foreign tax credit limitation, another central feature of the system, illustrates that Congress permitted taxpayers to mitigate double taxation through the foreign tax credit system for decades.  Congress introduced the limitation in 1921 to ensure that foreign taxes offset only U.S. tax imposed on foreign income, Congress then repeatedly reworked the mechanics of the limitation, permitting its application on a "per-country" basis (i.e., calculating the credit separately for each country) for forty years until its repeal in 1976 in favor of an "overall" limitation (i.e., aggregating all foreign income and taxes).  Under the per-country approach, a taxpayer with losses in one country could reduce its U.S. tax in one year without reducing foreign tax credits associated with income in other countries.  If, in a later year, the taxpayer earned a profit in what was previously a loss country, the taxpayer could then claim foreign tax credits on those earnings in a later year without "recapturing" the benefit from the earlier loss.  The Joint Committee on Taxation later explained, "[t]he use of the per-country limitation often permitted a U.S. taxpayer who had losses in a foreign country to obtain what was, in effect, a double tax benefit."  Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976 (JCS–33–76), Dec. 1976, p. 236.

Congress waited over 40 years before it changed the Code in 1976 to address the ongoing potential double tax benefit just described.  The government's concerns here—arising from the interaction of the foreign tax credit rules with the one-time tax imposed under § 965—are thus far from unprecedented.  And, as before, it is for Congress to decide whether any further statutory changes are warranted, not for Treasury to promulgate regulations contrary to the Code.

## III.  CONCLUSION

For the reasons explained in §§ I. and II., we respectfully ask this Court to affirm the District Court decision.

Dated:  March 30, 2026

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By:  *s/ Roderick K. Donnelly*
Roderick K. Donnelly
Counsel for Silicon Valley Tax
Directors Group

# CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,279 words.

This motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

By:  *s/ Roderick K. Donnelly*
Roderick K. Donnelly
Counsel for Silicon Valley Tax
Directors Group

**CERTIFICATE OF SERVICE**

I hereby certify that on March 30, 2026, a copy of the foregoing was filed electronically through this Court's CM/ECF system, which sent a notice of electronic filing to counsel of record.

By: *s/ Roderick K. Donnelly*
Roderick K. Donnelly
Counsel for Silicon Valley Tax
Directors Group