SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111

———

TEL: (202) 371-7000

FAX: (202) 393-5760

www.skadden.com

DIRECT DIAL
202-371-7370
EMAIL ADDRESS
SHAY.DVORETZKY@SKADDEN.COM

FIRM/AFFILIATE OFFICES
————
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WILMINGTON
————
ABU DHABI
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SINGAPORE
TOKYO
TORONTO

May 21, 2026

Kelly L. Stephens
Clerk of Court
U.S. Court of Appeals for the Sixth Circuit
Potter Stewart U.S. Courthouse
100 E. Fifth Street
Cincinnati, Ohio 45202

> RE:   *FedEx Corp. and Subsidiaries v. United States*, No. 25-5694: Federal Rule of Appellate Procedure 28(j) letter regarding *Montgomery v. Caribe Transport II, LLC*, No. 24-1238, 2026 WL 1336188 (U.S. May 14, 2026) (slip opinion (Op.) attached)

Dear Ms. Stephens:

*Montgomery* confirms that the government's position flouts ordinary textualist principles that the district court correctly applied.

*Montgomery* held that the safety exception to the Federal Aviation Administration Authorization Act's preemption clause saved from preemption a claim that a broker negligently hired a motor carrier. Op. 4-6. Arguing otherwise, the United States and the broker contended that the safety exception shouldn't be interpreted to cover brokers. Op. 7. Other statutory preemption language applied to brokers' *intrastate* rates, routes, or services, they explained, so it "would create an anomaly" to allow the safety exception to apply to brokers' "*interstate* rates, routes, and services." *Id.*

The Court acknowledged that "[i]t is not obvious why Congress included" an interstate but not an intrastate safety exception. *Id.* "But it would be even odder" to depart from the statute's plain language—"[t]he text of [the interstate safety exception] controls. Better to live with the mystery than to rewrite the statute." *Id.*

Just so here. The government claims congressional purpose allows FTCs only when they can perfectly mitigate double taxation, and it can promulgate regulations disallowing FTCs whenever that purpose isn't met. *See* FedEx Br. 7-8, 36-37, 43-60. The reply doubles down, leading with asserted purpose and arguing that "[a]llowing FTCs for Offset Earnings Foreign Taxes would avoid that purpose because Offset Earnings are U.S.-tax-free, so there is no double taxation to mitigate." Reply 2.

That view of purpose is overbroad and incorrect, FedEx Br. 51-52—but regardless, as the district court and FedEx have explained (Br. 38-43), statutory text entitles FedEx to FTCs. Ultimately, the government caves, acknowledging "the unassailable principle that 'agencies cannot rewrite statutes.'" Reply 12. Indeed, even if the government finds Congress's *reason* for allowing FTCs mysterious, it can't "rewrite the statute." Op. 7.

When the government finally confronts statutory text, its interpretation fails. The government claims (Reply 20) § 965(b)(4)(A) requires treating foreign taxes associated with offset earnings as "deemed paid." That's wrong: § 965(b)(4)(A) applies "[f]or purposes of applying section 959," not § 960, and the § 960's remaining text makes clear that FedEx is entitled to FTCs. FedEx Br. 58-60.

Respectfully submitted,

*/s/ Shay Dvoretzky*

Shay Dvoretzky

*Counsel for Plaintiff-Appellee-
FedEx Corp. and Subsidiaries*

## CERTIFICATE OF COMPLIANCE

I hereby certify that (1) this letter complies with the type-volume limitation of Federal Rule of Appellate Procedure 28(j) because, as calculated by Microsoft Word, its body contains 350 words, and (2) this letter complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: May 21, 2026                    */s/ Shay Dvoretzky*

                                       Shay Dvoretzky

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2026, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: May 21, 2026                    */s/ Shay Dvoretzky*

                                       Shay Dvoretzky

# ADDENDUM

*Montgomery v. Caribe Transport II, LLC*, No. 24-1238, 2026 WL 1336188 (U.S. May 14, 2026) (slip op.)

(Slip Opinion)                OCTOBER TERM, 2025                              1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MONTGOMERY *v.* CARIBE TRANSPORT II, LLC, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 24–1238.   Argued March 4, 2026—Decided May 14, 2026

Petitioner Shawn Montgomery sustained severe and permanent injuries after his tractor trailer was struck by a truck driven by respondent Yosniel Varela-Mojena. Varela-Mojena was driving a load of plastic pots through Illinois for respondent Caribe Transport II, LLC, a motor carrier. Respondent C.H. Robinson Worldwide, Inc.—a transportation broker—had coordinated the shipment. Montgomery sued all respondents in Federal District Court and alleged, among other things, that C.H. Robinson was liable for his injuries because it negligently hired Varela-Mojena and Caribe Transport. Montgomery claimed that C.H. Robinson knew (or should have known) from Caribe Transport's safety rating that hiring it to transport goods was reasonably likely to result in crashes that would injure others. The District Court held that the Federal Aviation Administration Authorization Act (FAAAA)—which preempts state laws related to the prices, routes, and services of the trucking industry, 49 U. S. C. §14501(c)(1)—expressly preempted Montgomery's negligent-hiring claim against C.H. Robinson. The District Court further held that the claim did not fall within the FAAAA's safety exception, which provides that the FAAAA's preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." §14501(c)(2)(A). The Seventh Circuit affirmed. The Court granted certiorari to resolve whether the FAAAA's safety exception permits negligent-hiring claims against brokers like C.H. Robinson that coordinate shipments in the transportation industry.

*Held*: A claim that one company negligently hired another to transport goods is not preempted by the FAAAA because States retain authority

Syllabus

to regulate safety "with respect to motor vehicles" under the Act. Pp. 4–8.

(a) Even if the FAAAA otherwise preempts Montgomery's negligent-hiring claim against C.H. Robinson, the safety exception saves it. The relevant text provides that the FAAAA's preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." §14501(c)(2)(A). All agree that common-law duties and standards of care form part of a State's authority to regulate safety. Negligent-hiring claims impose a duty of reasonable care in employing a contractor for work carrying a risk of physical harm. The preemption question thus boils down to whether negligent-hiring claims of the type Montgomery presses are "with respect to motor vehicles." Because the FAAAA supplies no definition of "with respect to," the Court gives the phrase its ordinary meaning. Following dictionary definitions, the Court has construed the same phrase in the FAAAA's preemption provision to mean "concern[s]." *Dan's City Used Cars, Inc.* v. *Pelkey*, 569 U. S. 251, 261. The FAAAA defines "motor vehicle" as "a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation." §13102(16). Putting the pieces together, a claim is "with respect to motor vehicles" if it "concerns" the vehicles used in transportation. Here, requiring C.H. Robinson to exercise ordinary care in selecting a carrier "concerns" motor vehicles—most obviously, the trucks that will transport the goods. Montgomery's negligent-hiring claim thus falls within the FAAAA's safety exception, which saves it from preemption. Pp. 4–6.

(b) C.H. Robinson's counterarguments are unpersuasive. Construing the safety exception as Montgomery requests does not mean that it saves everything preempted by the FAAAA's express preemption provision. The safety exception saves only a subset of preempted claims: those involving regulations concerning motor vehicle safety. State laws related to motor carrier prices, routes, and services that have no relationship to safety remain preempted.

C.H. Robinson argues that Montgomery's interpretation of the safety exception creates surplusage. But surplusage exists however the disputed phrase "with respect to motor vehicles" is defined, because any overlap comes from the reference to a State's regulatory authority over "safety."

Finally, C.H. Robinson asserts that interpreting the safety exception to cover brokers would create an anomaly with subsection (b) of the FAAAA, which preempts state regulation of "intrastate" rates, routes, or services "of any freight forwarder or broker." §14501(b)(1). Unlike subsection (c), subsection (b) does not contain a safety exception. C.H. Robinson invokes this textual difference as a reason that subsection

Syllabus

(c)'s safety exception should be read to exclude brokers.  While it is not obvious why Congress included a safety exception in (c) but not in (b), it would be even odder to say that the alleged tort—the negligent hiring of an unsafe motor carrier whose truck caused injury—is *not* an exercise of "the safety regulatory authority of a State with respect to motor vehicles" under §14501(c)(2)(A).  The text of subsection (c)(2)(A) controls.  Pp. 6–7.

124 F. 4th 1053, reversed and remanded.

BARRETT, J., delivered the opinion for a unanimous Court. KAVANAUGH, J., filed a concurring opinion, in which ALITO, J., joined.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 24–1238

## SHAWN MONTGOMERY, PETITIONER *v.* CARIBE TRANSPORT II, LLC, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[May 14, 2026]

JUSTICE BARRETT delivered the opinion of the Court.

The Federal Aviation Administration Authorization Act preempts state laws related to the prices, routes, and services of the trucking industry. But there is an important exception: States retain authority to regulate safety "with respect to motor vehicles." This case presents the question whether a claim that one company negligently hired another to transport goods falls within that exception. It does.

### I

### A

Sellers often use motor carriers to transport products to their destination. But finding a carrier can be time consuming, so many sellers rely on brokers to do it for them. Think of it this way: Brokers are the transportation industry's matchmakers, connecting sellers of goods to the carriers who move them.

Today, roughly 28,000 brokers arrange transportation for about a third of all freight shipped in the United States by more than 780,000 carriers. Dept. of Transp., Federal Motor Carrier Safety Admin., 2024 Pocket Guide to Large Truck and Bus Statistics 9–10; Brief for Truck Safety

Opinion of the Court

Coalition et al. as *Amici Curiae* 7−8. Brokers net the difference between the price that a company will pay to move goods and the cost of hiring a carrier. *Id.*, at 7.

The Federal Government began regulating the trucking industry in 1935. P. Teske, S. Best, & M. Mintrom, Deregulating Freight Transportation: Delivering the Goods 60 (1995) (Teske). The Interstate Commerce Commission (ICC) initially regulated rates and services of motor carriers "'in the public interest.'" 49 Stat. 543. But the ICC's interventions "inhibit[ed] market entry [and] carrier growth," creating "some operating inefficiencies and some anticompetitive pricing." 94 Stat. 793. Its regulation also stifled brokers' development. J. Kinsler, Motor Freight Brokers: A Tale of Federal Regulatory Pandemonium, 14 Nw. J. Int'l L. & Bus. 289, 290 (1994). So Congress enacted the Motor Carrier Act of 1980 to deregulate aspects of the industry. *Ibid.* The Motor Carrier Act "ease[d] entry requirements, reduce[d] collective rate making, and encourage[d] greater flexibility in pricing." Teske 69.

Even so, state regulation of the industry continued to inhibit competition. 108 Stat. 1605 (state regulation "impeded the free flow of trade, traffic, and transportation of interstate commerce" and "placed an unreasonable cost" on consumers). In 1994, Congress addressed that problem by enacting the Federal Aviation Administration Authorization Act (FAAAA), which expressly preempts certain state regulations involving motor carriers. *Id.*, at 1605−1607. A year later, Congress amended the Act to preempt state regulations involving other players in the transportation industry, including brokers. 109 Stat. 899. Its preemption provision now prohibits States from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service" of any motor carrier or broker "with respect to the transportation of property." 49 U. S. C. §14501(c)(1).

Opinion of the Court

While the FAAAA's preemption provision is broad, it contains exceptions.  §§14501(c)(2)–(4).  One—which we will call the safety exception—provides that the preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles."  §14501(c)(2)(A).  Other exceptions leave room for States "to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo" and to impose minimum insurance requirements on carriers.  *Ibid*.  Congress designed the safety exception "to ensure that its preemption of States' economic authority over motor carriers of property [did] 'not restrict' the preexisting and traditional state police power over safety."  *Columbus* v. *Ours Garage & Wrecker Service, Inc.*, 536 U. S. 424, 439 (2002) (quoting §14501(c)(2)(A)).

B

While driving a load of plastic pots through Illinois in a Mack Truck, respondent Yosniel Varela-Mojena veered off course.  He struck petitioner Shawn Montgomery's tractor-trailer, which was stopped on the side of the road.  Montgomery's leg had to be amputated, and he sustained other severe and permanent injuries from the collision.  Varela-Mojena was driving for respondent Caribe Transport II, LLC—a motor carrier.  Respondent C.H. Robinson Worldwide, Inc.—a broker—had coordinated the shipment.

Montgomery sued Varela-Mojena, Caribe Transport, C.H. Robinson, and corporate entities associated with them.  Among other claims, he alleged that C.H. Robinson was liable for his injuries because it negligently hired Varela-Mojena and Caribe Transport.  Montgomery claimed that Caribe Transport had a "'conditional'" safety rating from the Federal Motor Carrier Safety Administration when C.H. Robinson hired it.  App. 21.  That agency had allegedly found Caribe Transport to be deficient "with respect to qualification of drivers," "hours of service of drivers,"

4        MONTGOMERY *v.* CARIBE TRANSPORT II, LLC

Opinion of the Court

"inspection, repair and maintenance," "recordable crash rate," and more. *Id*., at 20–21 (internal quotation marks omitted). Based on that safety rating, Montgomery claimed that C.H. Robinson knew (or should have known) that choosing Caribe Transport to transport goods was reasonably likely to result in crashes that would injure others.

Applying Seventh Circuit precedent, see *Ye* v. *Global-Tranz Enterprises, Inc.*, 74 F. 4th 453 (2023), the District Court held that the FAAAA expressly preempts Montgomery's negligent-hiring claim against C.H. Robinson and that the claim does not fall within the safety exception. No. 19–cv–1300, App. to Pet. for Cert. 11a–12a (SD Ill., Jan. 11, 2024). The Seventh Circuit affirmed. 124 F. 4th 1053, 1058 (2025).

The Circuits are divided as to whether the FAAAA's safety exception permits negligent-hiring claims against brokers.[1] We granted certiorari. 606 U. S. 1066 (2025).

II

Montgomery argues that even if the FAAAA otherwise preempts his negligent-hiring claim against C.H. Robinson, the safety exception saves it. We agree.[2]

Recall the relevant text: The preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." §14501(c)(2)(A). All agree that common-law duties and standards of care form part of a State's authority to regulate safety. Tr. of Oral Arg. 52, 61; Brief for United States as *Amicus Curiae* 20–22; see *Kurns* v. *Railroad Friction Products Corp.*, 565 U. S. 625, 637

---

[1] Compare *Ye* v. *Global-Tranz Enterprises, Inc.*, 74 F. 4th 453, 456 (CA7 2023), and *Aspen Am. Ins. Co.* v. *Landstar Ranger*, 65 F. 4th 1261, 1264 (CA11 2023), with *Cox* v. *Total Quality Logistics, Inc.*, 142 F. 4th 847, 853−858 (CA6 2025), and *Miller* v. *C.H. Robinson Worldwide, Inc.*, 976 F. 3d 1016, 1020 (CA9 2020).

[2] Because we hold that the safety exception applies, we assume without deciding that 49 U. S. C. §14501(c)(1) would otherwise preempt Montgomery's negligent-hiring claim.

Opinion of the Court

(2012) (state common-law duties and standards of care are "designed to be . . . a potent method of governing conduct and controlling policy" (internal quotation marks omitted)). Negligent-hiring claims impose a duty of reasonable care in employing a contractor for work carrying a risk of physical harm. See Restatement (Second) of Torts §411 (1964).

The preemption question thus boils down to whether negligent-hiring claims of the type Montgomery presses are claims "with respect to motor vehicles." §14501(c)(2)(A). We conclude that they are. The FAAAA supplies no definition of "with respect to," so we give the phrase its ordinary meaning. Dictionaries define it as "referring to," "concerning," or "regarding." Oxford American Dictionary and Language Guide 853 (1999); Webster's New Universal Unabridged Dictionary 1640 (1996). Following those definitions, we have construed the same phrase in the FAAAA's preemption provision to mean "concern[s]." *Dan's City Used Cars, Inc.* v. *Pelkey*, 569 U. S. 251, 261 (2013) (interpreting "with respect to the transportation of property").[3] And the FAAAA defines "motor vehicle" as "a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation." §13102(16). Putting the pieces together, a claim is "with respect to motor vehicles" if it "concerns" or "regards" the vehicles used in transportation.

Applying that interpretation here is straightforward. Montgomery alleges that C.H. Robinson failed to exercise reasonable care when it hired Caribe Transport, which had a subpar safety rating from federal regulators, to transport goods via truck. Based on that safety rating, Montgomery

---

[3] In *Dan's City*, we explained that the phrase "transportation of property" "'massively limits the scope of preemption'" in the FAAAA. 569 U. S., at 261 (quoting *Columbus* v. *Ours Garage & Wrecker Service, Inc.*, 536 U. S. 424, 449 (2002) (Scalia, J., dissenting)). We did not hold or otherwise suggest that the words "with respect to" greatly limit the scope of preemption generally. Contra, Brief for Respondents 27.

claims that C.H. Robinson knew (or should have known) that choosing Caribe Transport to move goods was reasonably likely to cause an accident. Requiring C.H. Robinson to exercise ordinary care in selecting a carrier therefore "concerns" motor vehicles—most obviously, the trucks that will transport the goods. So Montgomery's negligent-hiring claim falls within the FAAAA's safety exception, which saves it from preemption.

## III

C.H. Robinson, joined in part by the United States, raises various counterarguments. None succeed.

C.H. Robinson and the United States contend that construing the safety exception as Montgomery requests would swallow the FAAAA's express preemption provision whole. In other words, everything that Congress preempted would also qualify for the safety exception. Not so. Recall that the express preemption provision applies to laws and regulations "related to a price, route, or service of" motor carriers or brokers "with respect to the transportation of property." §14501(c)(1). The safety exception saves only a subset of preempted claims: those involving regulations concerning motor vehicle safety. §14501(c)(2)(A). One can imagine many state laws that are related to motor carrier prices, routes, and services—such as how much a carrier may charge or which highways it may traverse—that have no relationship to safety.

C.H. Robinson also argues that Montgomery's interpretation of the safety exception creates surplusage. In addition to preserving a State's regulatory authority with respect to motor vehicles, the FAAAA also preserves state authority to impose route controls based on the size or weight of the vehicle or the hazardous nature of the cargo. *Ibid.* If Montgomery's interpretation were adopted, the argument goes, these carveouts would be redundant because they also speak to safety. But the surplusage exists whether the

Opinion of the Court

disputed phrase "with respect to motor vehicles" is defined narrowly or broadly, because any overlap comes from the reference to a State's regulatory authority over "safety." In any event, the provisions can be harmonized: A State's choice to impose route controls or weight limits may serve ends other than safety, such as guarding against highway wear and tear.

Finally, C.H. Robinson and the United States assert that interpreting the safety exception to cover brokers would create an anomaly with subsection (b) of the FAAAA. That section preempts state regulation of "intrastate" rates, routes, or services "of any freight forwarder or broker." §14501(b)(1). Unlike subsection (c), subsection (b) does not contain a safety exception. Why, respondents ask, would Congress completely preempt state regulation of brokers for *intrastate* rates, routes, and services while only partially preempting state regulation of brokers for *interstate* rates, routes, and services?[4] To avoid this anomaly, they argue, we should interpret subsection (c)'s safety exception to exclude brokers. Then, States could not impose either interstate or intrastate safety regulations on them.

We'll grant respondents this: It is not obvious why Congress included a safety exception in (c) but not in (b). But it would be even odder to say that the alleged tort—the negligent hiring of an unsafe motor carrier whose truck caused injury—is *not* an exercise of "the safety regulatory authority of a State with respect to motor vehicles." §14501(c)(2)(A). The text of subsection (c)(2)(A) controls. Better to live with the mystery than to rewrite the statute.

_____

[4]At oral argument, Montgomery's counsel was asked about the source of Congress's authority to enact subsection (b), given that it purports to preempt state regulation of purely intrastate activities. Tr. of Oral Arg. 34–35. Because subsection (b) is not before us, we do not address that issue.

8        MONTGOMERY *v.* CARIBE TRANSPORT II, LLC

Opinion of the Court

\*     \*     \*

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

KAVANAUGH, J., concurring

# SUPREME COURT OF THE UNITED STATES

——————

No. 24–1238

——————

## SHAWN MONTGOMERY, PETITIONER *v.* CARIBE TRANSPORT II, LLC, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[May 14, 2026]

JUSTICE KAVANAUGH, with whom JUSTICE ALITO joins, concurring.

I join the Court's opinion. I agree that the FAA Authorization Act of 1994 does not preempt state tort suits against brokers who negligently arrange truck transportation with an unsafe carrier.

In my view, this case is closer than the Court's opinion perhaps might suggest. The Seventh and Eleventh Circuits came out the other way, and in doing so, those courts raised a number of powerful points. See *Ye* v. *GlobalTranz Enterprises, Inc.*, 74 F. 4th 453 (CA7 2023); *Aspen Am. Ins. Co.* v. *Landstar Ranger*, 65 F. 4th 1261 (CA11 2023). In the end, however, I agree with this Court's decision and will briefly explain why.

\*    \*    \*

Brokers are intermediaries between shippers and trucking companies. Shippers contract with brokers, and brokers then select motor carriers (that is, trucking companies) to transport the shippers' goods. The trucking companies own or lease the trucks and hire the drivers.

When truck accidents occur, an injured party will sometimes bring a state tort suit against a trucking company that, for example, maintained an unsafe truck or hired or employed an at-fault driver. All parties here agree

that those suits against trucking companies are not preempted and thus are permitted under the FAA Authorization Act. The question is whether state tort suits against the upstream brokers who select the trucking companies are also permitted.

Under the text of the Act, that question ultimately boils down to whether a state tort claim against a broker for negligently arranging unsafe truck transportation is a claim "with respect to motor vehicles." 49 U. S. C. §14501(c)(2)(A). If yes, state tort suits against brokers are permitted. If no, state tort suits are preempted.

The answer depends on how expansively to read the key statutory phrase "with respect to motor vehicles." That inquiry is complicated because the phrase "with respect to"—like similar statutory phrases such as "related to" or "relating to"—is a somewhat elastic phrase whose breadth is determined by context. See *United States* v. *Miller*, 604 U. S. 518, 532–533 (2025); *Dubin* v. *United States*, 599 U. S. 110, 118–119 (2023); *Lamar, Archer & Cofrin, LLP* v. *Appling*, 584 U. S. 709, 717 (2018); *California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S. 316, 335 (1997) (Scalia, J., concurring) ("But applying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else").

Here, the brokers do not own or lease the vehicles or hire the drivers. But they do select the trucking companies. Does the statutory phrase "with respect to motor vehicles" extend so broadly as to encompass the brokers' activities? To answer that question and draw the appropriate line, we must examine the relevant statutory context, including surrounding statutory provisions.

The contextual considerations here point in different directions. In favor of the brokers are two other provisions

of the Act: the mandatory-insurance provision and the intrastate preemption provision.

First, the Act mandates a minimum level of insurance coverage for trucking companies—but not for brokers.  49 U. S. C. §§13906(a)(1), (b)(2)(A).  That coverage ensures that trucking companies can pay when they are held liable for truck accidents.  The dichotomy between trucking companies and brokers suggests (at least to some extent) that Congress did not anticipate state tort suits against brokers for negligent selection.  Otherwise, Congress presumably would have mandated insurance coverage for brokers as well.

Second, all agree that the Act as amended does not permit state tort suits against brokers for arranging *intrastate* transportation.  But plaintiff here is arguing that the statute allows state tort suits against brokers for arranging *interstate* transportation.  As a matter of ordinary preemption doctrine, which is rooted in federalism principles, that seems exactly backwards:  Why would Congress permit state tort suits against brokers for arranging interstate trips but preempt state tort suits against brokers for arranging intrastate trips? Plaintiff has no good answer to that question.  So as plaintiff's counsel forthrightly acknowledged at oral argument, a ruling in plaintiff's favor would create a substantial anomaly.  Tr. of Oral Arg. 7–8, 25.

For their part, the brokers seize on that rather glaring hole in plaintiff's argument.  The brokers note that there would be no anomaly if, as they argue, all state tort suits against brokers for negligent selection were preempted. Good point.

So those two contextual considerations favor the brokers and point toward a narrower construction of "with respect to motor vehicles" such that state tort suits against brokers would be preempted.  But other contextual points decisively tilt in the opposite direction and point toward a broader

4        MONTGOMERY *v.* CARIBE TRANSPORT II, LLC

construction of "with respect to motor vehicles" such that state tort suits against brokers would be permitted.

Most important is the overall structure of the safety regime for the trucking industry. Enacted in 1994, the FAA Authorization Act pursued economic deregulation of the industry. But the Act largely left intact the extant system of safety regulation, including state tort suits. See 49 U. S. C. §14501(c)(2)(A). The Act did not preempt state tort suits against trucking companies for truck accidents. And the negligent-hiring tort against brokers, like the negligence tort against trucking companies, exists to keep unsafe trucks and unsafe drivers off America's highways. Given that Congress in the FAA Authorization Act sought economic deregulation—not safety deregulation—it is hard to read the statute as written and conclude that Congress subtly sliced and diced state tort law so that trucking companies would be subject to state tort suits for accidents, but brokers would operate free of any such tort liability.

The brokers' preemption argument also lies in some tension with the absence of meaningful safety-related regulation of brokers at the federal level. In particular, federal law does not require brokers to take substantial steps to ensure that they select safe trucking companies. Congress's "regulation of brokers instead seems to address the financial aspects of broker services, not safety." *Ye*, 74 F. 4th, at 463. And the relevant regulatory agency, the Federal Motor Carrier Safety Administration, requires brokers to select a federally registered carrier but does not otherwise "impos[e] safety standards on broker hiring." *Ibid.* See Tr. of Oral Arg. 74–75, 90; Brief for Institute for Safer Trucking as *Amicus Curiae* 14–17.

The lack of meaningful federal safety regulation of brokers' selection of carriers tends to support plaintiff's argument here because it is doubtful that Congress, through such indirect language in an economic-

KAVANAUGH, J., concurring

deregulation statute, would allow brokers to operate in a black hole with no meaningful safety-related regulation.

And that contextual point matters because, as Congress well understood, truck safety is a matter of life and death. In 2022 in the United States, about 500,000 reported truck accidents resulted in about 5,000 deaths and 114,000 injuries. U. S. Dept. of Transp., Fed. Motor Carrier Safety Admin., Large Truck and Bus Crash Facts 2022, p. 45 (2025). Not all truck accidents can be prevented. But some can. Some carriers are known to be less safe; some truck drivers are known to be unfit.

It is true, as the brokers emphasize, that trucking companies are in the best position to monitor their own trucks and drivers. By contrast, brokers may not always (or even often) be in a good position to objectively assess the relative safety of different trucking companies. See Brief for Transportation Intermediaries Association, Inc. as *Amicus Curiae* 20–28. That said, brokers may sometimes become aware that a particular carrier operates unsafe trucks or hires unfit drivers. And if brokers can be "held liable for disregarding poor safety records, they have a strong incentive to do business only with safe and reliable motor carriers." Brief for the State of Ohio, 28 Other States, and the District of Columbia as *Amici Curiae* 18.

Importantly, the Court's decision today should not be read to mean that brokers will routinely be subject to state tort liability in the wake of truck accidents. As even plaintiff's counsel stressed, brokers should be able to successfully defend against state tort suits if the brokers have acted reasonably and arranged transportation with reputable trucking companies. Tr. of Oral Arg. 27–29. In plaintiff's counsel's words, the brokers "just have to hire carriers that actually have a reasonable policy," and "the broker is not going to have a problem if it's asking the hard questions of the carrier." *Id*., at 42, 45. In addition, the proximate-cause requirement in typical state tort law

6        MONTGOMERY *v.* CARIBE TRANSPORT II, LLC

KAVANAUGH, J., concurring

should help protect brokers from excessive liability.  *Id*., at 25.

That said, the brokers rightly caution against naiveté.  In the real world, as the brokers forcefully respond, state tort law can be unpredictable, and the costs to brokers of litigation and insurance may be significant even when brokers prevail in lawsuits.  Moreover, the costs of litigation and insurance, as well as the costs of brokers' conducting more substantial inquiries into trucking companies, will cascade through the economy and be paid in part by American consumers in the form of higher prices.  See Brief for Chamber of Commerce et al. as *Amici Curiae* 25–34; Brief for National Association of Manufacturers as *Amicus Curiae* 15.  The concerns expressed by the brokers are legitimate and weighty.  But those countervailing points ultimately do not carry the day in determining how broadly to construe the vague "with respect to motor vehicles" language in this Act.

\*        \*        \*

As I see it, the conflicting contextual considerations make this a close case as we determine how to construe and where to draw the line on the statutory phrase "with respect to motor vehicles."  In the end, I do not believe that Congress, through such oblique language in an economic-deregulation statute, simultaneously (i) allowed state tort suits against negligent trucking companies and (ii) categorically preempted state tort suits against upstream brokers who negligently select an unsafe trucking company.  The brokers and their *amici* raise serious concerns about the repercussions of state tort liability against brokers, and they may of course (among other possibilities) ask Congress and the President to change federal law.  But as of now, federal law does not preempt state tort liability against brokers for negligent selection of trucking companies.

Cite as: 608 U. S. ____ (2026)                    7

KAVANAUGH, J., concurring

With those additional comments, I join the Court's opinion.